# EXHIBIT 1

```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF WASHINGTON

 3                            AT SEATTLE

 4   CASEY INVESTIGATORS LLC, a        )
     Washington Limited Liability      )
 5   Company, and MARIO A. TORRES,     )
     an individual,                    )
 6                                     )
                Plaintiffs,            )
 7                                     )
          vs.                          )     No. CV04-1453 C
 8                                     )
     PRONTO PROCESS SERVICE, INC.,     )
 9   a Washington corporation;         )
     NORTHWEST RAIL ENTERPRISES,       )
10   INC., a Washington corporation;   )
     MARK OWENS, an individual;        )
11   GREGORY and MARY LEE RUSTAND,     )
     individually and as a married     )
12   couple; DIANE PEFLEY, an          )
     individual; A to Z LEGAL          )
13   SUPPORT SERVICES, a Washington    )
     business entity; ROBERT G.        )
14   LACK, an individual; WASHINGTON   )
     STATE PROCESS SERVERS             )
15   ASSOCIATION, a Washington         )
     business association; and        )
16   NATIONAL ASSOCIATION OF           )
     PROFESSIONAL PROCESS SERVERS,     )
17   a national business association)
                                       )
18              Defendants.            )

19   _____

20
              DEPOSITION UPON ORAL EXAMINATION OF:
21                       MARIO A. TORRES

22   _____

23

24

25
```

```
 1   TIME:          10:00 a.m., Monday, February 14, 2005

 2   TAKEN AT:      Leavy, Schultz, Davis & Fearing
                    2415 West Falls Avenue
 3                  Kennewick, Washington

 4   CALLED BY:     Defendants

 5   BEFORE:        DEBORAH K. RICHMAN, CCR, RPR

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2    For the Plaintiffs:

 3          McGlothin Myhre
            BY:   THEODORE A. MYHRE
 4          1221 East Pike Street, Suite 205
            Seattle, Washington 98122
 5
      For Defendants Pronto Process Service, Owens and Lack:
 6
            Leavy, Schultz, Davis & Fearing
 7          BY:   GEORGE FEARING
            2415 West Falls Avenue
 8          Kennewick, Washington 99336

 9    For Defendants A to Z Legal Support Services, Rustand and
      Pefley:
10
            Davis Pearson
11          BY:   EDWARD S. WINSKILL
            P.O. Box 1657
12          Tacoma, Washington 98401

13    For Defendant Washington State Process Servers Association:

14          Littler Mendelson
            BY:   JAMES G. ZISSLER
15          701 Fifth Avenue, Suite 6500
            Seattle, Washington 98104-7097

16

17

18

19

20

21

22

23

24

25
```

```
 1         Attorney's Office when you were part-time, working 24
 2         hours a week?
 3   A.    What's that, sir?
 4   Q.    How much did you make with the Prosecuting Attorney's
 5         Office when you were working 24 hours a week?
 6   A.    I don't remember.
 7   Q.    Once you were hired by the Liquor Control Board, did
 8         you work full-time with the Liquor Control Board?
 9   A.    Yes, I did, sir.
10   Q.    When did you form your private investigation business?
11   A.    I believe it was December 2001.
12   Q.    Has that business always been known as Casey
13         Investigations?
14   A.    Yes, sir.
15   Q.    Has that business always been a limited liability
16         company?
17   A.    Yes.
18   Q.    Who prepared the papers to form the limited liability
19         company?
20   A.    My wife and I.  Both of us.
21   Q.    Did she do most of the work in preparing the papers?
22   A.    No, I think it was equal.  We both sat at the kitchen
23         table and kind of tried to figure out, you know, how to
24         do it.
25   Q.    Did you have the assistance of any attorney?
```

BY MR. FEARING

Case 2:04-cv-01453-JCC   Document 49-2   Filed 03/28/05   Page 6 of 17
RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 24

1  A.  I've always known them just as Clayton, but she might
2      be -- I think she's got a partner in there now.
3  Q.  Is her office on 20th Street, or just off of 20th
4      Street?
5  A.  It was. It was. It's moved. It's over by the Ryder
6      Company off of Lewis now, but, yeah, it used to be
7      right off of 20th, right by the eyeglass place.
8  Q.  How long has Karen Clayton been the accountant?
9  A.  A couple years, sir.
10 Q.  Do you consider her the accountant for both the limited
11     liability company and you and your wife personally?
12 A.  Yeah, she does everything.
13 Q.  "Everything" being what?
14 A.  I mean, she handles our taxes.
15 Q.  Does she prepare profit-and-loss statements?
16 A.  I don't believe so. I think my wife handles the
17     profit-and-loss statements.
18 Q.  Does Karen Clayton prepare balance sheets?
19 A.  I'm not sure, sir. I'm not sure.
20 Q.  Who are the owners of the limited liability company?
21 A.  Myself and my wife.
22 Q.  Have there ever been any other owners?
23 A.  No, sir.
24 Q.  What does your wife do for the business?
25 A.  She manages the business. She works at the office,

Page 25

1     inside the office.
2  Q.  Where's the office located?
3  A.  8428 West Gage Boulevard, Suite No. F, Kennewick 99336.
4  Q.  How long have you had that office?
5  A.  We've been there probably two years, now.
6  Q.  Did you have any other offices?
7  A.  Yeah, we had one downstairs at that same location,
8      suite no. D.  And when I very first went into business,
9      I had an office over at the Fowler building, I had
10     another office in there, 1776 Fowler Avenue in
11     Richland.
12 Q.  When did you open the Fowler building office?
13 A.  As soon as I got my license.
14 Q.  License to do what?
15 A.  To do my investigations, as soon as my company got
16     licensed.
17 Q.  And when did your company get the license?
18 A.  December 2001.
19 Q.  And what does that license allow you to do?
20 A.  I'm a private investigation agency, process messenger
21     service.
22 Q.  Does one need a license to be a private investigator?
23 A.  Yes, sir.
24 Q.  Does one need a license to be a process server?
25 A.  No.  You need to be registered as a process server.  I

BY MR. FEARING

Page 105

1  Q.  Do you know Mary Rustand?
2  A.  No, sir.
3  Q.  Greg Rustand?
4  A.  No, sir.
5  Q.  Have you ever spoken with them on the phone?
6  A.  No, sir.
7  Q.  Have you ever spoken to Diane Pefley on the phone?
8  A.  No, sir.
9  Q.  Have you ever spoken to any representative of A to Z on
10     the phone?
11 A.  No, sir.
12 Q.  Have you ever spoken to any representatives of Pronto
13     Process, other than Mark Owens?
14 A.  No, sir.
15 Q.  Do you believe that Robert Lack knew the statements
16     that you have identified as being false in Exhibit 2 to
17     be false?
18 A.  I don't know what he's thinking.  I don't know.  The
19     only thing I know is that he's Mark Owens' friend,
20     roommate.
21 Q.  Were you notified of Robert Lack's complaint before you
22     left employment with the Liquor Control Board?
23 A.  I was notified of a complaint.
24 Q.  Who notified you of a complaint?
25 A.  Kevin Starkey.  Senior Agent Kevin Starkey.

BY MR. FEARING

Page 106

1  Q.   When did he notify you?

2  A.   He notified me July 9th, or, no, it was July 10th.  All
3       he did was, he called me in the office and said, "Hey,
4       Torres, we've got a complaint came in on you," and he
5       started talking, "But," he says, "it involves your
6       business," and when he said that, I told him, I said,
7       you know, "I've gotten --  My clients have been calling
8       me, telling me that there's a guy calling, saying that
9       I'm doing, you know, that I'm a felon and I've done
10      some time, prison time, I'm carrying a gun and
11      flashing a badge and I'm serving papers using my patrol
12      car," and I go, "Does that sound like anything that
13      you're --" and he goes --  He didn't say anything.
14           He goes, "Look, I just know some guy sent a
15      complaint in and he's provided some affidavits."  And I
16      go --  And he goes, "And we're going to go ahead and
17      move forward with the investigation."  And I said,
18      "Well, what does that mean?"  And he says, "Well,
19      we're going to --  This guy's also provided a list of
20      all your clients," and I go, well, you know, I said,
21      "Well, you can verify through all my time logs and
22      everything else.  You're not going to be contacting any
23      of my clients are you?"  And Kevin said, "Yeah."  He
24      goes, "We're going to contact all your clients."  He
25      says, "We got to."

BY MR. FEARING

Case 2:04-cv-01453-JCC   Document 49-2   Filed 03/28/05   Page 10 of 17
RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 107

1            I says, "Well, if you do that, you're going to
2     give this guy -- you're going to give him a voice, if
3     the clients, you know, think that I'm being
4     investigated," because one of the complaints -- one of
5     my clients was telling me that I was being investigated
6     by the Liquor Control Board and I wasn't at that time,
7     but I said, "If you come over and start asking
8     questions, you're giving this guy the validity," I
9     said, "that you're investigating me."  I go, "My
10    clients are going to walk on me if you do that."  And
11    he goes, "I'm sorry, man.  This is the way it's got to
12    be."
13           And I said, "Well, I'm not going to risk losing my
14    clients."  I said, "What do I got to do?"  He says,
15    "Well, you can put in your walking papers.  If you put
16    in your walking papers, we're not going to call
17    anybody."
18           So, I wrote up my resume -- my resignation right
19    there, submitted my resignation.  I said, "Here you
20    go."  That was it.
21  Q.  This was a conversation with Mr. Starkey on July 10;
22    correct?
23  A.  As soon as he gave me the complaint, told me what they
24    were going to do, because he says they were going to
25    contact my clients, I said, "When are you going to

Case 2:04-cv-01453-JCC   Document 49-2   Filed 03/28/05   Page 11 of 17
RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 141

1       MR. MYHRE:          You did open the door, George.
2   A.  Normally I can't get through the secretary up front,
3       so -- I got you right here, man.
4   Q.  Well, I've lost my place. Do you make enough money, as
5       far as you're concerned, with Casey Investigations to
6       support your family?
7   A.  Do I make enough money? Yes, sir. I can always make
8       more money. More money is good, but we're surviving.
9   Q.  If you gave my law firm a bid for your work, would you
10      underbid Pronto Process Service?
11  A.  I wouldn't know what his prices were. I would just
12      tell you what our prices would be and see if you could
13      live with that.
14  Q.  Would you tell me that you would charge $5 less than
15      what Pronto Process Service charges?
16  A.  No, I would say: I'll charge 25 to this area.
17  Q.  Have you ever told any clients or potential clients
18      that you would underbid other process servers?
19  A.  I have -- I have -- I have said that I would beat
20      anyone's price by 20 percent.
21  Q.  And to whom have you told that?
22  A.  I would send that out in a flyer when I very first got
23      started.
24  Q.  Is that something you would tell a potential client
25      today?

Page 146

1  A.  I do believe that Dina took to heart what she was told.
2  Q.  Has Dina ever told you that?
3  A.  Told me that?
4  Q.  Yes.
5  A.  No, but by her not doing business with us, when she had
6      already said she was, sent me a clear message that she
7      believed what she had been told.
8  Q.  Are you a member of the State Process Servers
9      Association?
10 A.  No, sir.
11 Q.  Do you plan to be a member?
12 A.  No, sir.
13 Q.  Why do you not wish to be a member?
14 A.  I feel that with what has gone on with this case
15     here -- You see, when I went up for the bid for the
16     state contract, on that day I was approached by a
17     member of the association with an application and a
18     pen.
19 Q.  That was in the year 2002?
20 A.  Yes, sir.  And they asked me to join right at that
21     table, and I said -- I told them that I didn't want to
22     at that point, I wanted to read and find out what it
23     was about.  We had a follow-up meeting a month later in
24     Olympia again regarding that same contract.  That same
25     individual came up to me with another form, and I told

BY MR. FEARING

Case 2:04-cv-01453-JCC   Document 49-2   Filed 03/28/05   Page 13 of 17
RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 149

```
 1         e-mail?
 2    A.   No.  No, sir.
 3    Q.   Are you a member of the National Association --
 4    A.   No, sir.
 5    Q.   -- of Process Servers?
 6    A.   No.
 7    Q.   Do you plan to join?
 8    A.   I don't, sir.
 9    Q.   If you know, what do you have to do to join the state
10         association?
11    A.   What do you have to do?
12    Q.   Yes.
13    A.   Just fill out the membership and send them their
14         money.  That's it.
15    Q.   How much money?
16    A.   I don't know.  A couple hundred bucks probably.
17    Q.   Do you know a gentleman by the name of Dennis Copeland?
18    A.   I've heard of him.
19    Q.   What have you heard about him?
20    A.   He's the owner of Legal Carriers.  He handles the
21         Yakima area.
22    Q.   He's a process server?
23    A.   He's an owner.
24    Q.   Of Legal Carriers?
25    A.   Legal Carriers, yeah.  And he serves --  They handle
```

Page 188

```
 1            you could probably get as an agent, using the radio,
 2            would be license plate information, if you used your
 3            radio, portable radio, but, other than that, that would
 4            be it.
 5   Q.       You testified this morning about an AS400 that you
 6            would have access to --
 7   A.       Yes, sir.
 8   Q.       -- where you could look up information about corporate
 9            offices?
10   A.       Yeah.  It's an in-house system with just the liquor
11            board, and if someone puts in a liquor license, it has
12            all -- it has the owner of the establishment, contact
13            phone, address, and also has a history of violations.
14            So, if they've had an over-serve or a minor violation,
15            it would be in the AS400.
16   Q.       So, the AS400 is limited to entities with a liquor
17            license?
18   A.       That's it, right, or tobacco license, sir.
19   Q.       I wanted to get as best an understanding as I can about
20            any conspiracy that you allege the defendants have
21            engaged in.  Can you tell me everything that you
22            believe has happened with respect to conspiracy?
23   A.       Okay.  Well, I believe that the conspiracy between Mark
24            Owens and Robert Lack, roommates, lived together, I
25            believe that they have conspired with Pefley, and all
```

BY MR. ZISSLER

Page 189

1    three of them decided t contact my job and submit all
2    these allegations on me and also contact my clients and
3    have all made it very difficult for me to try to gain
4    any business at all in the Tri-Cities or anywhere
5    else.
6         I feel Pefley is connected with Mr. Rustand
7    because she's their employee. They own the business
8    and she's the manager, and so -- And I feel that
9    they're all members of the state organization. I feel
10   the state organization assisted in price-fixing, and I
11   think they're all intertwined with each other.
12 Q. Is it not possible that any actions you allege that
13   Owens, Lack and Pefley engaged in were done solely on
14   behalf of their own company's interests and having
15   nothing to do with their membership in the state
16   association?
17 A. Well, I guess anything is possible, you know.
18 Q. Do you have reason to believe that any action Owens,
19   Lack and Pefley took was done with respect to their
20   membership in the state association?
21 A. I feel that them all being members of this
22   organization, I feel that me not joining the
23   organization, I feel that it really -- that these guys
24   started coming on strong at me when I did not join that
25   organization. That's what I feel. I feel if I would

Case 2:04-cv-01453-JCC   Document 49-2   Filed 03/28/05   Page 16 of 17
RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 190

1      have joined, I don't think that they would have been

2      acting the way they've acted and treated me.

3  Q.  When were you first approached and asked to join?

4  A.  I was approached at the very first meeting that was

5      held for the state contract in Olympia.

6  Q.  And when was that?

7  A.  Sir, I'm not very sure when it was. I believe it was

8      maybe August 2001.

9  Q.  August of 2001?

10  A.  I'm not positive, sir. I'm not sure. It was during

11      the first meeting, when everyone was trying for the --

12      when everyone knew that the state contract was up for

13      bid. It had been six years. There was, oh, probably

14      20 owners, 20 process service owners, showed up in

15      Olympia and we were all in a room this big at a little

16      table. So, I was kind of in there with all these big

17      guys in there, and then they had -- I believe they had

18      like two other meetings to tell us more information

19      about that contract, and so I went to each meeting, and

20      each meeting these guys were there, and that's how I

21      ended up knowing who everybody was.

22  Q.  And your testimony earlier -- I'm just trying to

23      clarify before I ask some more questions -- was that

24      you're not certain, but you believe it was Robert Zorn

25      that asked you to join and gave you, or tried to give

BY MR. ZISSLER

Page 191

| | | |
|---|---|---|
| 1 | | you an application and have you join; is that right? |
| 2 | A. | Right, sir. I'm not one hundred percent certain. |
| 3 | Q. | But someone did? |
| 4 | A. | Yes, someone definitely did. It was that same person |
| 5 | | each time. |
| 6 | Q. | And it was at this meeting? |
| 7 | A. | And it was at those meetings, yes, sir. |
| 8 | Q. | So, this meeting occurred before you even started your |
| 9 | | company; correct? |
| 10 | A. | What's that? |
| 11 | Q. | Your company began in December of 2001; correct? |
| 12 | A. | Right. |
| 13 | Q. | So, the meeting in Olympia occurred before you had even |
| 14 | | begun? |
| 15 | A. | You know, I may be off by one year, sir. |
| 16 | Q. | So -- |
| 17 | A. | I think I am. |
| 18 | Q. | So, it might have been August of 2002? |
| 19 | A. | I think so, yeah. |
| 20 | Q. | So, it might be August of 2002 that this meeting in |
| 21 | | Olympia takes place, where you're first approached -- |
| 22 | A. | Right. |
| 23 | Q. | -- and you said no? When was the next meeting, do you |
| 24 | | recall? A couple weeks later? |
| 25 | A. | Yes, sir. Yeah. It was like a month later, I think. |

BY MR. ZISSLER