# EXHIBIT 2

```
                      UNITED STATES DISTRICT COURT

                 FOR THE WESTERN DISTRICT OF WASHINGTON

                                AT SEATTLE


CASEY INVESTIGATORS LLC, a          )
Washington Limited Liability        )
Company, and MARIO A. TORRES,       )
an individual,                      )
                                    )
            Plaintiffs,             )
                                    )
      vs.                           )      No. CV04-1453 C
                                    )
PRONTO PROCESS SERVICE, INC.,       )
a Washington corporation;           )
NORTHWEST RAIL ENTERPRISES,         )
INC., a Washington corporation;     )
MARK OWENS, an individual;          )
GREGORY and MARY LEE RUSTAND,       )
individually and as a married       )
couple; DIANE PEFLEY, an            )
individual; A to Z LEGAL            )
SUPPORT SERVICES, a Washington      )
business entity; ROBERT G.          )
LACK, an individual; WASHINGTON     )
STATE PROCESS SERVERS               )
ASSOCIATION, a Washington           )
business association; and           )
NATIONAL ASSOCIATION OF             )
PROFESSIONAL PROCESS SERVERS,       )
a national business association     )
                                    )
            Defendants.             )
```

---

DEPOSITION UPON ORAL EXAMINATION OF:
ROBERT LACK

---

```
 1   TIME:           9:10 a.m., Tuesday, February 15, 2005

 2   TAKEN AT:       Leavy, Schultz, Davis & Fearing
                     2415 West Falls Avenue
 3                   Kennewick, Washington

 4   CALLED BY:      Plaintiffs

 5   BEFORE:         DEBORAH K. RICHMAN, CCR, RPR

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 33

1   A.   I'm sorry?

2   Q.   Are you aware if Pronto is a member?

3   A.   If they are?

4   Q.   Yes.

5   A.   I don't know.

6   Q.   Are you aware if A to Z is a member?

7   A.   I don't know.

8   Q.   When did Mr. Owens tell you about the association?

9   A.   It was when I was served at my house.  Well, actually,
10       I got served at my office, and then I went to my house
11       and called him and asked who all these people were.

12  Q.   Mr. Lack, let's turn to what's marked as Exhibit 2.  If
13       you would take a moment to read the document, and just
14       let me know --

15  A.   I went through it, kind of, earlier.  I might have to
16       jump back here, but --

17  Q.   So, are you comfortable discussing this document now?

18  A.   I can definitely try.

19  Q.   In the first sentence of the first paragraph -- Well,
20       actually, let me pause for a moment.  Do you recognize
21       this letter?

22  A.   Yes, sir.

23  Q.   Is this the letter that you communicated to Mr. Rex
24       Prout --

25  A.   Yes.

Case 2:04-cv-01453-JCC   Document 49-4   Filed 03/28/05   Page 5 of 18
RICHMAN & KENT COURT REPORTERS (509) 627-0869
ROBERT LACK

Page 34

1    Q.    -- on/or about June 30th, 2003?
2    A.    Yes, sir.
3    Q.    Is this an accurate version of that letter?  Is this a
4          true and accurate copy of that letter?
5    A.    I believe so.
6    Q.    All right.  Did you write this letter yourself?
7    A.    Yes.
8    Q.    Did anyone else assist you in writing this letter?
9    A.    No.
10   Q.    When did you compose this letter?
11   A.    I'm pretty sure that it was on the 30th of the day
12         of -- the 30th.
13   Q.    And you have sent this letter to Mr. Rex Prout; is that
14         correct?
15   A.    Yes.
16   Q.    What is your understanding of who Mr. Prout is?
17   A.    I believe he works with the Liquor Control Board and he
18         is, I think, one of the second people in charge, if
19         that makes sense.
20   Q.    So, your understanding is, he's in a managerial
21         capacity of some sort?
22   A.    Administration, yes, sir.
23   Q.    And how did you come to learn about Mr. Prout?
24   A.    I called, got on the telephone and called --  Let's
25         see.  I don't remember if it was that I called liquor

BY MR. MYHRE

Page 35

```
 1         control first or if it was that I called the ethics
 2         board first.  One of the two, they gave me the
 3         information.  And when I called, they put me through to
 4         one person.  Then I got Mr. Prout.
 5   Q.    So, your testimony is that you first telephoned the
 6         Liquor Control Board and the Ethics Board --
 7   A.    Yes.
 8   Q.    -- regarding your complaint?
 9   A.    Yes.
10   Q.    Do you recall on/or about what date you made those
11         phone calls?
12   A.    It's on/or around the 12th, in there somewhere.
13   Q.    In the first sentence you write:  I was made aware of a
14         problem involving a Liquor Control Board agent.
15              When you say "I was made aware," what do you
16         mean?  How were you made aware?
17   A.    I had a patient come in my office.
18   Q.    And that is the unknown and unnamed patient we
19         discussed earlier?
20   A.    Yes.
21   Q.    The patient who came into your office, had they been
22         your patient prior to that visit?
23   A.    I don't recall, to be honest.  I don't recall much
24         about that.  If I could, I could find the file.
25   Q.    Is it possible that they were not a patient of yours?
```

BY MR. MYHRE

Case 2:04-cv-01453-JCC  Document 49-4  Filed 03/28/05  Page 7 of 18
RICHMAN & KENT COURT REPORTERS (509) 627-0869
ROBERT LACK

Page 36

1  A.  Well, I know it happened in my office.
2  Q.  So, your testimony today is that you're certain you had
3      a conversation in your office, but you can't remember
4      whether it was with a patient or not?
5  A.  No, I'm pretty sure it was a patient, but I don't
6      remember who. I believe 42 CFR part 2 would not let me
7      tell you anyway. But if I could recall, I would.
8  Q.  Well, was this disclosure part of your counseling
9      services with them, or outside of the counseling
10     session?
11 A.  It actually took place during the counseling session.
12 Q.  Is that the only source of how you were made aware in
13     the first sentence?
14 A.  Other than the comments from Mark.
15 Q.  Other than the comments from Mark Owens and the unknown
16     unnamed patient, is there any other source of your
17     awareness related to that first sentence?
18 A.  No.
19 Q.  Your next sentence reads: My understanding is that
20     this individual drives to Moses Lake and many other
21     locations while on the clock with the state and in a
22     state vehicle.
23          What is the basis of your assertion there?
24 A.  Page 2, and that it was also the statement from that
25     patient telling me things.

Page 37

1  Q.  When you say "page 2" of the document, you are pointing
2      to what information specifically?
3  A.  It's a listing of papers that were served with
4      affidavits of service filed in Grant County.
5  Q.  So, then, my understanding is that the basis of that
6      assertion is the patient's comments, Mark's comments,
7      and that list of affidavits; is that correct?
8  A.  Yes, sir.
9  Q.  Is there any other basis for that assertion?
10 A.  No, sir.
11 Q.  All right.  In the middle end of that first paragraph
12     you write:  This seems to be a case of double dipping
13     and a possible conflict of interest with him using
14     state vehicles and time to support his private
15     business.
16         Do you have any personal knowledge that he was
17     using state vehicles and time to support his private
18     business?
19 A.  Are you asking me if I saw him, witnessed him doing
20     this?
21 Q.  Do you, yourself, have any direct personal knowledge of
22     that allegation?
23 A.  Other than just what I was told, no.
24 Q.  Other than talking to Mark and talking with your
25     patient, did you perform any independent investigation

BY MR. MYHRE

ROBERT LACK

### REPORTER'S CERTIFICATE

1  
2    I, DEBORAH K. RICHMAN, certify that **ROBERT LACK**
3  was duly sworn to testify the truth; that the said deposition
4  was taken in Stenotypy by me at the time and place aforesaid
5  and was thereafter reduced to typewritten form by
6  computer-aided transcription under my direction; that the
7  foregoing is a true and correct transcript of my notes and of
8  the testimony given and proceedings therein had.
9           That I am not attorney nor counsel, nor in any way
10  connected with any attorney or counsel for any of the parties
11  to said action, nor otherwise interested in the outcome of
12  this action.
13          IN WITNESS WHEREOF, I have affixed my signature
14  this 7th day of March 2005.



DEBORAH K. RICHMAN, Notary
Public, in and for the
State of Washington,
residing in Richland.
My commission expires 5-15-08.

Washington CCR License No. 2649

BY MR. MYHRE

# EXHIBIT 3

```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF WASHINGTON

 3                             AT SEATTLE

 4   CASEY INVESTIGATORS LLC, a      )
     Washington Limited Liability    )
 5   Company, and MARIO A. TORRES,   )
     an individual,                  )
 6                                   )
              Plaintiffs,            )
 7                                   )
          vs.                        )       No. CV04-1453 C
 8                                   )
     PRONTO PROCESS SERVICE, INC.,   )
 9   a Washington corporation;       )
     NORTHWEST RAIL ENTERPRISES,     )
10   INC., a Washington corporation;)
     MARK OWENS, an individual;      )
11   GREGORY and MARY LEE RUSTAND,   )
     individually and as a married   )
12   couple; DIANE PEFLEY, an        )
     individual; A to Z LEGAL        )
13   SUPPORT SERVICES, a Washington  )
     business entity; ROBERT G.      )
14   LACK, an individual; WASHINGTON)
     STATE PROCESS SERVERS           )
15   ASSOCIATION, a Washington       )
     business association; and      )
16   NATIONAL ASSOCIATION OF         )
     PROFESSIONAL PROCESS SERVERS,   )
17   a national business association)
                                     )
18            Defendants.            )

19   _____

20
                  DEPOSITION UPON ORAL EXAMINATION OF:
21                           MARK OWENS

22   _____

23

24

25
```

| | | |
|---|---|---|
| 1 | TIME: | 1:15 p.m., Tuesday, February 15, 2005 |
| 2 | TAKEN AT: | Leavy, Schultz, Davis & Fearing |
| 3 | | 2415 West Falls Avenue |
| | | Kennewick, Washington |
| 4 | CALLED BY: | Plaintiffs |
| 5 | BEFORE: | DEBORAH K. RICHMAN, CCR, RPR |

Page 11

1            that?
2   A.       I went back to work at Pronto Process.
3   Q.       Was that your father's company at the time?
4   A.       It was our whole family's company. We all were
5            stockholders, always.
6   Q.       When you say "whole family," who do you mean?
7   A.       Mother, sister, me, my dad. That is my whole immediate
8            family.
9   Q.       What is your sister's name?
10  A.       Charlys, C-h-a-r-l-y-s, Skinnell.
11  Q.       Could you spell that?
12  A.       S-k-i-n-n-e-l-l.
13  Q.       And what is your mother's name?
14  A.       My mother is deceased, but it was Delores R. Owens.
15  Q.       And your father's name?
16  A.       Is Charles F. Owens.
17  Q.       And he's currently alive, yes?
18  A.       Yes, he is.
19  Q.       So, what year was it that you went back to work at
20           Pronto Processing?
21  A.       It was -- We were in business for a couple of years.
22           We were incorporated in '81. So, I would say probably
23           '82, '83. I'm not sure about the exact date.
24  Q.       Have you worked continuously for Pronto since then?
25  A.       Yes, I have.

BY MR. MYHRE

Page 12

1  Q.  Have you worked for anyone else during that time?
2  A.  No.
3  Q.  Is Pronto your sole source of income from 1982 or '83
4      to the present?
5  A.  Yes, it is.
6  Q.  How many other competitors are there for Pronto
7      Processing in the area currently?
8  A.  There's Intercity. There's Bright Bowe & Associates.
9          MR. ZISSLER:   Could you repeat that, please?
10 A.  Bright Bowe. He's an ex-deputy sheriff that does
11     process work and investigation work.
12 Q.  Could you spell his name?
13 A.  B-r-i-g-h-t, and then Bowe, B-o-w-e. I think there's
14     somebody else, but -- I mean, we could grab a phone
15     book, but I'm not, you know -- I don't -- I've never
16     came in contact with them.
17 Q.  So, from your memory right now, these are the two
18     competitors for process servers?
19 A.  Yeah. And Casey Investigations.
20 Q.  Have you ever served in the United States military?
21 A.  No.
22 Q.  Have you ever been charged with, or convicted of a
23     criminal offense?
24 A.  Yeah, when I was a child, or younger, I was.
25 Q.  And when was that?

BY MR. MYHRE

Page 14

1      insurance for a service; I served the wrong person. I
2      don't know if it ever went to court or not.
3 Q. When was that?
4 A. Probably 2000, I think.
5 Q. Has the Department of Revenue ever brought action
6      against Pronto?
7 A. They have audited me.
8 Q. When was that audit?
9 A. Just recently.
10 Q. What do you mean by "recently?"
11 A. Just recently. Since last -- Since all this arose.
12 Q. In 2004?
13 A. Yep.
14 Q. Previously had there ever been any dispute between the
15      Department of Revenue and Pronto?
16 A. Not that I recall, no, unless it was when, you know, my
17      father was running it, you know.
18 Q. When did you begin running Pronto Processing?
19 A. Approximately five to six years ago, I would say, when
20      my dad retired.
21 Q. And do you recall what year he retired?
22 A. Not right offhand, no, I don't. I'm pretty sure it was
23      1999, I think.
24 Q. 1999. I'd like to ask you some questions about Robert
25      Lack. My understanding is that the house you currently

| | | |
|---|---|---|
| 1 | | live in is owned by Mr. Lack; is that correct? |
| 2 | A. | That's correct. |
| 3 | Q. | And why did you choose to move into Mr. Lack's house? |
| 4 | A. | I couldn't find a house, and he offered to let me move |
| 5 | | in until I found a house I wanted.  I didn't want to be |
| 6 | | rushed to buy a house. |
| 7 | Q. | And you've been there for two and a half years; is that |
| 8 | | correct? |
| 9 | A. | Yes, I have. |
| 10 | Q. | Are you still looking for a house? |
| 11 | A. | At this point, I don't really have the money to, but, |
| 12 | | you know, no. |
| 13 | Q. | So, you're not currently looking for a house? |
| 14 | A. | Not at this point, no. |
| 15 | Q. | Do you pay rent on the house? |
| 16 | A. | I pay utilities, garbage, yard care. |
| 17 | Q. | Do you pay for your yard care or do you perform the |
| 18 | | yard care? |
| 19 | A. | No, I can't do it myself.  I pay for it. |
| 20 | Q. | How long have you known Mr. Lack? |
| 21 | A. | Probably six, seven years maybe. |
| 22 | Q. | And how did you meet Mr. Lack? |
| 23 | A. | I can't really recall how I met him.  I think it was at |
| 24 | | his office.  He is a client of mine, but I know at the |
| 25 | | time he wasn't, so -- |

```
 1        service?
 2   A.   It's public knowledge.  I went to the courthouse and
 3        got them.  I pulled them myself, along with another
 4        gal.
 5   Q.   Who was that other gal?
 6   A.   Rachelle Montgomery works in my office, Vicki's
 7        daughter.
 8   Q.   Whose idea was it to get the affidavits?
 9   A.   Rex Prout called me, or I called him.  Vicki says that
10        he called me and I returned his call.  He asked me if I
11        could do it, get them for him, because they were
12        investigating Mr. Torres and they needed that
13        information to cross-reference to see if, in fact, this
14        was happening.
15   Q.   So, you spoke directly with Rex Prout?
16   A.   Yes, I did.
17   Q.   What day did that conversation take place?
18   A.   I have no idea what day it was.
19   Q.   What did you say during that conversation?
20   A.   I told him I could get them for him, and my only
21        concern was if he was, in fact, doing that, it was a
22        disadvantage to me.  That's all.  That was my whole
23        deal with him.  It was an unfair advantage to me if
24        that's what was what going on.  It was all
25        speculative.  I didn't accuse him of anything.
```

MARK OWENS

# REPORTER'S CERTIFICATE

I, DEBORAH K. RICHMAN, certify that **MARK OWENS** was duly sworn to testify the truth; that the said deposition was taken in Stenotypy by me at the time and place aforesaid and was thereafter reduced to typewritten form by computer-aided transcription under my direction; that the foregoing is a true and correct transcript of my notes and of the testimony given and proceedings therein had.

That I am not attorney nor counsel, nor in any way connected with any attorney or counsel for any of the parties to said action, nor otherwise interested in the outcome of this action.

IN WITNESS WHEREOF, I have affixed my signature this 7th day of March 2005.



DEBORAH K. RICHMAN, Notary Public, in and for the State of Washington, residing in Richland. My commission expires 5-15-08.

Washington CCR License No. 2649

BY MR. MYHRE