# EXHIBIT 1

Diane L. Pefley                                        February 17, 2005

```
 1              UNITED STATES DISTRICT COURT
 2             WESTERN DISTRICT OF WASHINGTON
 3                      AT SEATTLE
 4   ---------------------------------------------------
 5   CASEY INVESTIGATIONS, LLC, a      )
     Washington Limited Liability      )
 6   Company and MARIO A. TORRES,      )
     an individual,                    )
 7                                     )
             Plaintiffs,               )
 8                                     )
        vs.                            )   No. CV04-1453C
 9                                     )
                                       )
10   PRONTO PROCESS SERVICE, INC.,     )
     a Washington corporation;         )
11   NORTHWEST RAIL ENTERPRISES,       )
     INC., a Washington corporation;   )
12   MARK OWENS, an individual;        )
     GREGORY and MARY LEE RUSTAND,     )
13   individually and as a married     )
     couple; DIANE PEFLEY, an          )
14   individual; A to Z LEGAL          )
     SUPPORT SERVICES, a Washington    )
15   business entity; ROBERT G.        )
     LACK, an individual; WASHINGTON   )
16   STATE PROCESS SERVERS             )
     ASSOCIATION, a Washington         )
17   business association,             )
                                       )
18           Defendants.               )
19   ---------------------------------------------------
20         Deposition Upon Oral Examination Of
21                  DIANE L. PEFLEY
22   ---------------------------------------------------
23   701 Fifth Avenue, #6500, Seattle, Washington
24   DATE:  February 17, 2005
25   REPORTED BY:  Mindi L. Pettit, RPR, CCR #2519
```

Diane L. Pefley                                                                February 17, 2005

Page 26

1   happened with those documents?
2       A. The final minutes from the convention -- that
3   last one?
4       Q. Correct.
5       A. I then e-mailed those over to the president
6   and to the other members, and then those are kept, and
7   they just put them in -- publish them in the
8   newsletter. And the president keeps them, I believe.
9       Q. What happens to the -- the minutes you kept
10  that were not in the final version?
11      A. All of my minutes were in the final version.
12      Q. So there was nothing that was ever edited out
13  when you prepared a final version; is that correct?
14      A. Huh-uh.
15      Q. And how would you record the minutes? Would
16  you write down everything that everyone was saying?
17      A. Pretty much. Yup.
18      Q. So you kept -- you kept verbatim notes on each
19  meeting?
20      A. I write everything down, take minutes of all
21  the motions and, you know, the important things.
22      Q. And what was the name of the previous
23  secretary?
24      A. The one that left?
25      Q. That you replaced.

Page 27

1       A. I believe it was Amber. I don't remember her
2   last name.
3       Q. Do you know what business she worked with?
4       A. ABC.
5       Q. And she was the secretary for the first part
6   of --
7       A. I believe so.
8       Q. -- 2004? It's important to --
9       MR. WINSKILL: Let him finish.
10      Q. -- let me finish the question before you
11  answer.
12      A. Oh, I'm sorry.
13      Q. It helps the court reporter to take --
14      A. Okay. Sorry.
15      Q. -- down both. All right. Who was the
16  secretary prior to Amber?
17      A. I don't remember.
18      Q. Are the secretaries elected on a yearly basis?
19      A. Yes.
20      Q. Are they elected at the end of the prior year
21  or at the beginning of the new year?
22      A. They are elected at the annual convention each
23  year.
24      Q. And that takes place when?
25      A. Generally in September.

Page 28

1       Q. So, if I understand correctly, Amber was then
2   elected for 2004?
3       A. Um-hum.
4       Q. And that was probably done at the 2003 annual
5   convention; is that correct?
6       A. Um-hum, yes.
7       Q. Yes, okay. I -- it's all right. You'll get
8   used to --
9       A. Okay. I just keep trying to think.
10      Q. Okay. And do you have any memory of who the
11  secretary was for 2003?
12      A. No, I don't.
13      Q. Do you have any memory of who the secretary
14  was for 2002?
15      A. Perhaps Myrna Allen.
16      Q. Myrna Allen -- could you spell her name.
17      A. M-y-r-n-a, A-l-l-e-n.
18      Q. An e-n?
19      A. Um-hum.
20      Q. When you became secretary, did anyone give any
21  papers, documents, or electronic files to you?
22      A. No, sir.
23      Q. So my understanding is you received the -- the
24  position of secretary and no information regarding
25  it --

Page 29

1       A. No, no, I -- there is no -- the minutes, I'm
2   assuming, from the months before, whoever had done,
3   they went to the president, and he kept them. I just
4   would go to the meeting and take the notes for that
5   meeting to type them up for the next meeting to finish
6   out the year. I was given nothing.
7       Q. Okay. So, when you compiled the final
8   minutes, you didn't combine --
9       A. No.
10      Q. -- the minutes from the first meeting with the
11  minutes from the meetings you took --
12      A. No.
13      Q. -- is that correct? I'd like to ask you a few
14  questions about the purpose of the association. What
15  is your understanding of the purpose of the WSPSA?
16      A. My understanding is the purpose -- we have a
17  lobbyist that -- we go try and get a handle on
18  different things in the legislature that's going to
19  affect our industry. We give support to others that
20  have process serving business that belong to the
21  association, training, just trying to help each other,
22  you know, to stand behind them in their business, to
23  keep them up to date on the current and the correct
24  laws, so that we can -- are serving process correctly,
25  being an asset to the attorney and not hindrance.

8 (Pages 26 to 29)

Diane L. Pefley                                                                    February 17, 2005

<table>
<tr><td>

**Page 30**

1     Q.  Now, when you say "training," what do you mean
2 by "training"?
3     A.  Maybe "training" was the wrong word.  I
4 suppose giving -- what do I want to say?  You know,
5 talking -- telling you the specifics of different laws,
6 things that are going on within the process serving
7 industry, different laws that could be coming down,
8 from whether it be the sheriff or somebody that could
9 affect us adversely, things that we need to know about
10 to -- to continue to provide, you know, our service to
11 you as the attorneys.
12    Q.  What sorts of things would -- would that be?
13    A.  Serving process of your documents, serving
14 your summons and complaints.
15    Q.  So the training would involve teaching people
16 how to serve documents?
17    A.  I don't believe we teach people how to serve
18 documents.  WSPSA has provided -- has compiled a -- a
19 handbook that they have sold to different people that
20 gives you all the RCWs and statute, kind of a condensed
21 version.  I call it a process server's Bible, if you
22 want to look up to make sure that you're serving
23 process the correct way.  I think they're instrumental
24 in teaching people the correct way to serve process, to
25 know how to serve a document.

</td><td>

**Page 32**

1     A.  Well, you have a membership handbook.  If
2 you're looking for -- if I had a paper that came into
3 my office that needed to be served in Everett, I have a
4 handbook that has a list of all the members.  I can
5 pick it up, I can call one of them, ask them if they
6 would be able to serve this document for me, or did
7 they know somebody that was in their area that could.
8 Probably not a lot different than belonging to the Bar
9 Association.  You kind of have a network of people that
10 you can talk to if you need to talk to somebody, you
11 know.
12    Q.  So, other than the -- the handbook and the
13 list of members for referrals, is there any other
14 support that the WSPSA provides to its members?
15    A.  Not that I know of.  Not that -- excuse me,
16 no.
17    Q.  Is the referral list part of the handbook?
18    A.  What do you mean, the membership booklet?
19    Q.  Yes.  Earlier, when you spoke about being able
20 to look up the names of people to contact for
21 service --
22    A.  Anybody that is a member gets published in the
23 membership handbook.
24    Q.  Okay.
25    A.  And it's distributed out.

</td></tr>
<tr><td>

**Page 31**

1     Q.  Okay.  Who publishes the -- the handbook?
2    A.  WSPSA published the handbook.
3    Q.  Do they provide it to all their members?
4    A.  Yes, they had it for all the members to
5 purchase.
6    Q.  Okay.  How much does that cost?
7    A.  I believe they were like $8, but I don't
8 remember.
9    Q.  Is that book available for purchase by
10 nonmembers?
11    A.  Yes.
12    Q.  And how is that marketed to nonmembers?
13    A.  I would imagine if you just contact somebody
14 from -- you know, that's a member of WSPSA, they
15 would -- would either get you one or tell you who to
16 contact.
17    Q.  Is there -- are you aware of any marketing of
18 that particular book, or is there --
19    A.  No, sir.
20    Q.  Okay.  How would an outside person know of its
21 existence?
22    A.  I -- that, I wouldn't know.  I . . .
23    Q.  How does the -- you talked earlier about
24 supporting other members.  What did you mean by
25 "supporting other members"?

</td><td>

**Page 33**

1     Q.  Is the membership handbook different from
2 the -- the Bible?
3    A.  From the Bible?
4    Q.  Yes.
5    A.  Yeah.  The Bible doesn't have their names in
6 it.
7    Q.  By "Bible," we mean, the --
8    A.  The handbook -- the process serving manual,
9 yes.
10    Q.  And is that -- how often is that membership
11 handbook published?
12    A.  I believe they publish it every year.
13    Q.  Approximately how many members does WSPSA
14 have?
15    A.  Right now, I don't know.  I would imagine
16 somewhere in the neighborhood of 150 perhaps.
17    Q.  When you were secretary, do you have an idea
18 of how many --
19    A.  I don't recall the number, no, I don't.
20    Q.  We have to -- you have to let me finish
21 speaking before you talk.
22    A.  Okay.
23    Q.  Thank you.
24    A.  I'm sorry.
25    Q.  That's okay.  It just makes it easier for --

</td></tr>
</table>

9 (Pages 30 to 33)

Diane L. Pefley                                                    February 17, 2005

Page 34

1      A.  It does.
2      Q.  I'd like to talk to you about how the -- how
3  the referrals work.  Could you walk me through how you
4  would refer the servicing papers to another member of
5  the WSPSA.
6      A.  Well, I don't know that -- that -- I don't
7  mean like I'm referring.  I can use anybody I --
8  whoever -- I use this as a handbook.  These are my
9  members that I've got in the state of Washington.  So,
10  if I don't know another process server somewhere, this
11  is a good guide, a good place to start.
12      Q.  Okay.
13      A.  I mean, I use a lot of people that's probably
14  not in that book.
15      Q.  Okay.  In 2003, did you use anybody -- and by
16  "you," I think I'm referring to you in your role as an
17  employee of A to Z.
18      A.  Um-hum.
19      Q.  Did you refer any business to people who were
20  not in the handbook?
21      A.  I believe so, yes.
22      Q.  And who was that?
23      A.  Royce Enterprises.  I'm not sure if they're in
24  there.
25      Q.  And who is Royce Enterprises?

Page 35

1      A.  They have a process serving business in
2  Yakima.  They may be a member now though.
3      Q.  Does A to Z get referrals from out of state
4  for service in Washington?
5      A.  Get referrals?  You mean -- explain.
6      Q.  Are there papers from out of state that --
7      A.  Do I get papers in from out of state?  Is that
8  what you're asking me?
9      Q.  Yes.
10      A.  Yes.
11      Q.  To be served in Washington.
12      A.  Yes.
13      Q.  All right.  And how do you come by those
14  papers?
15      A.  I don't know how they got my name.
16      Q.  Are you a member of any other organization?
17      A.  No.
18      Q.  Are you aware that there is a national
19  association of process servers?
20      A.  Yes.
21      Q.  And what is that association called?
22      A.  National Association of Professional Process
23  Servers.
24      Q.  And I believe its nickname is NAPPS.  Is that
25  correct?

Page 36

1      A.  Yes.
2      Q.  Are you a member of NAPPS?
3      A.  I am not personally.  My corporate office is.
4      Q.  By "corporate office," you mean, A to Z is a
5  member of NAPPS?
6      A.  SSP.
7      Q.  SSP is a member of NAPPS?
8      A.  (Witness nodded.)
9      Q.  Is A to Z wholly owned by SSP?
10      A.  Yes, it is.
11      Q.  Do you know if A to Z is listed with NAPPS?
12  Which is another way of asking if NAPPS has a
13  membership handbook in the same way that WSPSA has.
14      A.  I have not -- WS -- or NAPPS does have a book.
15  I have not looked in it.  I'm not sure if A to Z and
16  SSP are listed in there separately or not.
17      Q.  Have you ever been a member of NAPPS?
18      A.  Not personally, no.
19      Q.  Okay.  Has A to Z while you were an owner been
20  a member of NAPPS?
21      A.  No.
22      Q.  So your -- is it correct to say that your
23  understanding of A to Z's membership in NAPPS was after
24  the Rustands purchased it?  Is that correct?
25      A.  Only -- I am not sure if it's, you know,

Page 37

1  under -- as A to Z and Rustand, Inc., SSP, or if it's
2  just under one listing, under the corporate umbrella.
3      Q.  But your understanding is that occurred after
4  they acquired A to Z?
5      A.  Yes.  Yes.
6      Q.  How do you determine your pricing for the
7  service of process in the Moses Lake area?
8      A.  In Moses Lake -- just Moses Lake?
9      Q.  Well, or for Grant County.
10      A.  I determine my pricing by my service fee, my
11  mileage, my affidavit fee.
12      Q.  What is an affidavit fee?
13      A.  The typing of my affidavit.  Your -- your
14  return.
15      Q.  And how much does that cost?
16      A.  I flat rate everything in Moses Lake.  If I
17  get outside of the area, I charge mileage.
18      Q.  What is the flat fee in the Moses Lake area?
19      A.  $40, unlimited attempts.
20      Q.  And outside of Moses Lake, what is the -- what
21  is the fee?
22      A.  It's $15, plus mileage, plus your affidavit
23  fee, so it equals out to about $25 plus your mileage,
24  would be a good average for you.
25      Q.  So the affidavit fee is approximately $10; is

10 (Pages 34 to 37)

Diane L. Pefley                                                                February 17, 2005

---

Page 38

1  that correct?
2      A.  7 and 5 -- yeah, about -- probably 12,
3  actually.  So you're looking at probably a $25 service
4  fee and a mileage fee.
5      Q.  In what counties does A to Z serve papers or
6  conduct business?
7      A.  Grant, Adams, Douglas, Chelan, Lincoln,
8  Okanogan, Stevens, and Ferry County.
9      Q.  Does A to Z have offices in each of those
10  counties?
11      A.  No, I do not.
12      Q.  Your office is located in --
13      A.  In Moses Lake.
14      Q.  In Moses Lake?
15      A.  Um-hum.
16      Q.  How do you effect service in those other
17  counties?
18      A.  Get in my car and drive.
19          MR. WINSKILL:  Can you deal with the light?
20  It is getting in your eyes there?
21          THE WITNESS:  No, I'm okay.
22          MR. MYHRE:  We can lower the shades if you
23  need to.
24          THE WITNESS:  No, it's fine.
25      Q.  I'd like to talk now about your relationship

---

Page 39

1  with the Rustands.
2      A.  Um-hum.
3      Q.  And this is Gregory Rustand and MaryLee
4  Rustand.  Is it your understanding they're a married
5  couple?
6      A.  Yes.
7      Q.  When did you first meet the Rustands?
8      A.  '94, '95.
9      Q.  And how did you meet them?
10      A.  At a WSPSA meeting.
11      Q.  Was that the yearly meeting --
12      A.  Yes.
13      Q.  -- for WSPSA?
14      A.  Um-hum.
15      Q.  Okay.  What -- what did you speak about with
16  them at that time?
17      A.  "Hi, my name is Diane."
18      Q.  Beyond simple introductions --
19      A.  That's about it.
20      Q.  How did they come to -- to communicate to you
21  that they wanted to buy your business?
22      A.  Oh, it was probably several years after I had
23  gotten to know them.  Talk just came around about,
24  "Like to merge our businesses.  What do you think about
25  doing that?"  Thought about it for about a year.

---

Page 40

1      Q.  When you say "gotten to know them," what does
2  that mean?
3      A.  After I -- you know, once you meet people and
4  then you kind of are around them a little more and you
5  develop a friendship and you start talking about things
6  and you find you like those people.
7      Q.  And you developed a friendship with the
8  Rustands?
9      A.  Yes, I did.
10      Q.  Is it a close friendship?
11      A.  I'd say so.
12      Q.  And when you say "friendship," what does that
13  entail?
14      A.  That means that if I decide I'm going to go to
15  Bellingham, that I'm more than welcome to stay at
16  Semiahmoo for the night, if I'd like to.
17      Q.  So friendship means visiting and staying with
18  them?
19      A.  Yes, not a lot.  We're all busy.
20      Q.  But from time to time?
21      A.  Yes.
22      Q.  Between 2002 and the present, have you visited
23  with them at their home?
24      A.  Yes.
25      Q.  How many times?

---

Page 41

1      A.  Half a dozen.
2      Q.  In 2003, do you recall how many times you
3  visited the Rustands in their home?
4      A.  No, I don't.
5      Q.  Is it fair to say on average you visit them a
6  couple times a year?
7      A.  That's fair, yes.
8      Q.  When you talk with the Rustands, are your
9  conversations merely about business, or do they include
10  personal information also?
11      A.  I would say it goes a whole realm of things,
12  business . . .  They don't get real involved in my
13  personal life.
14      Q.  Do you talk with them about your personal
15  life?
16      A.  Some.
17      Q.  We've been discussing the Rustands kind of as
18  a -- as a unit, as two people.  I'd like to talk about
19  them individually now.
20      A.  Okay.
21      Q.  You said that you primarily discuss business
22  with the Rustands; visit them, on average, a couple
23  times a year; and sometimes discuss your personal life.
24      A.  Um-hum.
25      Q.  Regarding Gregory Rustand, is that a fair

---

11 (Pages 38 to 41)

Diane L. Pefley                                              February 17, 2005

**Page 42**

1  characterization of your relationship to him, or is
2  that relationship more business than personal?
3      (Mr. Fearing left.)
4      A.  I'd say it's a 50-50 split.
5      Q.  And with MaryLee Rustand?
6      A.  The same thing.
7      Q.  So do you discuss all aspects of your business
8  with MaryLee Rustand?
9      A.  Of A to Z?
10     Q.  A to Z, yes.
11     A.  Absolutely.
12     MR. WINSKILL:  Let's take a five-minute break.
13     MR. MYHRE:  Okay.
14     (Brief recess.)
15     (Mr. Fearing present.)
16     MR. MYHRE:  Back on the record.
17     Q.  All right.  Ms. Pefley, before we took our
18  break, we were discussing your relationship with the
19  Rustands.
20     A.  Um-hum.
21     Q.  And I believe we just discussed that your
22  relationship with them individually, Gregory and
23  MaryLee -- for both of them, it's about a 50-50 split
24  between discussing business issues and discussing
25  personal issues --

**Page 43**

1      A.  Yes.
2      Q.  -- is that correct?
3      A.  Yes.
4      Q.  All right.  When you discuss business issues
5  with them, what does -- what does that usually entail?
6      A.  Employee issues, accounts payable issues, just
7  things about running that office, if there's
8  difficulty.
9      Q.  Does that also include the volume of the
10  business?
11     A.  Yes, we talk about the volume of the business.
12     Q.  Does that also include competition in the
13  business?
14     A.  No.  Competition's really not -- everybody in
15  the world's got competition.  I've got too much to do,
16  quite frankly.
17     Q.  When you say "too much to do," do you mean, in
18  terms of business?
19     A.  I have a lot -- yes, I'm very busy.
20     Q.  So you do a large volume of business?
21     A.  For a small office like Moses Lake, yes.
22     Q.  Are there any competitors in the Moses Lake
23  area for your business?
24     A.  I believe there's one.
25     Q.  And who is that?

**Page 44**

1      A.  It would be AMPM Process Serving, I -- I think
2  their name . . .
3      Q.  Do you know anyone associated with AMPM
4  Process Serving?
5      A.  It's Pauline and Darwin Hines.  I know both of
6  them personally.
7      Q.  Are they members of WSPSA?
8      A.  I believe Darwin was a founding -- one of the
9  founding members.
10     Q.  Do you believe they're currently members?
11     A.  I don't recall.  I know he's ill.
12     Q.  Is it your understanding that they were
13  members in 2002 and 2003 -- and/or?
14     A.  I believe they were.
15     Q.  Is there any competition in the Moses Lake
16  area that is -- well, actually you said there is just
17  one competitor and that's their -- their business?
18     A.  That's all I know of.
19     Q.  So all of the volume of work in the Moses Lake
20  area is with A to Z; is that correct?
21     A.  I don't know about --
22     MR. WINSKILL:  Well, other than the competitor
23  she just named?
24     MR. MYHRE:  Other than that competitor.
25     Q.  Do you have any understanding of how busy they

**Page 45**

1  are?
2      A.  I don't know.  He's done it for 35 years,
3  so . . .
4      Q.  Ms. Pefley, when you refer service to another
5  WSPSA member located in a different area, how is
6  pricing determined for service of that process?
7      A.  Whatever they charge me, I pay it.
8      Q.  So I wonder if you can clarify that for me.
9  How does that work?
10     A.  I -- I don't know how somebody else charges.
11  I mean, I send a document out for service.  I call them
12  in a week if I haven't heard from them.  I say, Hey, do
13  you have so and so served on John Doe.  "Yes, I do.
14  Get the affidavit to you."  And they send me the
15  affidavit and the bill.  I stick the bill over for the
16  bookkeeper.  She pays the bill and end of story.
17     Q.  So do you pay the other member, or does your
18  client pay the other member for the service of process?
19     A.  I pay them.
20     Q.  So what that means -- if I understand this
21  correctly -- just walk me through from the beginning.
22     A.  Okay.
23     Q.  So I am an attorney.  I'm new in town.  I have
24  some papers that I need served, but I need them served
25  in a county where you don't normally work.

Diane L. Pefley                                                    February 17, 2005

Page 46

```
 1      A.  Okay.
 2      Q.  So I give you these papers and say, "I need
 3  them served."  What do you do?
 4      A.  Okay.  If you want something served in
 5  Spokane, I'll call Eastside Process and say, "Gail, I'm
 6  sending you a paper."
 7          "Is it a rush?"
 8          "No, just routine serve.  Get it done as soon
 9  as you can for me."  Stick it in the mail.  Or if it's
10  faxable, I'll fax it to her.
11      Q.  Okay.
12      A.  Okay?
13      Q.  And then how is that paid for?
14      A.  How is it paid for?  There is no money that
15  transfers right then.
16      Q.  Okay.
17      A.  Okay.  So then she'll send me an affidavit of
18  service.  I would imagine her bill is going to be 35,
19  $45 if it's there in Spokane.
20      Q.  Okay.  Then what happens?  How is that paid?
21      A.  Then it goes in the stack of bills that goes
22  to my bookkeeper, and the bookkeeper will pay her.
23      Q.  All right.  So you --
24      A.  And I will send you a bill.
25      Q.  All right.  So your bookkeeper will pay the
```

Page 47

```
 1  person -- the other server --
 2      A.  Yes.
 3      Q.  -- in the other county directly?
 4      A.  Yes.
 5      Q.  And then you invoice the client --
 6      A.  Yes.
 7      Q.  -- that amount?
 8      A.  Um-hum.
 9      Q.  Okay.
10      A.  When I send you your affidavit, you'll have a
11  nice little bill out in front of it.
12      Q.  Thank you.
13      A.  You're welcome.  Remember that, and I'll do a
14  good job for you.
15      Q.  Well, I do have a lot of friends in Spokane.
16      A.  Do you?
17      Q.  Actually I have family in Moses Lake also.
18      A.  Do you?  Well, if you're ever over there . . .
19      Q.  That was a very clear explanation.
20      A.  Okay.
21      Q.  I'd like to discuss the plaintiffs with you at
22  this point.  Are you aware of Mario Torres or Casey
23  Investigations?
24      A.  Yes.
25      Q.  Okay.  And how are you aware of them?
```

Page 48

```
 1      A.  This lawsuit would be one.
 2      Q.  Are you aware of them prior to this lawsuit?
 3      A.  Yes.
 4      Q.  And how are you aware of them prior to this
 5  lawsuit?
 6      A.  I've never met him.
 7      Q.  Have you spoken with him?
 8      A.  Never spoken with him.
 9      Q.  Have you seen him?
10      A.  Never seen him.
11      Q.  How were you made aware of him?
12      A.  I can't remember what year I had the DSHS
13  contract for Grant, Adams, Douglas, and Chelan
14  Counties.  It went out for bid.  He also bid for those
15  counties.  He obviously did a better job at bidding
16  than I did.  He won it.  It's the first time I ever
17  heard of him.
18      Q.  Did you attend the -- the meeting for bidding
19  on that contract --
20      A.  No, sir, I did not.
21      Q.  It's important to let me finish.
22      A.  Oh, gosh.  I'm sorry.
23      Q.  You're very quick on the trigger.
24      A.  I know.  I'm sorry.
25      Q.  So, when he was awarded the contract, that was
```

Page 49

```
 1  the first time you became aware of him; is that
 2  correct?
 3      A.  Um-hum.
 4          MR. WINSKILL:  Say --
 5      A.  Yes.
 6      Q.  What was the next piece of information you
 7  learned about Mr. Torres or Casey Investigations?
 8      A.  I don't know.
 9      Q.  Do you know anything about him other than the
10  plaintiffs were awarded that contract?
11      A.  Do I know the rumors I heard about him?
12  That's all I know.  I don't know anything about him.
13      Q.  So, other than the rumors, you don't know
14  anything about him?
15      A.  No.  No.
16      Q.  Do you know where he's located?
17      A.  I believe he's in -- somewhere in the
18  Tri-Cities area.
19      Q.  Do you know if the plaintiffs serve any papers
20  in -- in the Moses Lake area or Grant County?
21      A.  I believe that he probably does.
22      Q.  And what is the basis for that belief?
23      A.  Well, when he got the support enforcement
24  contract, it was for Grant County.
25      Q.  And A to Z was the previous holder of that
```

13 (Pages 46 to 49)

Diane L. Pefley                                                    February 17, 2005

Page 50

1  contract?
2      A. Um-hum. Yes.
3      Q. Yes. Ms. Pefley, you mentioned rumors. Let's
4  talk about those rumors. What were the rumors that you
5  heard?
6      A. I had heard that he had gone to one of my
7  clients and told them that he could serve the papers
8  cheaper than I could or anybody that was a member of
9  WSPSA, because WSPSA dictates the amount of money that
10 we could charge.
11     Q. And what else did you hear?
12     A. At that time, I didn't hear anything for a
13 while, until I heard he was under investigation.
14     Q. Well, let's see. So how many rumors are we
15 talking about?
16     A. Couple. Those two.
17     Q. So there are two rumors; is that correct? And
18 the first rumor is -- that you heard is that he had
19 gone to one of your clients and said that he could
20 serve for less money than A to Z could serve; is that
21 correct?
22     A. Yes, because we -- WSPSA price fixes, not just
23 that he could serve cheaper.
24     Q. When did you hear that rumor?
25     A. I don't know. I -- I could not tell you a

Page 51

1  date because why would I have thought it would have
2  been important to remember that?
3          MR. WINSKILL: Just answer the question.
4          THE WITNESS: I don't know.
5      Q. Since you don't know the specific day, maybe
6  we can narrow down to an area in time.
7      A. Okay.
8      Q. Would it be around the time he got the
9  contract for the State?
10     A. That's hard for me to answer.
11     Q. Okay.
12     A. I don't know.
13     Q. Maybe we can try it by year. Did you hear
14 that rumor in 2002?
15     A. If he could tell me when he started serving
16 process for Olympic Credit, I could tell you when I
17 heard it.
18     Q. And why is that?
19     A. Because I heard it from someone at Olympic
20 Credit, when they stopped using me.
21     Q. All right. And what was the second rumor you
22 heard?
23     A. The next time I heard anything about him was
24 that he was under investigation.
25     Q. All right. And "under investigation," do you

Page 52

1  know with --
2      A. From his -- from his job that he had with the
3  State.
4      Q. And who told you that?
5      A. Mark Owens and Dennis Copeland.
6      Q. Did they tell you that at the same time or
7  independent of each other?
8      A. Independent of each other.
9      Q. Did they speak with you in person or on the
10 telephone or --
11     A. Telephone.
12     Q. Do you recall when that was?
13     A. No, sir, I don't.
14     Q. Was it in the summer of 2003?
15     A. I would like to say spring, early summer
16 perhaps.
17     Q. When you say "spring, early summer," what
18 months?
19     A. I don't know. March, April, May.
20     Q. So, other than these two rumors, that he was
21 under investigation and that he could charge a lower
22 price because he can charge less than the WSPSA --
23     A. Um-hum.
24     Q. -- did you hear anything else about Mario
25 Torres or Casey Investigations?

Page 53

1      A. No.
2      Q. Have you ever spoken about the plaintiffs
3  to -- to any other party? To any other person?
4      A. Repeat it one more time.
5      Q. Have you ever spoken about the plaintiffs to
6  any other person?
7      A. No. Are you talking after this lawsuit was
8  filed or --
9      Q. We'll limit it in time. So, prior to this
10 lawsuit being filed --
11         MR. WINSKILL: Before the lawsuit.
12         THE WITNESS: Oh, before the lawsuit.
13     Q. -- have you spoken with anyone regarding the
14 plaintiffs?
15     A. Once.
16     Q. And who did you speak with?
17     A. One of the employees at Olympic Credit.
18     Q. Have you spoken with anyone else?
19     A. Not to my recollection.
20         MR. WINSKILL: Liquor Control.
21         THE WITNESS: Yeah, and the Liquor Control
22 guy, when he called me.
23     Q. And when you spoke to the Liquor Control guy,
24 do you recall who you were speaking to?
25     A. No, sir, I don't.

14 (Pages 50 to 53)

Diane L. Pefley                                                    February 17, 2005

Page 54

1    Q.  And what did you say to the person from the
2  Liquor Control Board?
3    A.  I believe he called me.
4    Q.  So he initiated the contact?
5    A.  I do not recall ever initiating any contact
6  unless it was because he had called and left a number
7  for me to return a phone call.
8    Q.  And what did you tell him?
9    A.  Person called me and asked me -- or identified
10  himself -- I don't know what his name is -- and that he
11  was investigating Mario Torres and wanted -- and was
12  told that Mark Owens had given him my name, that I
13  might have some information about him.
14    Q.  And what did you say?
15    A.  I told him I was hesitant to say anything to
16  him at all, because anything I would say would sound
17  like sour grapes on my part, since he had obviously
18  gotten some work from one of my clients.  And I -- he
19  said, "I understand that," and I said, "I don't know
20  anything about him."  I repeated what Mr. Torres
21  supposedly had said about WSPSA price fixing.
22    Q.  Did you say anything else to the
23  representative of the Liquor Control Board?
24    A.  If my memory serves me correctly -- and this
25  has been a long time ago.  Like I said, you know,

Page 55

1  why -- why would I remember any of this -- I believe
2  this person told me that Mr. Torres was under
3  investigation.  And I had told him what they had said
4  from Olympic Credit.  And he asked me if I knew
5  anything else about him.
6    And I said, "Nothing, other than the fact that
7  somebody told me that he sure was able to find people
8  quickly and that it had" -- the question had been
9  presented to me, "Well, do you think he's got access to
10  a lot of equipment," and I said, "I don't know what he
11  does, because I don't know him."
12    Q.  Who did you -- who did you hear that from --
13  that he was able to find people quickly?
14    A.  From one of the workers at Olympic Credit.
15    Q.  Do you recall who that is?
16    A.  Her name was Lee.  She's not employed there
17  any longer.
18    Q.  Do you know Lee's last name?
19    A.  No, I don't remember her last name.
20    Q.  Do you remember what -- when that call was?
21  When you talked to Lee?
22    A.  No, I don't.
23    Q.  And who asked you or indicated to you that he
24  might have access to equipment?
25    A.  Nobody ever indicated that he had access to

Page 56

1  any equipment.
2    Q.  Okay.  Earlier you said somebody told you that
3  he sure was able to find people quickly --
4    A.  Right.
5    Q.  -- and then they --
6    A.  And they said, "Well, do you think he's
7  got" -- because we -- like in my office, I have a
8  locate program.  So, in reference to, well, he must
9  have access to something, you know.  What other -- what
10  else does he have?
11    Q.  So did you ask the question of what other
12  equipment he must have access to, or did somebody else
13  ask that question?
14    A.  Somebody else asked that question, I believe.
15    Q.  Did you have an answer for that question?
16    A.  No, I did not.  I don't know.
17    Q.  Do you have any personal knowledge about how
18  Mario Torres or Casey Investigations conducts their
19  business?
20    A.  None.
21    Q.  Ms. Pefley, what is your telephone number at
22  work?
23    A.  (509) 766-2111.
24    Q.  And how long has that been the work number?
25    A.  Forever.

Page 57

1    Q.  And do you have a cell phone?
2    A.  Yes, I do.
3    Q.  What is that number?
4    A.  771-2526.
5    Q.  (509)?
6    A.  Um-hum, yes.
7    Q.  Thank you.  And how long have you had that
8  cell phone number?
9    A.  I don't know.  Three, four years.
10    Q.  Have you ever had a -- a different cell phone
11  number?
12    A.  A long time ago.
13    Q.  Within the last four years, have you had a
14  different cell phone number?
15    A.  I don't think so.  I don't remember.
16    Q.  Okay.  And what is your home number?
17    A.  (509) 764-6722.
18    Q.  Who is the service provider for the work
19  phone?
20    A.  I don't know.
21    Q.  And who is your service provider for your cell
22  phone?
23    A.  T-Mobile.
24    Q.  Has it been T-Mobile for the past three or
25  four years?

15 (Pages 54 to 57)

Diane L. Pefley                                                    February 17, 2005

Page 58

1    A.  I believe so.
2    Q.  And who is the service provider for your home
3  phone?
4    A.  Quest.
5    Q.  Has it been Quest for the past three or four
6  years?
7    A.  (Witness nodded.)
8    Q.  Is that a yes?
9    A.  I think so.  AT&T might have squeezed in there
10  someplace, but I can't remember when.
11    Q.  Do you keep any of your phone records?
12    A.  No.
13    Q.  Does A to Z keep any of its phone records?
14    A.  I'm sure the bookkeeper does.
15    Q.  And who is the bookkeeper for A to Z?
16    A.  It's in our corporate office in Bellingham.
17    Q.  Do you know their name?
18    A.  Mary.
19    Q.  Do you know Mary's last name?
20    A.  Hone.
21    Q.  Could you please spell that.
22    A.  I think it's H-o-n-e.
23    Q.  And how long has she been the bookkeeper
24  there?
25    A.  I don't know.

Page 59

1    Q.  How long have you been working with Mary Hone?
2    A.  Since the merge of the two businesses.
3    Q.  So I'm correct in -- am I correct in sort of
4  characterizing what you said is that you have a cell
5  phone and a home phone, and you do not keep any
6  telephone records or bills for those phones?  Is that
7  correct?
8    A.  Nope.  Pay my bill, and I don't keep them.
9    Q.  The conversation you had with the person from
10  the Liquor Control Board, that was telephonic; is that
11  correct?
12    A.  Yes, sir.
13    Q.  And from what phone did you speak with him?
14    A.  I do not remember.  Either my office or my
15  cell phone.
16    Q.  Do you use your cell phone for business or
17  personal use or for a combination --
18    A.  Both.
19    Q.  -- of both?
20    A.  Combination.
21    Q.  Does -- does A to Z pay part of your cell
22  phone bill?
23    A.  A to Z pays the cell phone bill -- or the
24  corporate.
25    Q.  Which is?

Page 60

1    A.  SSP.
2    Q.  SSP.
3    MR. MYHRE:  I'd like to take a moment, and
4  would you please mark this as Exhibit-15.
5    Q.  Ms. Pefley, I'm going to pass around an
6  exhibit.  It's going to be marked No.-15.
7    (Exhibit-15 marked.)
8    (Discussion off the record.)
9    Q.  Let me know when you're done reviewing it.
10    A.  I'm . . .
11    Q.  Okay.  Ms. Pefley, what you have here marked
12  as Exhibit-15 is an e-mail from a Rick Phillips to a
13  Rex Prout.  The -- in the e-mail, Rick Phillips
14  indicates that he spoke with you.  Does this refresh
15  your memory as to who you might have spoken to at
16  Liquor Control Board?
17    A.  It does not refresh my memory about the name
18  of who I spoke to.
19    Q.  But it was a man at the Liquor Control Board?
20    A.  Um-hum, yes.
21    Q.  Could it have been Rick Phillips?
22    A.  Obviously, yes.
23    Q.  All right.  In this letter, he indicates that
24  he spoke to you and that you had spoken with Mark
25  Owens?

Page 61

1    A.  Um-hum.
2    Q.  And that Mr. Owens had given you Rick
3  Phillips' number.  Do you recall that as having been
4  what took place?
5    A.  I recall Mark -- yes, I recall Mark calling
6  and giving me a phone number.  I do not remember the
7  name.  I recall him saying that this man wanted me to
8  call him.
9    Q.  And did you, in fact, call this man?
10    A.  I cannot remember if he called me or if I took
11  the phone number and called him.
12    Q.  He indicates in this e-mail that you -- and
13  I'll just read this, so we have it out there, "I told
14  her we had" -- quote, I told her we had initiated an
15  investigation -- excuse me, go back a paragraph.
16    Quote, She wanted to share that she thinks
17  Officer Torres has been using his access to State
18  computers to get addresses and other information for
19  his personal business of serving papers, end quote.
20  Did you say this to -- to the person --
21    A.  No, I don't believe I did.
22    Q.  And what is the basis for your -- for your
23  saying you don't believe you said that?
24    A.  I believe in the conversation that I had with
25  him, I was relaying to him rumors, things that had been

16 (Pages 58 to 61)

Diane L. Pefley                                                                    February 17, 2005

Page 62

1  said to me, not sharing information with him that I had
2  information or a fact that I knew this man was doing
3  that. I was telling him what I had heard.
4      Q. And by "rumors," are you referring to the two
5  rumors we've previously spoken about?
6      A. About the man being on investigation, yes, and
7  about -- what was it? When Lee had said how he, you
8  know, sure could find people. What does he have? I
9  don't know.
10     Q. In the next paragraph, he says that he told
11 you they had initiated an investigation into the
12 complaints and would have the investigator contact you.
13 Were you subsequently contacted by an investigator?
14     A. See, that I don't remember at all. I remember
15 talking to someone. I do not know if it was one time,
16 two times. I know I was told that there was an
17 investigation going.
18     Q. So, after this conversation, you can't recall
19 if you were contacted again?
20     A. I don't -- no, I don't remember.
21     Q. Ms. Pefley, I'd like to talk to you for a
22 moment about your affirmative defenses in this matter.
23     A. Okay.
24     Q. Are you aware that you have alleged
25 affirmative defenses in this case?

Page 63

1      A. Yes.
2      Q. Yes. So what I'm now going to be asking you
3  is sort of the factual basis for those defenses. And
4  it's your knowledge of the factual basis of that.
5      (Mr. Fearing left.)
6      MR. WINSKILL: He's just going to ask you
7  about your understanding of those things, okay?
8      THE WITNESS: Right.
9      Q. Were you served with a summons and complaint
10 in this matter?
11     A. No, sir, I was not.
12     Q. Was A to Z served?
13     A. No, they were not.
14     Q. And how do you know that A to Z was not
15 served?
16     A. I have a secretary. If my office had been
17 served with anything, I would have known.
18     Q. So the basis for your knowledge that A to Z
19 was not served is that your secretary did not --
20     A. Well, nobody came in. I -- I never was served
21 with anything. My office nor myself.
22     Q. How did you become aware of this lawsuit?
23     A. I was working in Wenatchee for the day and
24 MaryLee had heard -- I don't even know how -- she
25 called me.

Page 64

1      Q. "MaryLee," you mean, MaryLee Rustand?
2      A. MaryLee Rustand, yes.
3      Q. And she informed you of the lawsuit; is that
4  correct?
5      A. Yes.
6      Q. Ms. Pefley, one of the affirmative defenses
7  you asserted was that the plaintiffs had failed to
8  state a claim. What is the factual basis for that
9  particular assertion? To the best of your
10 understanding.
11     MR. WINSKILL: If you know.
12     A. I don't know.
13     (Mr. Fearing entered.)
14     THE WITNESS: How's that?
15     Q. The next assertion you have made is that this
16 matter lacks -- or this complaint lacks subject matter
17 jurisdiction. What is your understanding of the
18 factual basis for that assertion?
19     A. You have to speak with my attorney about that.
20     Q. Do you have any understanding at this time --
21     A. No, sir.
22     Q. The next affirmative defense you have asserted
23 is -- is the contributory fault of the plaintiffs. Do
24 you have any understanding of the factual basis for
25 that assertion?

Page 65

1      A. No, sir.
2      Q. You have asserted that your acts were
3  privileged. What is the basis for that assertion?
4      A. I'll let you -- I don't know.
5      THE REPORTER: Excuse me?
6      MR. WINSKILL: Nothing.
7      THE WITNESS: I'm just talking.
8      Q. Did you need to take a break?
9      A. No, I'm fine.
10     Q. Next you asserted that this lawsuit is not
11 well grounded in fact or law and is frivolous. What is
12 the basis for that assertion?
13     MR. WINSKILL: Your understanding.
14     A. I have got lots of things going through my
15 mind here --
16     Q. Okay.
17     A. -- that I --
18     Q. Just answer it to the best of your ability.
19     A. If you were asking me, I would say yes, I
20 think it's frivolous because I don't believe I did
21 anything. I -- I repeated what I heard. I didn't
22 state anything as being fact or having any knowledge
23 of.
24     Q. Did you talk to anyone else concerning these
25 rumors other than the people from the Liquor Control

17 (Pages 62 to 65)

www.seadep.com                                                          FAX: (206)622-6236

Diane L. Pefley                                                      February 17, 2005

---

Page 74

1    record is clear that --
2         MR. MYHRE:  Well, let's give them the same
3    exhibit numbers.
4         MR. WINSKILL:  -- that we have duplicates.
5         MR. MYHRE:  Yeah.
6         MR. WINSKILL:  But what has been marked today
7    as Exhibit-15 and discussed in the questioning of Ms.
8    Pefley, which is the July 11th, Rick Phillips e-mail to
9    Rex Prout, is Exhibit-6, which was marked and discussed
10   during the deposition of Mario Torres on Monday.
11        And what has just been marked as Exhibit-16,
12   which is an e-mail from Rick Phillips also to Rick
13   Prout, dated July 10th, has previously been marked and
14   discussed as Exhibit-4 in the deposition of Mario
15   Torres on Monday of this week.
16        MR. MYHRE:  All right.  So let's correct.  The
17   references to that exhibit -- so the July 10th exhibit
18   which you now have before you is Exhibit-4.  And the
19   July 11th e-mail that we previously discussed is
20   Exhibit-6.
21        MR. WINSKILL:  Well, they've already been
22   marked here, and so you're either going to have to
23   withdraw them or just -- you know, just keep them in,
24   but recognizing they're duplicates.
25        MR. MYHRE:  Well, let's just withdraw 15 and

Page 75

1    16.
2         MR. WINSKILL:  Okay.  All right.
3         MR. MYHRE:  That way -- I think it would be a
4    lot easier if we don't have duplicates in the record.
5         MR. WINSKILL:  Well, I'm going to hand them
6    back to the court reporter, so 15 and 16, and she can
7    dispose of them.
8         Q.  All right.  In this e-mail, Mr. Phillips says
9    that he spoke with -- with Mark Owens.
10        MR. WINSKILL:  "This" being Exhibit-4.
11        MR. MYHRE:  "This" being Exhibit-4.
12        Q.  And he indicated that Mr. Owens, quote, Also
13   said he had an affiliate in the Moses Lake area who
14   said that Mario is killing her business.  He is only
15   charging $30 to serve papers in Moses Lake, Coulee
16   City, et cetera, and they feel the only way he can do
17   it so cheap is to be doing it on State time and using
18   his State vehicle, end quote.  Are you the affiliate in
19   Moses Lake?
20        MR. WINSKILL:  Well, you're asking her to
21   speculate.
22        MR. MYHRE:  Well, I'm --
23        MR. WINSKILL:  If you're asking her if she's
24   the person who said that, then I guess that would be
25   speculation.

Page 76

1         Q.  Are you the person who said that?
2         A.  I never said he was killing my business.
3         Q.  Did you say that Mario was only charging $30
4    to serve papers in Moses Lake, Coulee City, and other
5    areas?
6         A.  I probably said 25 to 30.  Did I tell that to
7    Mark?  Yes, I did.
8         Q.  Did you -- did you tell Mark Owens that you
9    felt the only way he could do this so cheap is to be
10   doing it on State time using State vehicles?
11        A.  No, I did not.
12        Q.  All right.  Thank you.  Have you ever spoken
13   with Rachel Montgomery?
14        A.  No.
15        Q.  Do you know who Rachel Montgomery is?
16        A.  No.
17        Q.  Does A to Z do business outside of the state
18   of Washington?
19        A.  I forward papers out, outside the state of
20   Washington, when it's needed.
21        Q.  And that's using the same process of referral
22   that you had testified to earlier?
23        A.  It's using -- picking up the NAPPS book and
24   going through it and seeing who lives in that area that
25   might be able to serve the paper for me.

Page 77

1         Q.  And the -- the out-of-state process servers
2    then bill you, and you invoice your client; is that
3    correct?
4         A.  Yes.
5         Q.  2002, approximately how much business did you
6    send outside of the state of Washington?
7         A.  I don't know.
8         Q.  Same question for 2003.
9         A.  I don't know.
10        Q.  And for 2004.
11        A.  I don't know.
12        Q.  Does A to Z keep records?
13        A.  Yeah.  I don't do a great lot out of state.
14        Q.  On average, how much a month would you
15   estimate you --
16        A.  I think you --
17        MR. WINSKILL:  Let him finish the question,
18   please.
19        Start over again.
20        Q.  On average, what do you estimate is the number
21   of papers that you -- you send out of state for
22   service?
23        A.  I wouldn't average it a month.  I would say,
24   by year, it may be a dozen a year perhaps.
25        Q.  Is that true for each year, 2002 through the

20 (Pages 74 to 77)

Diane L. Pefley                                    February 17, 2005

---

Page 82

1  been used in prior depositions.
2         MR. WINSKILL:  The Lack letter -- I can see
3  that in front of you -- that's Exhibit-2.
4         MR. MYHRE:  That's Exhibit-2.
5         (Discussion off the record.)
6     Q.  Exhibit-No.-2 is a letter from Robert Lack to
7  Rex Prout dated June 30th, 2003.  If you will turn to
8  the second page of the letter.  On the second page of
9  the letter, there are a list of affidavits,
10  approximately ten of them.  Could you review that list.
11    A.  Um-hum.
12    Q.  Are you familiar with any of those affidavits?
13    A.  Do I know the people?  No.
14    Q.  No, have you -- well, let's -- let me rephrase
15  the question.  In -- in Moses Lake, these ten
16  affidavits were filed, and they were retrieved by
17  someone in the Moses Lake area for a Mr. Robert Lack.
18  Were you contacted by Mr. Lack concerning these
19  affidavits?
20    A.  No.
21    Q.  All right.  Did you retrieve these affidavits
22  for Mr. Lack or for any other person?
23    A.  Not me personally.  Someone in my office did.
24    Q.  Someone in -- and by "someone" in your office,
25  you're referring to who specifically?

Page 83

1     A.  His name is Ron Simpson.
2     Q.  Ron Simpson.  And he's -- what is the title of
3  his job?
4     A.  He was -- he's an employee -- does our courier
5  run, our courthouse run, file and conform documents, do
6  document retrieval.
7     Q.  Were you aware that he was sent to retrieve
8  these affidavits?
9     A.  Yes.
10    Q.  Okay.  And how were you made aware of that?
11    A.  I had requested my office to see if we could
12  obtain copies of some documents from Grant County.  I
13  put the request in Ron's box and asked him to see what
14  he could find.
15    Q.  Who made that request?
16    A.  I believe it came from Mark's office.
17    Q.  By "Mark," you mean, Mark Owens?
18    A.  Yes.
19    Q.  And did Ron Simpson convey these affidavits to
20  Mark Owens' office?
21    A.  No.  He brought them to my -- back to our
22  office, and they were faxed over to Mark's office.
23    Q.  Did you ever speak with Mark Owens or Robert
24  Lack about this request?
25    A.  I never spoke with Robert Lack.  I don't even

Page 84

1  know who he is.  Mark -- I -- if my memory serves me
2  correctly, had called and said that there was something
3  with the -- an investigation on Mr. Torres and they
4  needed -- he had pulled some affidavits in Benton and
5  Franklin County and could I possibly be able to find
6  some affidavits of service that were -- that pertained
7  to Casey Investigations, specifically Mr. Torres.
8     Q.  Okay.
9     A.  And I just said I'd try.
10    Q.  Did you --
11    A.  No.
12    Q.  Did you invoice Mark Owens or Pronto for that
13  service?
14    A.  No, I did not.
15    Q.  Okay.  Did you do that service free of charge?
16    A.  Yes.
17    Q.  And why did you do that free of charge?
18    A.  Because it was my understanding that Mark had
19  been in contact with someone -- and I do not know
20  who -- that there was an investigation relative to Mr.
21  Torres and that Mark had been requested to see if he
22  could find some of this information so as to help with
23  the investigation.  That is all I knew.
24    Q.  Okay.  Did you have any other involvement in
25  the retrieval of these affidavits?

Page 85

1     A.  No.
2     Q.  Was Ron Simpson compensated for his time in
3  retrieving those affidavits?
4     A.  Well, he was on the clock, yeah, working for
5  me, so . . .
6     Q.  I'd like to turn now to Exhibit-13.  Woops.
7         (Discussion off the record.)
8     Q.  Exhibit-13 is a March 22nd letter.  Do you
9  have --
10        MR. WINSKILL:  I've got a copy of it.
11    Q.  From Mario Torres to Mark Owens.  It's dated
12  March 22nd, 2002.  In the letter, Mr. Torres is
13  discussing a number of false allegations made about
14  him.  Would you review that letter for just a moment.
15  Have you ever seen that letter before, Ms. Pefley?
16    A.  Not that I remember.
17    Q.  Did Mr. Owens ever call you to discuss this
18  letter?
19    A.  I remember something that Mark had told me
20  that he had received a letter from -- from Mr. Torres
21  or he came to his office, but I don't remember anything
22  else about it.  It -- I don't recall ever seeing the
23  letter.
24    Q.  Okay.  Did Mr. Owens discuss any of the
25  content of this letter with you?

22 (Pages 82 to 85)

Diane L. Pefley                                          February 17, 2005

---

**Page 86**

1    A.  I believe that he told me that Mr. Torres had
2  said that he was saying something about him, but
3  that's -- I don't -- like I said, I don't really
4  remember any specifics.
5    Q.  Did he indicate to you what any of those
6  allegations were?  What those comments were?
7    A.  No.  No.
8    Q.  I'd like you to take a look at Exhibit-14 to
9  prior depositions.  This is -- your counsel will --
10    MR. WINSKILL:  I'll find a copy of it here.
11    Q.  This is a second letter from Mario Torres to
12  Mark Owens, dated July 10th, 2003.  Would you take a
13  moment to review that letter, please.  Okay.  Have you
14  ever seen this letter before?
15    A.  I don't think so.
16    Q.  Did Mark Owens ever discuss this letter with
17  you?
18    A.  I don't think so.
19    Q.  How many meetings of the Washington State
20  Process Servers Association have you gone to?  Have you
21  attended?
22    MR. WINSKILL:  This is -- you're talking about
23  these yearly meetings, or you're talking about in
24  connection with the board meetings or how --
25    MR. MYHRE:  Let's -- we'll start with the

**Page 87**

1  yearly meetings.
2    A.  I think I've gone to every convention, except
3  for one which was in -- I think my son got married in
4  2000, I think, and if it -- the convention was at the
5  same time as my son's wedding, and so I didn't go.
6    Q.  And how many meetings did you attend when you
7  were working with the board?
8    A.  In '04, two, I believe.
9    Q.  So, as secretary, you attended two meetings?
10    A.  I -- I believe -- I believe it was two.
11    Q.  In any of the meetings you attended, either as
12  a secretary or the yearly conventions as a -- in
13  whatever capacity you were attending, was Mario Torres
14  or Casey Investigations ever discussed?
15    A.  Yes.
16    Q.  And what were those discussions?
17    A.  Are you saying in an actual meeting?  Excuse
18  me.
19    Q.  Well, I'm unsure as to -- as to how the
20  meetings actually occur.  So, conceptually, at any of
21  the meetings, either in a formal meeting or in an
22  informal way, was Mario Torres or the plaintiffs
23  discussed?
24    A.  Yeah, the name was brought up.  But it was
25  never in a meeting.  It was when a meeting would break

**Page 88**

1    Q.  So he was -- the plaintiffs were discussed?
2    A.  Like people are all there -- I'm talking about
3  the state convention.  I'm not talking about just a
4  board meeting.
5    Q.  So the plaintiffs were discussed at breaks in
6  the -- during this state convention?
7    A.  Well, might not -- not like, "Let's all run
8  out in the hall and talk about Mario Torres," no.
9    Q.  Well, what were the discussions?
10    A.  It was -- people -- obviously the man had
11  stepped on a few people's toes.
12    Q.  And by that, what do you mean?
13    A.  I mean, that he was coming into their backyard
14  saying things, obviously, if it was getting back to
15  us -- saying things that were not true.  So, if there
16  was a break and there was somebody -- and this is
17  particularly in Eastern Washington -- and somebody was
18  there and his name was brought up, you know, Did you
19  hear Mr. Torres is serving papers for so and so now,
20  and he's still saying that WSPSA price fixes.  That was
21  pretty much what it was.
22    Q.  So did -- it's your understanding that Mario
23  had taken some of the clients from the WSPSA members?
24    A.  I don't know how many.  I only know that he
25  took one client from me.

**Page 89**

1    Q.  Who was present in these discussions?
2    A.  I don't know.
3    Q.  Who participated in these discussions?
4    A.  Mark would talk about him and just what was
5  going on in his area.  Dennis Copeland would talk about
6  things that he had heard about him down in the Yakima
7  area.  And I'm a real good listener.
8    Q.  Would anyone else discuss Mario or the
9  plaintiffs?
10    A.  Not anybody's name that I can think of right
11  now, no.
12    Q.  Were there others participating in the
13  discussion?
14    A.  No.
15    Q.  So, this discussion would be between you and
16  Mark Owens and Dennis Copeland?
17    A.  Yes.  And there could have been other people.
18  I don't know who was standing around listening.  It was
19  at like a break, a session -- you know, you're standing
20  there, and you go out, and conversations are going.
21  Half the people are paying attention, and half aren't.
22  It was a BS session.
23    Q.  I got the impression that this kind of
24  conversation took place more than once.  Did it occur
25  more than once?

23 (Pages 86 to 89)

Diane L. Pefley                                                                      February 17, 2005

Page 90

```
 1        A.  I probably heard his name brought up several
 2  different times.
 3        Q.  Were these at different convention meetings?
 4        A.  Um-hum.
 5        Q.  Is that a yes?
 6        A.  Yes.
 7        Q.  Yes.  Was anything else said regarding Mario
 8  Torres or Casey Investigations?
 9        A.  Not to my knowledge.
10        Q.  Was it the same people having these
11  conversations at each of these meetings?
12        A.  Yes.  There could have been others, as far as
13  I know, but I wasn't in the same group.
14        Q.  Have you ever discussed Mario Torres or Casey
15  Investigations with any potential clients from 2002 to
16  the present?
17        A.  Absolutely not.
18        Q.  And other than the Liquor Control Board, have
19  you ever discussed Mario Torres or Casey Investigations
20  with any governmental entity?
21        A.  Absolutely not.
22        MR. MYHRE:  All right.  Ms. Pefley, I have no
23  further questions at this time.
24        THE WITNESS:  "At this time."
25        MR. WINSKILL:  I have no questions.
```

Page 91

```
 1        MR. ZISSLER:  No questions.
 2        MR. FEARING:  No questions from me.
 3        MR. WINSKILL:  We reserve signature.
 4        MR. MYHRE:  And pending other information
 5  coming to light with other depositions, such as
 6  discovery responses, we may need to speak with you
 7  again, but for now, we're done.  Thank you very much.
 8        MR. WINSKILL:  We don't agree with that --
 9        THE WITNESS:  Nice meeting you.
10        MR. WINSKILL:  -- but we will cross that
11  bridge when we come to it.
12        (Deposition adjourned at 12:13 p.m.)
13        (Signature reserved.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 92

```
 1                S I G N A T U R E
 2
 3
 4
 5        I declare under penalty of perjury under the
 6  laws of the State of Washington that I have read my
 7  within deposition, and the same is true and accurate,
 8  save and except for changes and/or corrections, if any,
 9  as indicated by me on the CHANGE SHEET flyleaf page
10  hereof.  Signed in...............WA on the......day
11  of.................., 2005.
12
13
14
15        ..........................
16        DIANE L. PEFLEY
17        Taken:  February 17, 2005
18
19
20
21
22
23
24
25  Mindi L. Pettit, RPR, CCR
```

Page 93

```
 1             C E R T I F I C A T E
 2  STATE OF WASHINGTON  )
 3                       ) ss.
 4  COUNTY OF KING       )
 5        I, the undersigned Registered Professional
 6  Reporter and an officer of the Court under my
 7  commission as a Notary Public for the State of
 8  Washington, hereby certify that the foregoing
 9  deposition upon oral examination of DIANE L. PEFLEY was
10  taken before me on February 17, 2005, and transcribed
11  under my direction;
12        That the witness was duly sworn by me to
13  testify truthfully; that the transcript of the
14  deposition is a full, true, and correct transcript to
15  the best of my ability; that I am neither attorney for,
16  nor a relative or employee of, any of the parties to
17  the action or any attorney or counsel employed by the
18  parties hereto, nor financially interested in its
19  outcome.
20        IN WITNESS WHEREOF, I have hereunto set my
21  hand and seal this date:  February 24, 2005.
22        /S/MINDI L. PETTIT
23        NOTARY PUBLIC in and for the State of Washington,
24        residing at Snohomish.  Commission expires
25        June 27, 2006.
```

24 (Pages 90 to 93)