# EXHIBIT 2

```
 1                  UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF WASHINGTON
 3                           AT SEATTLE
 4   CASEY INVESTIGATORS LLC, a      )
     Washington Limited Liability    )
 5   Company, and MARIO A. TORRES,   )
     an individual,                  )
 6                                   )
              Plaintiffs,            )
 7                                   )
         vs.                         )         No. CV04-1453 C
 8                                   )
     PRONTO PROCESS SERVICE, INC.,   )
 9   a Washington corporation;       )
     NORTHWEST RAIL ENTERPRISES,     )
10   INC., a Washington corporation;)
     MARK OWENS, an individual;      )
11   GREGORY and MARY LEE RUSTAND,   )
     individually and as a married   )
12   couple; DIANE PEFLEY, an        )
     individual; A to Z LEGAL        )
13   SUPPORT SERVICES, a Washington  )
     business entity; ROBERT G.      )
14   LACK, an individual; WASHINGTON)
     STATE PROCESS SERVERS           )
15   ASSOCIATION, a Washington       )
     business association; and      )
16   NATIONAL ASSOCIATION OF         )
     PROFESSIONAL PROCESS SERVERS,   )
17   a national business association)
                                     )
18            Defendants.            )
19   _____
20
                DEPOSITION UPON ORAL EXAMINATION OF:
21                       MARIO A. TORRES
22   _____
23
24
25
```

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 82

1  just extended it again one year.
2  Q. Have you had to rebid?
3  A. No.
4  Q. And the seven counties -- You got seven counties in
5     September of 2001?
6  A. Right.
7  Q. And those seven counties are Asotin, Garfield,
8     Pend Oreille, Grant, Adams, Chelan and Douglas?
9  A. Yes, sir.
10 Q. From whom did you take the Chelan County work when you
11    were the successful bidder?
12 A. I don't know who.
13 Q. From who did you take the Douglas County work?
14 A. I don't know.
15 Q. From whom did you take the Grant County work?
16 A. I think Grant County was A to Z.
17 Q. Do you know that for sure?
18 A. I don't know that for sure, but I did have -- I had a
19    client over in Wenatchee, and one of the gals there who
20    was serving when I got the contract, when I knew I was
21    going to have to be in those areas, those counties, our
22    company was going to be serving papers there, I
23    figured, hey, we better start picking up clients over
24    here because there isn't a whole lot of state papers to
25    serve over there. So, I went over there -- I remember

Page 83

1     I went in to the collection agency over there, Olympic,
2     and they told me, when I introduced myself, they said,
3     "Oh, you're the guy who won the contract, won the
4     state contract," and I go, "Yeah, we're up here."
5  Q. For Grant County?
6  A. Yeah, for Grant. And they had told me they had been
7     using A to Z.
8  Q. And did you get the Olympic Credit work --
9  A. Yes.
10 Q. -- for process serving?
11 A. I was doing work for them. I don't no longer have them
12    as a client, but I did.
13 Q. And from whom did you take the work from?
14 A. I don't know who.
15 Q. Who has the work now?
16 A. I have no idea.
17 Q. During what time did you do process-server work for
18    Olympic?
19 A. I want to say 2002, around January 2002 to probably
20    about four months ago, three months ago.
21 Q. Why did Olympic stop using your services?
22 A. They didn't tell me. They did not tell me.
23 Q. Do you have any idea or opinion why they no longer use
24    your services?
25 A. No. The only thing they said was that they were going

Page 84

1     to be doing some changes and that was it.
2  Q. Had Olympic complained to you about your performance?
3  A. No.
4  Q. Who at Olympic did you have contact with?
5  A. The owner, the female owner there, and also one of the
6     workers there. Her name is Judy. I don't think she
7     was there anymore.
8  Q. What was the name of the female owner?
9  A. Cindy -- Cindy is her name.
10 Q. Do you blame Pronto Process or Mark Owens for losing
11    the Olympic work?
12 A. No.
13 Q. Do you blame Robert Lack for losing the Olympic work?
14 A. No.
15 Q. Do you blame A to Z for losing the Olympic work?
16 A. No.
17 Q. Or Diane Pefley?
18 A. No.
19 Q. Or the Rustands?
20 A. No. They wouldn't tell me. They just didn't -- They
21    refused to tell me why they were not going to do
22    business us with us anymore. They just said, you know,
23    we're going to -- we've decided to try something new,
24    is what they told me. That was it. Short and brief.
25 Q. During what days do you personally serve papers?

Page 85

1  A. I serve papers pretty much every day.
2  Q. During what hours do you serve papers?
3  A. It just depends. I don't have any set hours.
4  Q. During what hours of the day can businesses with liquor
5     licenses serve liquor?
6  A. What?
7  Q. During what hours of the day can an establishment with
8     a liquor license serve liquor?
9  A. Oh, they can start serving alcohol at 6 a.m. And at
10    2 a.m. all alcohol has to be cleared off the tables, no
11    one can be in possession of any alcohol.
12 Q. Did you ever work as a Liquor Control Board agent
13    between 2 a.m. and 6 a.m.?
14 A. Did I ever work -- Yeah, I worked as an agent.
15 Q. Between 2 a.m. and 6 a.m.?
16 A. Yeah, sometimes I did.
17 Q. What did you do during those hours when you worked?
18 A. You work as -- You go around and you look for
19    after-hours. You have to work -- At least once a
20    month you have to conduct after-hours inspections,
21    after 2:00. What you're looking for, you're looking
22    for parties, you're looking for the special customer
23    that gets to hang out after the bar closes. And so
24    that's what we're doing, you know.
25 Q. You're checking to see if some establishment is serving

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 90

1  A.  No, sir.
2  Q.  Do you still do work for Evergreen?
3  A.  Yes, sir.
4  Q.  When did you start doing work for Evergreen?
5  A.  I don't know the exact date. I believe we've had them
6      as clients for about two years, roughly two years, now.
7  Q.  Has anything that Mark Owens has done taken any work
8      away from you from Evergreen?
9  A.  No.
10 Q.  Has anything that Robert Lack has done taken away work
11     from you at Evergreen?
12 A.  No.
13 Q.  Same question with Pronto Process.
14 A.  From Evergreen?
15 Q.  Yes.
16 A.  No.
17 Q.  Same question with A to Z.
18 A.  No.
19 Q.  The Rustands, have they done anything to take work away
20     from you at Evergreen?
21 A.  No.
22 Q.  Diane Pefley?
23 A.  Now, when you say "take away" --
24 Q.  Yes.
25 A.  -- or sent information or --

Page 91

1  Q.  Taken away work from you.
2  A.  Have I lost work from them?
3  Q.  Yes.
4  A.  No, I have not.
5  Q.  Has the state association done anything that has caused
6      you to lose work with Evergreen?
7  A.  No, sir.
8  Q.  How long have you done work for Yakima County Credit
9      Services?
10 A.  They were our clients roughly about a year, for a year
11     and a half.
12 Q.  During what time?
13 A.  We stopped doing business with them around November of
14     last year.
15 Q.  Of 2004?
16 A.  Yes, sir.
17 Q.  Why did you stop doing business?
18 A.  They would not give me a reason.
19 Q.  Who at Yakima County Credit Services told you that it
20     would no longer do business with you?
21 A.  I believe it was the owner. Teresa is her name.
22 Q.  Do you know Teresa's last name?
23 A.  No, I don't.
24 Q.  Did anyone at Yakima County Credit Services ever
25     express displeasure with your services?

Page 92

1  A.  No.
2  Q.  Have you asked Yakima County Credit Services to tell
3      you why they stopped doing business?
4  A.  Yes, I did ask them.
5  Q.  And did you ask Teresa that?
6  A.  I did ask Teresa.
7  Q.  Did you ask anybody else that?
8  A.  No, I asked Teresa.
9  Q.  Did Teresa give you a reason why she would not give you
10     the reasons why they stopped doing business with you?
11 A.  No, she would not tell me. She said that she was just
12     going to try something new.
13 Q.  Where did you perform services for Yakima County Credit
14     Services?
15 A.  I performed them here in the surrounding counties,
16     Benton and Franklin and in Chelan County, Douglas
17     County, and possibly Adams County.
18 Q.  If you know, who does Yakima County Credit Services do
19     business with now in the counties for which you did
20     business for them?
21 A.  No, I don't know who they're using.
22 Q.  If you know, how much work, in terms of how much
23     income, did you have from Yakima County Credit
24     Services?
25 A.  How much --

Page 93

1  Q.  Income.
2  A.  -- income? I believe we were billing about $1,800 to
3      $2,000 for Yakima County Credit Service, somewhere
4      around there.
5  Q.  How often?
6  A.  Monthly.
7  Q.  If you know, from whom did you take Yakima County
8      Credit Services' business when you got their business?
9  A.  I'm not positive because they did not tell me, but I
10     assumed it was from Mark Owens in this area, from
11     Pronto.
12 Q.  Do you know from whom the business was taken in the
13     other counties?
14 A.  No.
15 Q.  During what period of time did you do work for Olympic
16     in the Wenatchee area?
17 A.  I don't know the specific times, but it was -- We had
18     them for -- We had them for about a year and a half,
19     and they stopped doing business with us, also, at the
20     same time that YCCS stopped doing business with us in
21     November.
22 Q.  Of 2004?
23 A.  Yes, sir.
24 Q.  Which would be more than a year after you quit work
25     with Liquor Control Board?

BY MR. FEARING

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

### Page 94

1  A.  Yes, sir.
2  Q.  Do you know why Olympic quit doing business with you?
3  A.  No, they would not tell me.
4  Q.  Did you ask somebody?
5  A.  I asked the owner.
6  Q.  Cindy?
7  A.  Cindy.
8  Q.  And what, if anything, did she say in response to your
9      asking?
10 A.  She didn't say nothing. She just said, you know,
11     "Mario, we're just going to do something different."
12     That's it. She says, you know, "I don't want to talk
13     about it," and I said, "Okay."
14 Q.  How much income did you have from Olympic in the
15     Wenatchee area?
16 A.  About $2,000.
17 Q.  How often?
18 A.  Monthly.
19 Q.  During what period of time did your business do work
20     for Olympic Collection in the Ellensburg area?
21 A.  We only served one or two papers for them.
22 Q.  When was that?
23 A.  Probably within the last year. I don't know
24     specifically when, what time, but I know I've got -- I
25     think we had like maybe two papers that came out of the

### Page 95

1      Ellensburg area.
2  Q.  And were those papers served after the Wenatchee
3      Olympic office quit doing work with you?
4  A.  No, no, this was before.
5  Q.  How much income do you get from Evergreen a month?
6  A.  It varies anywhere from $2,500 to up to $5,000 a month.
7  Q.  Do you have any knowledge of Mark Owens, Robert Lack,
8      Pronto Process, A to Z, the Rustands, Diane Pefley or
9      the state association doing anything that took the work
10     away from you from Yakima County Credit Services?
11 A.  I don't know. I don't know.
12 Q.  Do you have any knowledge that Robert Lack, Mark
13     Owens -- let me just say any of the defendants in this
14     case --
15 A.  Right, okay.
16 Q.  -- did anything that led to the Olympic Wenatchee
17     office taking work away from you?
18 A.  I don't know, sir.
19 Q.  How much work do you get from Roach & Petersen?
20 A.  Well, this month -- I served my first paper this year
21     for them last night, so it's not -- We maybe average
22     one legal document a month from them.
23 Q.  For how long have you been doing work for Roach &
24     Petersen?
25 A.  Since I started my business.

### Page 96

1  Q.  To your knowledge, does Roach & Petersen use other
2      process servers?
3  A.  Yes, sir.
4  Q.  Is there a particular lawyer in that firm who uses your
5      services, as opposed to the other lawyers?
6  A.  No, I've done serves for all of them. What they tell
7      me is, their regular server is Dina. There's certain
8      documents, there's certain places that Dina won't go,
9      or she gets afraid to go to certain places at night or
10     dealing with certain people, and so when that happens,
11     they'll call me and they'll say, "Mario, you know,
12     we've got some legal documents that need to be served,"
13     you know, like the ones I did last night, East Pasco,
14     10 o'clock at night, an eviction, you know. Dina
15     didn't want to do that, so, you know, they give it to
16     me. It's pretty much anything she doesn't want, you
17     know, so I take it.
18 Q.  Does Dina have someone who serves papers on behalf of
19     her company?
20 A.  I don't know if she's working with anyone or not. I'm
21     not sure.
22 Q.  Have you suggested to Roach & Petersen that the law
23     firm just use you as the process server since you're
24     willing to go anywhere, as opposed to Dina?
25 A.  Have I what?

### Page 97

1  Q.  Indicated to anyone at Roach & Petersen that the law
2      firm ought to use you exclusively because, unlike Dina,
3      you'll go wherever?
4  A.  No, I've never told them not to use Dina.
5  Q.  How often do you perform services for Steve Defoe?
6  A.  Only once. I only served one paper for them.
7  Q.  And when was that?
8  A.  Probably about two years ago.
9  Q.  Do you know why he used you on that occasion?
10 A.  I don't know. He needed something done. It was a rush
11     job that needed to be done that day and he couldn't
12     find anyone else that would do that, so he ended up
13     calling us. And I went over there and picked it up and
14     served it that day.
15        (Reporter requests recess)
16 A.  I was wondering if I could clarify something, sir.
17 Q.  Sure.
18 A.  Okay, before we left for lunch, I talked about that we
19     were a private investigation agency. I wanted to let
20     you know as a PI agency what access I have as a PI and
21     what we are able to run out of our home office. You
22     know, we're able to run license plates, Social Security
23     numbers, address histories, full asset checks, criminal
24     histories. We're able to do all that through our
25     computers from my house, or from my home, from my

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 102

1  A. Yes, sir.
2  Q. Did the State of Texas need to go through Washington
3     State to collect the child support?
4  A. No, sir. No, we ended up going over there. I ended up
5     going over there and having the -- the case -- The
6     child -- I was told about a child when the child was
7     17, 17 and a half. So, by the time I went to court to
8     fight about the child, the child had already turned 18,
9     and so the state did collect for a few months on that
10    case.
11 Q. Do you agree that you're the father of that child?
12 A. Yes, sir. Paternity was established.
13 Q. What year was paternity established?
14 A. It was established in 2003. It was established after
15    the child was 18.
16 Q. And do you have to pay the State of Texas back child
17    support now?
18 A. Yes, I've got to pay. There's a judgment on file.
19 Q. For how much?
20 A. I believe it's $20,000.
21 Q. And are you making monthly payments?
22 A. I'm not, at this point.
23 Q. Are you making any payments now?
24 A. No.
25 Q. Do you plan to make payments in the future?

Page 103

1  A. Oh, I'm planning to appeal the decision over there in
2     Texas.
3  Q. Do you have a lawyer in Texas that is assisting you?
4  A. I have had one. At this point, I don't have one. But
5     I did have one dealing with everything that was going
6     on over there.
7  Q. To your knowledge, do you still have appeal rights?
8  A. I do. I feel that I do.
9  Q. Do you know Robert Lack?
10 A. No, sir, I don't know him.
11 Q. Have you ever met him?
12 A. No, sir.
13 Q. If he walked in the room, would you recognize him?
14 A. No, sir.
15 Q. Have you ever called him on the phone?
16 A. No, sir.
17 Q. Do you know Mark Owens?
18 A. I've seen him, sir.
19 Q. Where have you seen him?
20 A. I saw him at the bidding for the state contract. He
21    was there. I also knew Mark when I was at the
22    Prosecutor's Office, whenever I had any process service
23    that needed to be sent out of the area where I wasn't
24    willing to travel, Seattle or wherever, I would take
25    papers over, walk them over to his office and hand it

Page 104

1     to him. I never talked to him, you know. I probably
2     said -- You know, I haven't had a very -- any
3     type of --
4     MR. ZISSLER:    I need to step out a second.
5     MR. FEARING:    Do you want us to continue?
6     MR. ZISSLER:    Yes.
7  Q. Would you recognize Mark if you saw him?
8  A. I would.
9  Q. To whom did you hand the papers at Pronto?
10 A. To him.
11 Q. When you would walk over?
12 A. Yeah. And I'd walk over there from the courthouse. I
13    walked over there and knew it was him.
14 Q. Where is his office?
15 A. It's in Pasco on -- I'm not sure of the street.
16 Q. 5th?
17 A. 5th and Clark, I think.
18 Q. Has it always been in the same place, to your
19    knowledge?
20 A. Yes, sir.
21 Q. Do you know Diane Pefley?
22 A. No, sir.
23 Q. Do you know Susan Rustand?
24 A. No, sir.
25    MR. WINSKILL:    My client, Rustand.

Page 105

1  Q. Do you know Mary Rustand?
2  A. No, sir.
3  Q. Greg Rustand?
4  A. No, sir.
5  Q. Have you ever spoken with them on the phone?
6  A. No, sir.
7  Q. Have you ever spoken to Diane Pefley on the phone?
8  A. No, sir.
9  Q. Have you ever spoken to any representative of A to Z on
10    the phone?
11 A. No, sir.
12 Q. Have you ever spoken to any representatives of Pronto
13    Process, other than Mark Owens?
14 A. No, sir.
15 Q. Do you believe that Robert Lack knew the statements
16    that you have identified as being false in Exhibit 2 to
17    be false?
18 A. I don't know what he's thinking. I don't know. The
19    only thing I know is that he's Mark Owens' friend,
20    roommate.
21 Q. Were you notified of Robert Lack's complaint before you
22    left employment with the Liquor Control Board?
23 A. I was notified of a complaint.
24 Q. Who notified you of a complaint?
25 A. Kevin Starkey. Senior Agent Kevin Starkey.

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 106

1  Q.  When did he notify you?
2  A.  He notified me July 9th, or, no, it was July 10th. All
3      he did was, he called me in the office and said, "Hey,
4      Torres, we've got a complaint came in on you," and he
5      started talking, "But," he says, "it involves your
6      business," and when he said that, I told him, I said,
7      you know, "I've gotten -- My clients have been calling
8      me, telling me that there's a guy calling, saying that
9      I'm doing, you know, that I'm a felon and I've done
10     some time, prison time, I'm carrying a gun and
11     flashing a badge and I'm serving papers using my patrol
12     car," and I go, "Does that sound like anything that
13     you're --" and he goes -- He didn't say anything.
14         He goes, "Look, I just know some guy sent a
15     complaint in and he's provided some affidavits." And I
16     go -- And he goes, "And we're going to go ahead and
17     move forward with the investigation." And I said,
18     "Well, what does that mean?" And he says, "Well,
19     we're going to -- This guy's also provided a list of
20     all your clients," and I go, well, you know, I said,
21     "Well, you can verify through all my time logs and
22     everything else. You're not going to be contacting any
23     of my clients are you?" And Kevin said, "Yeah." He
24     goes, "We're going to contact all your clients." He
25     says, "We got to."

Page 107

1      I says, "Well, if you do that, you're going to
2      give this guy -- you're going to give him a voice, if
3      the clients, you know, think that I'm being
4      investigated," because one of the complaints -- one of
5      my clients was telling me that I was being investigated
6      by the Liquor Control Board and I wasn't at that time,
7      but I said, "If you come over and start asking
8      questions, you're giving this guy the validity," I
9      said, "that you're investigating me." I go, "My
10     clients are going to walk on me if you do that." And
11     he goes, "I'm sorry, man. This is the way it's got to
12     be."
13         And I said, "Well, I'm not going to risk losing my
14     clients." I said, "What do I got to do?" He says,
15     "Well, you can put in your walking papers. If you put
16     in your walking papers, we're not going to call
17     anybody."
18         So, I wrote up my resume -- my resignation right
19     there, submitted my resignation. I said, "Here you
20     go." That was it.
21  Q.  This was a conversation with Mr. Starkey on July 10;
22     correct?
23  A.  As soon as he gave me the complaint, told me what they
24     were going to do, because he says they were going to
25     contact my clients, I said, "When are you going to

Page 108

1      start it up? How soon is this going to happen?" And
2      Kevin said, "On Monday." He says, "This coming Monday
3      the ball's going to start rolling." And I go, I said,
4      "Well, I can't have that." I said, "You guys call my
5      clients, they're all going to leave."
6  Q.  What day of the week was July 10?
7  A.  I believe it was a Thursday.
8  Q.  What time of the day was the conversation with Mr.
9      Starkey?
10 A.  About 2 o'clock, somewhere around there.
11 Q.  Where was the conversation?
12 A.  At the office, in his office, in Kennewick.
13 Q.  At the Liquor Control Board office?
14 A.  Right. We have an office that's used for seniors. Any
15     senior can use it at the office.
16         (Mr. Zissler now in attendance)
17 Q.  Any senior officer?
18 A.  Any senior agent.
19 Q.  Who else, if anyone, was present during that
20     conversation?
21 A.  No one was present. Just me and him.
22 Q.  Did Mr. Starkey identify the person who filed the
23     complaint?
24 A.  I don't believe so. I don't believe so, at that point.
25 Q.  Did Mr. Starkey ask you for your side of the story?

Page 109

1  A.  No. Didn't want to hear anything. He says he wasn't
2      going to be the investigating officer, wasn't going to
3      be in charge of the investigation. He was just told to
4      let me know that I was being placed under investigation
5      and that, you know, it was going to move forward.
6  Q.  Did he tell you who would conduct the investigation?
7  A.  I believe he told me it was Justin Nordhorn, who was a
8      senior agent at the time. Justin is now the agent in
9      charge of Region 4.
10 Q.  Was it your understanding that you would be able to
11     explain your side of the story during the
12     investigation?
13 A.  No, no, it was not my understanding.
14 Q.  Why was that not your understanding?
15 A.  Because -- Well, my understanding was that they were
16     going to contact my clients and, you know, take it from
17     there. And that was my biggest concern. That was my
18     concern right there. I knew, you know, whatever -- I
19     knew that I had never served papers using state time.
20     I've never ran anybody. I'm not even a felon. I knew
21     all that was, you know, was BS, you know, but I did not
22     want my clients to be contacted because I knew that
23     they were going to leave. And so when I found out that
24     they were going to do that, that the board had planned
25     to do that and that this guy had gave him all my

BY MR. FEARING

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 118

1  know who Rex Prout is?
2  A. Yes, sir.
3  Q. Who is Rex Prout?
4  A. He is the assistant chief of the liquor board.
5  Q. And was Rick Phillips then the chief?
6  A. Yes, sir.
7  Q. Who is Jesse Mack?
8  A. Jesse Mack was the agent in charge.
9  Q. Agent in charge of what?
10 A. Agent in charge of Region 4.
11 Q. Who is Barb Vane?
12 A. Barb Vane is the HR manager, director.
13 Q. For the Liquor Control Board?
14 A. Board, yeah.
15 Q. Who is Pat Kohler?
16 A. Pat Kohler's the one gal that has the -- she's the one
17    that has the job right over all the directors, between
18    the board members and the directors.
19 Q. On page 1 of Exhibit 5, in the body of the message it
20    begins: Louie or Luis. Do you know who Louie or Luis
21    is?
22 A. I don't.
23 Q. Do you know if Mr. Prout's middle name is Luis or
24    Louie?
25 A. No. I think Luis -- and I'm just going out on a

Page 119

1  limb -- I think he might be with the union. I think he
2  might be a union rep with WPEA, but I'm not positive.
3  Q. On July 10 were you served some papers?
4  A. What do you mean "served some papers?" Was I served
5     with a complaint, is that what you're talking about?
6  Q. Yes.
7  A. Yeah, I believe that was the day that Kevin gave me the
8     complaint.
9  Q. Did he give you the complaint that was written by Mr.
10    Lack?
11 A. No, no, he handed me --
12 Q. Did he hand to you the second and third pages of
13    Exhibit 5?
14 A. Right, yes, sir, I believe he handed me these. This is
15    what he handed me.
16    MR. MYHRE: Do you need to take a break?
17 A. Yeah. Can I take a break?
18 Q. Yes.
19 A. Okay. Thank you.
20           (Recess)
21 Q. On July 10 were you handed the second two pages of
22    Exhibit 5?
23 A. Yes, sir.
24 Q. Have you ever met Justin Nordhorn?
25 A. Yes, I know Justin.

Page 120

1  Q. Did you ever speak to him about this investigation?
2  A. No.
3  Q. To your knowledge, did the Liquor Control Board conduct
4     any investigation?
5  A. Yes, to my knowledge, they had already started an
6     investigation.
7  Q. Under your union contract were you entitled to a
8     hearing before being fired?
9  A. I believe so, sir.
10 Q. Do you have a copy of your union contract?
11 A. No, sir.
12 Q. Under Liquor Control Board rules were you entitled it a
13    hearing before you were fired?
14 A. Yes, sir.
15    (Exhibit No. 6 marked for identification)
16 Q. Mr. Torres, you're being handed Exhibit 6. Have you
17    seen this document before?
18 A. No, sir.
19 Q. Would you read the exhibit to yourself, please?
20 A. Yes, sir.
21 Q. Is any statement that is attributed to Miss Pefley in
22    this memo false?
23 A. I'm still reading the last paragraph.
24 Q. I'm sorry.
25 A. No problem, sir. Okay, now, did she ever say anything

Page 121

1  false, right?
2  Q. Any statement attributed to Miss Pefley in this
3     memorandum, or in this message, that is false.
4  A. I think the second paragraph here, she wanted to share
5     that she thinks Officer Torres has been using his
6     access to state computers to gather information for his
7     personal business of serving papers, that is definitely
8     false. That is not true.
9  Q. Do you have any knowledge as to whether Miss Pefley
10    believed that statement to be false?
11 A. No, sir, I don't know what she believed, but I know
12    this is not a true statement.
13    (Exhibit No. 7 marked for identification)
14 Q. Mr. Torres, you're being handed Exhibit 7. Can you
15    identify that exhibit, please?
16 A. Yes, sir. This is the e-mail I sent out to the boss,
17    let him know I was leaving.
18 Q. And the bosses are Jesse Mack, Mark Keller, Justin
19    Nordhorn, Kevin Starkey and Rex Prout?
20 A. Yes, sir, those are all --
21 Q. When did you resign?
22 A. That day, sir.
23 Q. July 14?
24 A. No, sir, the 11th.
25    MR. WINSKILL: It's dated the 11th.

31 (Pages 118 to 121)

BY MR. FEARING

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 134

1  those comments?
2  A. He had a book, and, no, he didn't tell me specifically,
3     but he said that he had contacted a couple of
4     collection agencies in Spokane.
5  Q. Is that book still around?
6  A. No, I don't have it.
7  Q. Have you asked Mr. Stotts for a copy of it?
8  A. No, I haven't talked to Stott in a year. Over a year,
9     since July.
10 Q. What, if any, other clients or potential clients have
11    told you that they've received contact from Mark Owens?
12 A. That's all I can remember, sir.
13 Q. Any other potential clients or clients who told you
14    that they had received contact from Robert Lack?
15 A. That's all I can remember, sir.
16 Q. Any clients or potential clients who told you they had
17    received contact from Pefley, Diane Pefley?
18 A. That's all I can remember.
19 Q. Or from the Rustands?
20 A. That's all I can remember, sir.
21 Q. Well --
22      MR. WINSKILL: Wait a minute.
23 Q. Did any of them say they had contact from the Rustands?
24 A. Okay. Sorry. Go back. You've kind of lost me there.
25 Q. Did any clients or potential clients indicate to you

Page 135

1     that they had received any calls from Diane Pefley
2     about you?
3  A. No.
4  Q. Same question with regard to the Rustands?
5  A. No.
6  Q. Same question with regard to any representatives of
7     A to Z?
8  A. No.
9  Q. Same question with regard to any representatives from
10    the State Process Servers Association?
11 A. No.
12 Q. Why are you suing the State Process Servers
13    Association?
14 A. I think that what the process servers association is
15    doing is, I think they're price-fixing. I think if
16    you're not part of their organization, then you are
17    going to be charged more money. And it's a control of
18    the paper. If I got a paper that comes in -- Let's
19    just say I've got a paper that needs to be served in
20    Seattle, so I'll call and the first thing the company
21    who answers the phone over there will tell me is: Are
22    you a member of the state NAPPS, you know, and I'll say
23    no, and they'll say, well, that's X amount of money for
24    the paper to get served over there.
25      And I'll say, well, how about if I am a member?

Page 136

1     And they go, well, it's 40 bucks. For members it's
2     40. For nonmembers it's 70. And, so, you know, no
3     matter where you go, that's what you get, you know.
4     I've had papers that needed to be served in Seattle.
5     I've called four different places and I get the same
6     response every time. You know, it's a controlled price
7     that they got, you know.
8        The same thing with over here. If a paper
9     needs to be served in this area, you know, it goes
10    straight -- if it originates, starts in Seattle, it
11    goes straight from ABC to Mark. It's a straight shot,
12    you know.
13 Q. Is Dina Navejar a member of the state association?
14 A. I don't know, sir.
15 Q. Do you have any other knowledge upon which you claim
16    that the state association fixes prices?
17 A. No, that's it, sir.
18 Q. Do you know who Northwest Rail Service is?
19 A. No, sir.
20 Q. Do you know that you're suing Northwest Rail Services
21    in this case?
22      MR. MYHRE:    If I can jump in here. That was
23 a typo on what got filed with the operative complaint,
24 so that particular party has never been served and is
25 not being treated as part of this case.

Page 137

1  Q. Okay. Do you know where the you even learned about
2     Northwest Rail?
3  A. What?
4  Q. I guess you've never even heard of it.
5  A. No.
6  Q. So, you don't know the answer to that question. To
7     your knowledge, has the Liquor Control Board contacted
8     any of your clients?
9  A. To my knowledge, they have not, sir.
10 Q. To your knowledge, has the Liquor Control Board
11    conducted any investigation of you?
12 A. Yes, sir, they have.
13 Q. And what investigation was done?
14 A. They investigated the complaint.
15 Q. What did they do to investigate the complaint?
16 A. They compared the affidavits that Robert Lack had
17    provided and given to Rex Prout, and they checked all
18    my logs. They compared my logs, my fuel card. They
19    conducted a mileage investigation. They did all that.
20    I found that out because when -- They never told me
21    they had done that, but when I requested their
22    disclosure and I got everything on the complaint, I saw
23    all the information that they had did. I saw their
24    numbers, everything that they used.
25 Q. Do you still have copies of those?

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 138

1  A.  I turned everything over to my lawyer.
2      MR. FEARING:    Were those produced?
3      MR. MYHRE:      I think those were produced.
4  Q.  Who conducted that investigation at the board?
5  A.  I'm not sure who it was. I'm not sure who that person
6      was.
7  Q.  What was the result of the investigation?
8  A.  Didn't say. Didn't say.
9  Q.  Do you know of any contact between Diane Pefley and
10     Mark Owens?
11 A.  Other than just the e-mail that I read that you just
12     gave me, I think that said that Mark -- On one of
13     those e-mails in here it says Mark is talking to the
14     chief and said, hey, talk to Diane, she's got some
15     additional information, something like that. That's
16     the only information I got.
17 Q.  Do you have any knowledge of Robert Lack getting a hold
18     of Miss Pefley?
19 A.  No, sir, not that I know of.
20 Q.  Do you have any knowledge of Mark Owens having contact
21     with the Rustands?
22 A.  Not that I know of.
23 Q.  Do you have any knowledge of Robert Lack having contact
24     with the Rustands?
25     MR. WINSKILL:   Rustand.

Page 139

1  Q.  R-u-s-t-a-n-d. I thought there was an N in there.
2      What was the answer? Do you want me to ask it again?
3      Do you have any knowledge of Robert Lack having contact
4      with the Rustands?
5  A.  Do I have any knowledge? No, I don't have any
6      knowledge. You know, what I want to know is, you guys
7      do this all the time? Wow.
8  Q.  Do what?
9  A.  Ask these questions, man. I've got a whole new respect
10     for you guys. I just thought I'd throw it out.
11     MR. MYHRE:      Mario has never been deposed.
12     So, to have a seven-hour conversation with four
13     gentleman is unusual for him.
14 Q.  Respect in a good regard?
15 A.  Normally, the my gist of my conversation is: Hey,
16     here's your document, and I'm out of there, you know,
17     15 seconds and I'm gone.
18     MR. MYHRE:      You're coughing a lot. Do you
19     want to take a break?
20 A.  Yeah, can we? For a little bit, if that's okay.
21 Q.  Sure.
22          (Recess)
23 Q.  Back on the record. Mr. Torres, if you know, is there
24     an ethics board within the Liquor Control Board?
25 A.  An ethics board? I'm not sure, sir. I don't know if

Page 140

1      there's an ethics board within the liquor board.
2  Q.  Have you heard of a gentleman by the name of Brian
3      Milorkee?
4  A.  No, sir.
5  Q.  Do you have any knowledge of Mr. Lack having contact
6      with the Attorney General's Office?
7  A.  No, sir.
8  Q.  Do you have any plans now to obtain any employment
9      other than your work with Casey Investigations?
10 A.  No, sir.
11 Q.  Have you been looking for any other work?
12 A.  What do you mean, sir?
13 Q.  Have you been looking to obtain employment with some
14     other entity?
15 A.  No, sir.
16 Q.  Would that be helpful to you so you could make more
17     money?
18 A.  Are you trying to say if I'm looking for clients? Is
19     that what you're trying to say, sir?
20 Q.  No. Looking for employment with an employer like the
21     Prosecutor's Office, a law enforcement office.
22 A.  Oh. Right. No, I'm not trying. I am trying to find
23     any clients. I was going to ask if I could serve your
24     papers after we're done here. I'll give you a good
25     price, man. We'll talk later, all right, George?

Page 141

1      MR. MYHRE:      You did open the door, George.
2  A.  Normally I can't get through the secretary up front,
3      so -- I got you right here, man.
4  Q.  Well, I've lost my place. Do you make enough money, as
5      far as you're concerned, with Casey Investigations to
6      support your family?
7  A.  Do I make enough money? Yes, sir. I can always make
8      more money. More money is good, but we're surviving.
9  Q.  If you gave my law firm a bid for your work, would you
10     underbid Pronto Process Service?
11 A.  I wouldn't know what his prices were. I would just
12     tell you what our prices would be and see if you could
13     live with that.
14 Q.  Would you tell me that you would charge $5 less than
15     what Pronto Process Service charges?
16 A.  No, I would say: I'll charge 25 to this area.
17 Q.  Have you ever told any clients or potential clients
18     that you would underbid other process servers?
19 A.  I have -- I have -- I have said that I would beat
20     anyone's price by 20 percent.
21 Q.  And to whom have you told that?
22 A.  I would send that out in a flyer when I very first got
23     started.
24 Q.  Is that something you would tell a potential client
25     today?

BY MR. FEARING

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 142

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Would you, today, give a 20 percent reduction from |
| 3 | | other competitors? |
| 4 | A. | No, I would just go with our flat fee. I think it's |
| 5 | | the lowest in town. That's what everyone tells me. |
| 6 | Q. | Who tells you that? |
| 7 | A. | I've heard that from the attorneys that we've dealt |
| 8 | | with, you know, that we serve a paper, and, you know, |
| 9 | | when I serve a paper for someone and they call me and |
| 10 | | they go: 25? You know, and I go: Yeah. |
| 11 | Q. | Okay, the only ones I know that you've served is |
| 12 | | Roach & Petersen and Steve Defoe. |
| 13 | A. | Right. |
| 14 | Q. | Anybody else? |
| 15 | A. | No, that's it. But, also, I hear that quite a bit from |
| 16 | | our out-of-state clients that call, because normally |
| 17 | | our out-of-state clients will call and then they shop |
| 18 | | around, they'll call around, and when they talk to us, |
| 19 | | I give them our price and they go: Wow, that's the |
| 20 | | cheapest I've heard. And, you know, it's the lowest |
| 21 | | price I've heard of yet. |
| 22 | Q. | Have you ever been charged with a crime? |
| 23 | A. | No. |
| 24 | Q. | Do you own any guns? |
| 25 | A. | Yes. |

Page 143

| | | |
|---|---|---|
| 1 | Q. | Do you have a license for guns? |
| 2 | A. | Yes, sir, I do. |
| 3 | Q. | What guns have you owned since January of 2003? |
| 4 | A. | I have a 9-millimeter Glock. |
| 5 | Q. | Have you owned any other guns since January 2003? |
| 6 | A. | No. |
| 7 | Q. | From whom do you get a license for that, the Bureau of |
| 8 | | ATF? |
| 9 | A. | When you purchase a gun, it's got to be licensed and |
| 10 | | then -- yeah. |
| 11 | Q. | Did you use that gun while you were employed with the |
| 12 | | Liquor Control Board? |
| 13 | A. | For the first couple of years, I did use that weapon |
| 14 | | because we had to furnish our own, and then probably |
| 15 | | three years ago, three or four years ago, the agency |
| 16 | | made it mandatory for every officer, every agent, to |
| 17 | | carry only one, and so we all had to go to a 40-cal |
| 18 | | Glock. So, they provided the Glock at that point. |
| 19 | Q. | And when you retired, you returned -- |
| 20 | A. | Yeah, I returned that weapon back. It was never mine. |
| 21 | Q. | Did you carry a gun on you when you performed your |
| 22 | | duties as a Liquor Control Board officer? |
| 23 | A. | Yes, sir, we were armed. |
| 24 | Q. | Have you ever been investigated by the FBI? |
| 25 | A. | No, sir. You know, whoever had this thing had it in |

Page 144

| | | |
|---|---|---|
| 1 | | their pocket for like three months because I've been |
| 2 | | trying -- |
| 3 | | MR. FEARING: You can probably go off the |
| 4 | | record on that. |
| 5 | | (Discussion off the record) |
| 6 | Q. | Back on the record. Did the Liquor Control Board find |
| 7 | | no merit to Robert Lack's complaint? |
| 8 | A. | I was never notified. |
| 9 | Q. | So, you don't know either way? |
| 10 | A. | No, sir, I don't know. |
| 11 | Q. | Did the Liquor Control Board ever find any merit to |
| 12 | | Diane Pefley's complaints or statements? |
| 13 | A. | I was never -- Same thing. I don't know. |
| 14 | Q. | You don't know either way? |
| 15 | A. | No, sir. |
| 16 | Q. | To your knowledge, did anyone at the Liquor Control |
| 17 | | Board believe the complaints that Robert Lack filed? |
| 18 | A. | Did anyone believe? I don't know if they believed him |
| 19 | | or not. |
| 20 | Q. | To your knowledge, did anyone at the Liquor Control |
| 21 | | Board believe anything that Mark Owens said? |
| 22 | A. | I don't know, sir. |
| 23 | Q. | To your knowledge, did any one at the Liquor Control |
| 24 | | Board agree with what Diane Pefley said? |
| 25 | A. | I don't know, sir. |

Page 145

| | | |
|---|---|---|
| 1 | Q. | To your knowledge, did anyone at Evergreen agree with |
| 2 | | anything that Mark Owens or Robert Lack told them? |
| 3 | A. | I don't believe that they agreed with them, but it did |
| 4 | | worry them. I felt that if they would have just blown |
| 5 | | it off and not believed it, they wouldn't have called |
| 6 | | me on the carpet the way they did. |
| 7 | Q. | To your knowledge, did anyone at Yakima County Credit |
| 8 | | Services believe anything that Mark Owens or Robert |
| 9 | | Lack told them? |
| 10 | A. | Same thing with them. I don't believe that they |
| 11 | | actually believed it. I do know that they did have a |
| 12 | | conversation with me about it. It was an area of |
| 13 | | concern with them. I hoped that they didn't believe |
| 14 | | it, but I never -- I never really got a warm fuzzy |
| 15 | | afterwards that everything was, you know -- Even |
| 16 | | though I told them that, you know, everything was okay, |
| 17 | | I don't know, I still felt something was there. |
| 18 | Q. | To your knowledge, did anyone at Olympic Credit believe |
| 19 | | anything that Mark Owens or Robert Lack told them? |
| 20 | A. | There, I don't think they believed anything. I mean, |
| 21 | | they were very adamant about -- The owner there said, |
| 22 | | you know -- she pretty much just laughed and said, "Oh, |
| 23 | | whatever," you know. |
| 24 | Q. | To your knowledge, did anyone at Armada believe what |
| 25 | | Mark Owens or Robert Lack told them? |

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 186

1  writing up my resume.
2      MR. MYHRE:    Resignation.
3  A. (Continuing) I came back in his office and I said,
4     "What's up?" And he goes, "I just got off the phone
5     with Rex." And Rex is the assistant chief. And he
6     goes, "Rex says that you turn in your resignation right
7     now, nobody's going to be contacted." And I said,
8     "Well, here you go," and I handed him my resignation
9     right there and I said, "I'll bring in my car. I'll
10    clean, wash -- I'll bring all my gear, everything
11    assigned to me, it will be on my desk tomorrow
12    afternoon, tomorrow evening," and that was it.
13        I showed up there, handed everything over. There
14    was no one at the office. I was by myself. Turned
15    everything over, left my keys in my desk and left. I
16    had Cassie come by and pick me up. It was like a bad
17    dream.
18 Q. I know we've gone over this, but it will be faster, and
19    I apologize --
20 A. No, sir, don't worry about that.
21 Q. -- some of these questions, I know, have been asked --
22 A. That's okay.
23 Q. -- but because they're buried in my notes here, which
24    clients do you allege ceased providing you work as a
25    result of any of the allegations you've made in this

Page 187

1     case? I know we've talked about Armada; right?
2  A. Yes, sir.
3  Q. Although they were not technically a client yet?
4  A. Right.
5  Q. Anyone else?
6  A. I know that Washington Collectors did not do business
7     with me. Hanford Collectors, NCMI. That's all I can
8     think of right now, sir.
9  Q. You had testified this morning that there were various
10    things that you could do, such as running asset checks,
11    running a license check, and you testified that you
12    could do it on an office computer?
13 A. Right, my office computer. I've got the Casey office
14    computer.
15 Q. You were not referring to the state computer?
16 A. No, sir. No, sir.
17 Q. So, you were referring to a home computer and Casey
18    office computer?
19 A. Right, sir. In fact, you can't run anything from the
20    liquor board computers, nothing. Everything gets --
21    In order for you to run anything for the Liquor Control
22    Board, you have to write up a memo and send to what we
23    call "CRY" at headquarters, and they would run it and
24    send you the information through a report.
25        The other way would be -- I think the only thing

Page 188

1     you could probably get as an agent, using the radio,
2     would be license plate information, if you used your
3     radio, portable radio, but, other than that, that would
4     be it.
5  Q. You testified this morning about an AS400 that you
6     would have access to --
7  A. Yes, sir.
8  Q. -- where you could look up information about corporate
9     offices?
10 A. Yeah. It's an in-house system with just the liquor
11    board, and if someone puts in a liquor license, it has
12    all -- it has the owner of the establishment, contact
13    phone, address, and also has a history of violations.
14    So, if they've had an over-serve or a minor violation,
15    it would be in the AS400.
16 Q. So, the AS400 is limited to entities with a liquor
17    license?
18 A. That's it, right, or tobacco license, sir.
19 Q. I wanted to get as best an understanding as I can about
20    any conspiracy that you allege the defendants have
21    engaged in. Can you tell me everything that you
22    believe has happened with respect to conspiracy?
23 A. Okay. Well, I believe that the conspiracy between Mark
24    Owens and Robert Lack, roommates, lived together, I
25    believe that they have conspired with Pefley, and all

Page 189

1     three of them decided t contact my job and submit all
2     these allegations on me and also contact my clients and
3     have all made it very difficult for me to try to gain
4     any business at all in the Tri-Cities or anywhere
5     else.
6         I feel Pefley is connected with Mr. Rustand
7     because she's their employee. They own the business
8     and she's the manager, and so -- And I feel that
9     they're all members of the state organization. I feel
10    the state organization assisted in price-fixing, and I
11    think they're all intertwined with each other.
12 Q. Is it not possible that any actions you allege that
13    Owens, Lack and Pefley engaged in were done solely on
14    behalf of their own company's interests and having
15    nothing to do with their membership in the state
16    association?
17 A. Well, I guess anything is possible, you know.
18 Q. Do you have reason to believe that any action Owens,
19    Lack and Pefley took was done with respect to their
20    membership in the state association?
21 A. I feel that them all being members of this
22    organization, I feel that me not joining the
23    organization, I feel that it really -- that these guys
24    started coming on strong at me when I did not join that
25    organization. That's what I feel. I feel if I would

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 190

1  have joined, I don't think that they would have been
2  acting the way they've acted and treated me.
3  Q.  When were you first approached and asked to join?
4  A.  I was approached at the very first meeting that was
5      held for the state contract in Olympia.
6  Q.  And when was that?
7  A.  Sir, I'm not very sure when it was. I believe it was
8      maybe August 2001.
9  Q.  August of 2001?
10 A.  I'm not positive, sir. I'm not sure. It was during
11     the first meeting, when everyone was trying for the --
12     when everyone knew that the state contract was up for
13     bid. It had been six years. There was, oh, probably
14     20 owners, 20 process service owners, showed up in
15     Olympia and we were all in a room this big at a little
16     table. So, I was kind of in there with all these big
17     guys in there, and then they had -- I believe they had
18     like two other meetings to tell us more information
19     about that contract, and so I went to each meeting, and
20     each meeting these guys were there, and that's how I
21     ended up knowing who everybody was.
22 Q.  And your testimony earlier -- I'm just trying to
23     clarify before I ask some more questions -- was that
24     you're not certain, but you believe it was Robert Zorn
25     that asked you to join and gave you, or tried to give

Page 191

1      you an application and have you join; is that right?
2  A.  Right, sir. I'm not one hundred percent certain.
3  Q.  But someone did?
4  A.  Yes, someone definitely did. It was that same person
5      each time.
6  Q.  And it was at this meeting?
7  A.  And it was at those meetings, yes, sir.
8  Q.  So, this meeting occurred before you even started your
9      company; correct?
10 A.  What's that?
11 Q.  Your company began in December of 2001; correct?
12 A.  Right.
13 Q.  So, the meeting in Olympia occurred before you had even
14     begun?
15 A.  You know, I may be off by one year, sir.
16 Q.  So --
17 A.  I think I am.
18 Q.  So, it might have been August of 2002?
19 A.  I think so, yeah.
20 Q.  So, it might be August of 2002 that this meeting in
21     Olympia takes place, where you're first approached --
22 A.  Right.
23 Q.  -- and you said no? When was the next meeting, do you
24     recall? A couple weeks later?
25 A.  Yes, sir. Yeah. It was like a month later, I think.

Page 192

1  Q.  And when was the contract awarded?
2  A.  The contract was awarded -- It took effect that
3      September of that year, but I remember -- I mean, it
4      was like a couple months, I hadn't gotten any papers
5      from the state, and I'm going, hey, man, I thought I
6      was supposed to get the papers. So, it took a while
7      before it actually kicked in, I think.
8  Q.  So, about September of 2002 you learned that you had
9      been successful?
10 A.  Right, that I had gotten -- that I had won at least
11     seven counties, the bid.
12 Q.  When were you next approached and asked to join the
13     association?
14 A.  At the next meeting.
15 Q.  Which was when?
16 A.  Well, I was approached twice. The second time I was
17     approached was when I actually got the bid, when they
18     actually gave us the bids and said, hey, this is who
19     this is, what everybody got. At that point I got -- I
20     remember, because I just got my bid and I walked out.
21     I didn't even open it. I just walked out to my car.
22     And as I was walking, that same gentleman walked behind
23     me and said, you know --
24 Q.  And, to the best of your recollection, that was roughly
25     September 2002?

Page 193

1  A.  Yes, sir.
2  Q.  And it's your testimony that because you didn't join
3      the association, the defendants contacted your clients
4      and the liquor board in June of 2003; is that correct?
5  A.  That's what I feel, sir.
6  Q.  What facts or basis do you have to believe that that's
7      why in May of 2003 or June of 2003 that the defendants
8      allegedly did what you said?
9  A.  One of my beliefs is that I know when I looked into
10     that, the way I understood the information on the
11     association was that if there was a member, like here
12     with Pronto having control over a certain area, that I
13     could not go in that area and contact or bid for his
14     clients. Let's just say this office here -- George,
15     wake up -- let's just say that I was here, that Mark
16     was working with George here and I came in and I gave a
17     bid for George at his place here, that if George
18     agreed, that I would then have to allow Owens to match
19     my bid. And so -- That was my understanding.
20         And so I thought, wow, what a great organization
21     to be in. If you were one of the first guys in there
22     where you got this area, but if you're like a guy like
23     me trying to get going, you're not going to get in, you
24     know. And so that was my understanding of how that
25     worked.

BY MR. ZISSLER

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARIO A. TORRES

Page 202

1  Q. You've testified about someone telling you you have to
2     join the association?
3  A. Yes, sir.
4  Q. Is there anything other than that that you believe the
5     defendants did on behalf of the association?
6  A. Not that I know of at this point, sir.
7        MR. MYHRE:    I'll put an objection on the
8     record at this point. That does mischaracterize his
9     earlier testimony where he talked about unfair
10    competition.
11       MR. ZISSLER:    Tell me a little more.
12       MR. MYHRE:    Just several paragraphs back he
13    was talking about not being able to compete in this
14    particular marketplace, the chilling effect it was
15    causing with other people.
16       MR. ZISSLER:    Okay, great.
17 Q. You've testified about price-fixing. If there were
18    price-fixing fixing in this market -- "in this market"
19    I mean the Tri-Cities area -- aren't you free to come
20    in and just offer a lower price and get the business?
21 A. I am free to do that, but I have not been able to have
22    much success because I think here in the Tri-Cities the
23    problem isn't the price-fixing; it's the lies that have
24    come up that have been said about me, my company. That
25    is the problem here. It's not the price-fixing. I

Page 203

1     mean, I think if I came in and I told attorneys I'll do
2     your jobs for free, they would not still not do
3     business with me because, you know, they just, I don't
4     know, they just think I'm damaged goods or something.
5        MR. MYHRE:    Counsel, we're almost at 5:00.
6        MR. ZISSLER:    I was going to say, we promised
7     5:00. So, let me just -- I'm not done, but let me
8     just see if I have one more question before we wrap up
9     for today.
10       MR. WINSKILL:    While you're doing that, may I
11    ask one question, and one question only, recognizing
12    that we'll have to reconvene, but I'd like to get a
13    piece of information before --
14       MR. MYHRE:    Certainly, Counsel. I'll give
15    you my remaining time.
16
17       EXAMINATION
18 BY MR. WINSKILL:
19 Q. Mr. Torres, do you have any information about any bad
20    thing or false thing that Diane Pefley has said about
21    you or your business other than what is shown in
22    Exhibit 6, which reflects the phone call that she made
23    to the LCB people?
24 A. What was the question, sir? I'm sorry, one more time.
25 Q. My question is, other than that --

Page 204

1  A. Other than this?
2  Q. Other than this, which is the Exhibit 6, which reflects
3     a phone call from Diane Pefley to the Liquor Control
4     Board on Friday July 11th, 2003, do you have any
5     information, direct or indirect, of anything besides
6     that that Diane Pefley has said false or bad about you
7     or your business?
8  A. This is the first piece of information that I had
9     learned about Diane Pefley at all, was this, that she
10    has -- that she had been working with Mark Owens in
11    contacting the liquor board.
12 Q. Okay. So, my question is, other than that --
13 A. Other than this?
14 Q. -- are you aware, directly or indirectly, of other bad
15    things she has done with respect to you or your
16    company?
17 A. No, no.
18       MR. WINSKILL:    That's all I have. That's the
19    one question I had today.
20       MR. MYHRE:    Will you allow me a cross
21    question?
22       MR. WINSKILL:    Sure, of course. I'm
23    recognizing we're not going to be able to finish with
24    Mr. Torres. Since we're leading into these defense
25    depositions, I want to get that information.

Page 205

1        EXAMINATION
2  BY MR. MYHRE:
3  Q. Mario, does that include any knowledge about any
4     conversations Diane Pefley has made to any of your
5     clients or potential clients?
6  A. What?
7  Q. Which is to say, are you aware of any communications
8     whatsoever, verbal or written, that Diane Pefley has
9     made to either the Liquor Control Board or to any of
10    your clients or potential clients other than Exhibit 6?
11       MR. WINSKILL:    That's what I'm trying to find
12    out. That's my question.
13 A. I'm sorry, I don't know at this time. I believe
14    that -- Yeah, I don't know at this time. My brain is
15    absolutely mush right at this moment.
16       MR. WINSKILL:    Well, we better leave it at
17    that.
18       MR. MYHRE:    All right. So I guess that will
19    be it for today. Clearly, there's more for --
20       MR. WINSKILL:    I've got about half an hour's
21    worth of questions. I don't need to replow all the
22    ground that these gentlemen have done. My questions
23    will be focusing on Rustand and Pefley, most of which
24    information I already have, I think, but I would
25    probably have about a half an hour's worth of