# EXHIBIT 3

```
                                                                  Page 1
 1                    UNITED STATES DISTRICT COURT
 2                   WESTERN DISTRICT OF WASHINGTON
 3                              AT SEATTLE
 4    ------------------------------------------------------------
 5    CASEY INVESTIGATIONS, LLC, a      )
      Washington Limited Liability     )
 6    Company and MARIO A. TORRES,     )
      an individual,                   )
 7                                     )
              Plaintiffs,              )
 8                                     )
         vs.                           )    No. CV04-1453C
 9                                     )
                                       )
10    PRONTO PROCESS SERVICE, INC.,    )
      a Washington corporation;        )
11    NORTHWEST RAIL ENTERPRISES,      )
      INC., a Washington corporation;  )
12    MARK OWENS, an individual;       )
      GREGORY and MARY LEE RUSTAND,    )
13    individually and as a married    )
      couple; DIANE PEFLEY, an         )
14    individual; A to Z LEGAL         )
      SUPPORT SERVICES, a Washington   )
15    business entity; ROBERT G.       )
      LACK, an individual; WASHINGTON  )
16    STATE PROCESS SERVERS            )
      ASSOCIATION, a Washington        )
17    business association,            )
                                       )
18            Defendants.              )
19    ------------------------------------------------------------
20               Deposition Upon Oral Examination Of
                         GREGORY W. RUSTAND
21
22    ------------------------------------------------------------
23    701 Fifth Avenue, #6500, Seattle, Washington
24    DATE:  February 17, 2005
25    REPORTED BY:  Mindi L. Pettit, RPR, CCR #2519
```

Page 14

1  different companies.
2      Q. Your wife is smiling. I'm assuming that you
3  don't -- you don't --
4      A. That is correct.
5      Q. -- deal with the bills concerning the phone.
6  Is that correct?
7      A. I just oversee them.
8      MRS. RUSTAND: She's smiling because she wants
9  to speak and she can't.
10     MR. WINSKILL: You'll have a chance.
11     Q. Do you know who the service provider is for
12 your cell phone?
13     A. Verizon.
14     Q. Verizon. And for how long have you had that
15 cell phone?
16     A. I don't recall.
17     Q. Have you had it since 2002?
18     A. Yes.
19     Q. Do you think you had it prior to 2002?
20     A. Possibly.
21     Q. I'd like to talk with you about the Washington
22 State Process Servers Association, and I guess we'll
23 just call it WSPSA for the purposes of this deposition.
24     A. Okay.
25     Q. Are you a member of that organization?

Page 15

1      A. Yes.
2      Q. Okay. For how long have you been a member?
3      A. One of the founders.
4      Q. And when was it founded?
5      A. I believe it was 1985.
6      Q. And what was the purpose of founding this
7  organization?
8      A. To create professionalism and a code of
9  contact -- conduct for professional process servers.
10     Q. Has that purpose changed over the years?
11     A. No.
12     Q. Have you held any positions within that
13 organization?
14     A. Yes.
15     Q. And what are those positions?
16     A. I am past president. And I was president for
17 two years prior to that, this year.
18     Q. So you've been a president twice for the
19 organization; is that correct?
20     A. The position for president is a two-year
21 position.
22     Q. So, when did you become president of the
23 organization?
24     A. Approximately two years ago, September.
25     Q. September 2002 or September 2003?

Page 16

1      MS. PEFLEY: 2003.
2      A. '2, I think it was.
3      Q. Have you ever held any other positions with
4  the organization?
5      A. Yes.
6      Q. And what were those positions?
7      A. Treasurer.
8      Q. And when were you treasurer?
9      A. I don't recall.
10     Q. Is it within the past five years?
11     A. No.
12     Q. Any other positions?
13     A. Yes. I believe I was one of the zone
14 directors.
15     Q. A zone director?
16     A. I believe that's not the correct name for it
17 though.
18     Q. Please describe that position. What does it
19 do?
20     A. The state is broken up, for example, in
21 fourths. I was the Northwest contact.
22     Q. And what area does that cover?
23     A. Several counties on the north side, Whatcom,
24 Skagit, Island, Pierce, King, Snohomish.
25     Q. Any other counties?

Page 17

1      A. No.
2      Q. So you were the zone director of the northwest
3  fourth of the state. What were your duties as zone
4  director?
5      A. Basically to keep contact with members --
6  members.
7      Q. And by saying "keep contact with members,"
8  what does that mean?
9      A. Members that belong to the association.
10     Q. What does "keep contact" mean?
11     A. If they had any problems or concerns with
12 legislation, they could contact us.
13     Q. Any other sorts of problems or concerns?
14     A. No.
15     Q. How many members -- or how many people helped
16 found the WSPSA?
17     A. I believe when we started out, we had at least
18 12.
19     Q. Are individuals members or businesses members
20 or both?
21     A. I believe it's individuals.
22     Q. Do they have to be affiliated with a process
23 serving business?
24     A. Yes.
25     Q. And during your tenure as president, how

Page 22

1 said that the state is divided into fourths?
2    A. Basically.
3    Q. What's a -- what happens in each of the
4 fourths of the state? Why is it divided into fourths?
5    A. For example, we would go ahead and -- and vote
6 in someone who is in Spokane, so the process servers
7 that are in the Spokane region have a single contact.
8    Q. Okay.
9    A. Even, in fact, if they don't want to contact
10 the director, they want to go ahead and contact the
11 administrator, they can do that as well. But it's
12 easier to go ahead and have one individual, so if they
13 have concerns, they can go to that one individual in
14 that area, do the question-and-answer thing, and then
15 it can go on to the next step to the board.
16    Q. Okay. So they're sort of like the point
17 person --
18    A. Yes.
19    Q. -- in each region? Okay. How many members
20 are in each region?
21    A. I can't answer that.
22    Q. You can't answer that because?
23    A. I don't know.
24    Q. Do you know the -- the region with the highest
25 number of members in it?

Page 23

1    A. I believe it's the northwest.
2    Q. I'd like to discuss Diane Pefley with you now.
3 And what is your relationship to Diane Pefley?
4    A. She's my employee. She's my manager.
5    Q. And what does she manage?
6    A. She manages the Moses Lake office.
7    Q. And the Moses Lake office is -- is A to Z --
8    A. Yes.
9    Q. -- is that correct? And A to Z is wholly
10 owned by SSP; is that correct?
11    A. Yes.
12    Q. For how long has she been your manager there?
13    A. Approximately five years.
14    Q. And my understanding is that Diane Pefley was
15 one of the former owners of A to Z. How did you come
16 to purchase A to Z?
17    A. You gave me two questions. Take the first
18 one.
19    Q. Well, the first one was actually just
20 summarizing something she said.
21    A. Let's split them up and ask me again, please.
22    Q. How did you come to own A to Z?
23    A. My wife and I contacted Diane.
24    Q. And why did you contact her?
25    A. Because we had an interest in Moses Lake.

Page 24

1    Q. When you say "interest," what do you mean?
2    A. I have relatives in Moses Lake.
3    Q. So you -- please explain a little bit more
4 about why relatives in Moses Lake would make you
5 interested in contacting Diane Pefley.
6    A. Moses Lake is also a growing area.
7    Q. What other reasons did you have to contact
8 Diane Pefley?
9    A. We felt that the Moses Lake operation that she
10 was running was a good opportunity to expand our
11 business.
12    Q. How did you come to know Diane Pefley?
13    A. Through WSPSA.
14    Q. When did you meet her?
15    A. I don't recall the date.
16    Q. Was it more than five years ago?
17    A. I believe so, yes.
18    Q. Was it more than ten years ago?
19    A. No, not more than ten.
20    Q. Not more than ten; is that correct?
21    A. Correct.
22    Q. Are you aware of -- of other process serving
23 businesses in the Moses Lake area?
24    A. Yes.
25    Q. How many other businesses are you aware of?

Page 25

1    A. There's only one that I am aware of.
2    Q. And what business is that?
3    A. Darwin Hines.
4    Q. And how long has that business -- how long
5 have you been aware of that business in the area?
6    A. Eight to ten years.
7    Q. Is Darwin Hines a member of WSPSA?
8    A. I believe he was.
9    Q. And do you know the period of time when he was
10 a member?
11    A. I do not.
12    Q. Okay. Is it your belief that he's no longer a
13 member?
14    A. Yes.
15    Q. And what is the basis for that belief?
16    A. Probably didn't want to pay the dues.
17    Q. Do you know when he stopped being a member?
18    A. No, I don't.
19    Q. Was it in the past two years?
20    A. I have no idea.
21    Q. Was he a member at the time you purchased A to
22 Z?
23    A. I don't know.
24    Q. What is the nature of -- of your relationship
25 to Diane Pefley, other than as a business associate or

Page 26

1  employee?
2      A. Very good friend.
3      Q. When you say a "very good friend," what does
4  that mean?
5      A. It means we met, and we have casual
6  conversations.
7      Q. How often do you have conversations?
8      A. Average would be about one every two weeks.
9      Q. And the casual conversations, are they about
10 personal information or business information or both?
11     A. Could be both.
12     Q. Has Ms. Pefley visited your home?
13     A. Yes.
14     Q. How many times has Ms. Pefley visited your
15 home?
16     A. Half dozen.
17     Q. When she visits, how long does she stay?
18     A. One day, approximately.
19     Q. Are you aware of a man named Mark Owens?
20     A. Yes.
21     Q. What is your awareness of Mark Owens?
22     A. He is a member of WSPSA.
23     Q. And how long has he been a member of that
24 organization?
25     A. Individually, ten years.

Page 27

1      Q. Did you know his father?
2      A. I did.
3      Q. And what is his father's name?
4      A. What the hell is his name?
5      MR. SCHULTZ: Chuck.
6      THE WITNESS: Chuck. Chuck Owens, thank you.
7  Jeez. Chuck Owens was also a founder.
8      Q. Were you good friends with Chuck Owens?
9      A. Yes.
10     Q. Did Chuck Owens have a business also?
11     A. Yes, Pronto Process.
12     Q. Are you familiar with Pronto Process?
13     A. Other than a business?
14     Q. Well, as a business?
15     A. As a business, yes, I am familiar with it.
16     Q. Is your relationship with Mark Owens
17 professional or personal or both?
18     A. Both.
19     Q. How often do you and he speak?
20     A. Normally during meetings with WSPSA if he
21 shows up.
22     Q. Do you talk at times other than WSPSA
23 meetings?
24     A. Very seldom.
25     Q. When you talk with Mark at the meetings,

Page 28

1  what's the subject matter of conversation?
2      A. Could be anything -- golf, what he's doing for
3  vacation, how his dad is.
4      Q. Do you ever talk about competitors to these --
5  to your businesses?
6      A. We have.
7      Q. When you talk about your competitors, who have
8  you talked about?
9      A. We've talked about ABC, other members.
10     Q. Have you ever discussed Casey Investigations
11 or Mario Torres?
12     A. He has contacted me on them.
13     Q. By "he," you mean, Mark has contacted you?
14     A. Yes.
15     Q. And what has Mark said when he's contacted
16 you?
17     A. Nothing recently. He did contact me stating
18 that he was not happy with Casey Investigation for
19 competitive reasons.
20     Q. And what were those competitive reasons?
21     A. I believe it was process fees.
22     Q. Has Mr. Owens spoken to you about the
23 plaintiffs more than once?
24     A. Yes.
25     Q. Approximately how many times?

Page 29

1      A. Approximately two.
2      Q. Do you recall when those conversations took
3  place?
4      A. I do not.
5      Q. Was the substance of both conversations the
6  same?
7      A. Yes, competitive.
8      Q. Okay. So the information you've testified to
9  already, that is the substance of both conversations --
10     A. Yes.
11     Q. -- is that correct? Okay. Is there anything
12 else that was discussed in those conversations?
13     A. Not that I recall.
14     Q. Has Mr. Owens ever visited you at home or at
15 work in Bellingham?
16     A. Not at home. We might have had a WSPSA
17 meeting in our office.
18     Q. Do you recall when that meeting might have
19 been?
20     A. No.
21     Q. Is it your memory that a meeting actually did
22 occur at your offices for the WSPSA?
23     A. Yes.
24     Q. And you believe Owens visited at that time; is
25 that correct?

Page 30

1    A. Yes.
2    Q. Do you refer -- or have you referred any
3  business to Mark Owens or Pronto?
4    A. Yes.
5    Q. And when -- when did those referrals occur?
6    A. Unknown.
7    Q. Do they take place regularly?
8    A. Not that I'm aware of.
9    Q. Have you sent him referrals within the last
10 five years?
11   A. I don't know.
12       (Discussion off the record.)
13   Q. Is it -- is it possible to find out what work
14 you referred over to Mark Owens and Pronto?
15   A. I'd have to contact my staff.
16   Q. Okay. And why would your staff know?
17   A. Because they do the forwarding.
18   Q. And so do you have records of the -- of the
19 documents you forwarded over to Mark Owens or Pronto?
20   A. I'm sure we do.
21   Q. Okay. For how long do you keep records in
22 your office?
23   A. We keep the service sheets, I believe it's ten
24 years -- seven or ten years. I don't know for sure.
25   Q. So currently you have at least back until 1998

Page 31

1  or so; is that correct?
2    A. Yes.
3    Q. And if you looked at that material, you'd be
4  able to refresh your memory; is that correct?
5    A. It would take me ten years to look at it.
6  Because there is no filing system of sorts, I would not
7  know who I forward to or where I got it from. You'd
8  have to give me a case number.
9    Q. Without the case number, would it be possible
10 to --
11   A. No.
12   Q. Have you ever visited Mark Owens?
13   A. We have went to his office for a state
14 association meeting.
15   Q. And when was that approximately?
16   A. I don't recall.
17   Q. Does the state association meeting rotate from
18 people -- around people's offices?
19   A. Yes.
20   Q. Do you recall where it was for 2003?
21   A. No.
22   Q. Do you recall where it was for 2002?
23   A. No.
24   Q. How about 2004?
25   A. Are you asking for Mark Owens' office?

Page 32

1    Q. No, just where the -- where the meetings
2  occurred -- your annual meetings.
3    A. We've been in Spokane. We have been in
4  Seattle. We have been in Bellingham. We have been in
5  Moses Lake. We have been in Vancouver office.
6        MS. PEFLEY: Ocean Shores.
7    A. They vary.
8    Q. So the annual meeting has taken place at A to
9  Z in Moses Lake before; is that correct?
10   A. The annual, no, it's not. The annual is --
11 has normally been in Eastern Washington -- Eastern
12 Washington, Ellensburg. Last year, our annual
13 convention was held in Skagit County Casino.
14   Q. Sounds fun. So the meeting in Moses Lake,
15 what meeting was that?
16   A. I don't recall what -- the date.
17   Q. That was a meeting that was not the annual
18 convention; is that correct?
19   A. We have never had the annual in Moses Lake.
20   Q. All right.
21   A. We have had our quarterly meetings at
22 different offices.
23   Q. So, when the meetings rotate around various
24 members' offices, that's the quarterly meetings that
25 are occurring?

Page 33

1    A. Correct.
2    Q. And so the people attending are the members of
3  the board?
4    A. Members of the board and all members.
5    Q. Are you aware of a man named Robert Lack?
6    A. No.
7    Q. Has -- has Mark Owens ever mentioned Robert
8  Lack to you?
9    A. No.
10   Q. Has Robert Lack -- or, excuse me, has Mark
11 Owens ever attended a meeting with anyone else before?
12   A. Chuck --
13   Q. I mean, did he bring anyone else with him?
14   A. His father.
15   Q. His father. Other than his father?
16   A. Not that I'm aware of.
17   Q. I'd like to explore a little bit how the WSPSA
18 referral system works. When you join the organization,
19 what happens then? You become a member. What happens
20 to the WSPSA member?
21   A. He is given a handbook and a membership book.
22 He is encouraged to attend the meetings. He is
23 encouraged to promote other process servers to join our
24 association. We will go ahead and -- "we" being
25 different companies -- will forward legal work to

9 (Pages 30 to 33)

Page 34

1  different members who belong to our associations. And
2  most importantly is to go ahead and promote the
3  industry that we have to protect.
4       Q. Does -- what does "promote the industry" mean?
5       A. Getting new members, promoting
6  professionalism, code of conduct, good ethics.
7       Q. Does it include generating work?
8       A. It could.
9       Q. In your opinion, does it?
10      A. Yes.
11      Q. So I understood you to say that you send other
12 members work. Is that -- is that correct?
13      A. That is correct.
14      Q. When you send them work, how does the pricing
15 operate?
16      A. That depends on the process server or the
17 company that we send it to.
18      Q. And what is it dependent on?
19      A. It depends on amount of miles they have to
20 travel, the type of documents that they're serving, is
21 it a rush order, do we need to make fax copies, do we
22 need to make -- get material. It depends on the
23 company.
24      Q. How does billing work for the service of
25 process that you send to somebody else?

Page 35

1       A. Fairly simple. We send them the documents.
2  They serve it. They do up an affidavit that it was
3  served or not served. And they send us a bill, and
4  it's directed back to our office for payment.
5       Q. So my understanding is your office then would
6  pay the bill?
7       A. That is correct.
8       Q. And then you would invoice the client; is that
9  correct?
10      A. The invoice would -- well, it's generated
11 either by my Moses Lake office or by my office in
12 Bellingham.
13      Q. What jobs does Diane Pefley perform for A to Z
14 in the Moses Lake office?
15      A. She is the office manager. She serves legal
16 papers. She does legal messenger. She controls staff.
17 She has the authority to hire and fire.
18      Q. Have her job duties or responsibilities
19 changed since you bought the business?
20      A. No.
21      Q. Do you know a Robert Zornes?
22      A. Yes.
23      Q. Is his name spelled Z-o-r-n-e-s -- the last
24 name?
25      A. I believe so.

Page 36

1       Q. And how do you know Robert Zornes?
2       A. He's a member and a good friend.
3       Q. For how long has he been a member of the
4  WSPSA?
5       A. I don't know the exact numbers.
6       Q. Longer than ten years?
7       A. I don't know.
8       Q. Do you believe longer than five years?
9       A. Yes.
10      Q. Has he ever been in charge of recruiting new
11 members?
12      A. Absolutely.
13      Q. And where does he -- where is his business
14 located?
15      A. Port Angeles -- no, Port Orchard.
16      Q. And what is the name of his business?
17      A. Falcon
18      Q. Simply Falcon or Falcon something else?
19      A. I don't recall the full name.
20      Q. His business is similar to yours?
21      A. Yes.
22      Q. Is he also a PI?
23      A. I believe he was.
24      Q. Have you ever had any conversations with
25 Robert Zornes concerning or relating to the plaintiffs

Page 37

1  in this matter, Mario Torres or Casey Investigations?
2       A. At the time of the suit he was our
3  administrator for WSPSA.
4       Q. And so, by your answer, are you telling me
5  that you had a conversation with him at the time of
6  this suit?
7       A. Yes.
8       Q. Prior to this suit?
9       A. No.
10      Q. Do you know if Mr. Zornes has ever had a
11 conversation with Mario Torres?
12      A. Not that I'm aware of. Correction. Prior to
13 this, yes.
14      Q. Okay. When was that?
15      A. When we were bidding for the State contract,
16 both Bob and I introduced ourselves to Mr. Torres and
17 invited him to join WSPSA.
18      Q. When was that?
19      A. I don't recall the dates.
20      Q. So the two of you together asked him to join?
21      A. Separately, but yes.
22      Q. When you ask someone to join, do you provide
23 any forms to them?
24      A. If they're interested, we'll send them forms.
25      Q. What is your relationship to NAPPS?

Page 38

1 A. I'm a member.
2 Q. And NAPPS is the National Association of
3 Professional Process Servers; is that correct?
4 A. Correct.
5 Q. How long have you been a member?
6 A. 1984, 1985?
7 Q. So approximately 20 years?
8 A. Approximately.
9 Q. Was NAPPS in existence prior to your becoming
10 a member of WS -- or being a founding member of WSPSA?
11 A. Yes.
12 Q. Did you model WSPSA on NAPPS?
13 A. Yes.
14 Q. Did NAPPS provide you with any assistance or
15 forms or information for forming WSPSA?
16 A. I don't recall.
17 Q. Do you believe it's likely that they did?
18 A. Some forms, yes.
19 Q. Is your organizational model structured in the
20 same way as NAPPS?
21 A. Pretty much.
22 Q. Is there a membership overlap between WSPSA
23 and NAPPS? Do they share members in common?
24 A. I'm sure we do. There's affiliate members,
25 and there is also state members.

Page 39

1 Q. What's an affiliate member?
2 A. For example, an out-of-state member -- let's
3 take Oregon.
4 Q. Okay.
5 A. Oregon can go ahead and join WSPSA, which
6 means they're affiliate. They want our information in
7 regards to what Washington State is doing for laws --
8 Q. Okay.
9 A. -- that type of deal, RCWs. And the national
10 has the big scope. If we have any changes or a state
11 association charter has any situation where we need
12 help, where we need money, we need additional help for
13 lobbyists, or even if they need -- we need them to come
14 in and support, to talk to legislation, they will do
15 that.
16 Q. Does NAPPS have a membership book?
17 A. Yes.
18 Q. Do they publish that yearly?
19 A. Yes.
20 Q. And where is that available?
21 A. You could contact the NAPPS association, and
22 they're in Portland, Oregon.
23 Q. Have you served in any positions for NAPPS?
24 A. No.
25 Q. So it's my understanding that you're simply a

Page 40

1 member of the organization. Is that correct?
2 A. Yes.
3 Q. Have you ever recruited for NAPPS?
4 A. Absolutely.
5 Q. And what does that entail?
6 A. We encourage every process server to join as
7 many associations as possible. And if they would like
8 to be a member, to contact the NAPPS or WSPSA or any
9 other organization.
10 Q. Okay. Is NAPPS a source of referrals for your
11 business?
12 A. Yes, we get sent papers.
13 Q. And has -- has A to Z been sent papers from
14 NAPPS?
15 A. Yes.
16 Q. Do --
17 A. Clarification, NAPPS members.
18 Q. NAPPS members.
19 A. Thank you.
20     MR. WINSKILL: Let's take a five-minute break,
21 okay?
22     THE WITNESS: Okay.
23     (Brief recess.)
24     MR. MYHRE: Back on the record.
25 Q. Mr. Rustand, to refresh your memory, we're

Page 41

1 discussing NAPPS currently.
2     MR. MYHRE: Can you read back what the -- the
3 last statement or the last bit of testimony prior to
4 the break.
5     (Reporter read back as requested.)
6 Q. Do you know whether Pronto has been sent
7 business by NAPPS members?
8 A. No idea.
9 Q. Has -- has Mark Owens ever talked to you about
10 NAPPS?
11 A. He stated he's a NAPPS member.
12 Q. To your knowledge, has he held any positions
13 with NAPPS?
14 A. No.
15 Q. What is the -- what is the purpose for NAPPS?
16 A. Same as WSPSA, promote professionalism.
17     (Interruption.)
18     MR. MYHRE: Sorry. Sorry about that.
19 Q. Do they have any purpose that differs from
20 WSPSA?
21 A. More members, bigger education.
22 Q. When you say -- "bigger education"; is that
23 correct?
24 A. They have -- individuals come in to educate
25 members in the legal process field, judges, court

Page 46

1    A. First vice president.
2    Q. Anyone else?
3    A. Yes.
4    Q. Who are they?
5    A. Diane Pefley.
6    Q. What is her position?
7    A. Tres.
8    Q. What are your duties as president of the
9  corporation?
10   A. Basically to oversee the other two
11 corporations.
12   Q. And by "other two" corps, you mean?
13   A. Greg Rustand, Inc., and Rustand, Inc.
14   Q. What are Diane Pefley's duties as treasurer?
15   A. Basically to come to the meetings, give any
16 input that she wishes.
17   Q. Did she have any other duties?
18   A. Treasurer.
19   Q. Which entails what?
20   A. Treasurer.
21   Q. Does she make financial reports about A to Z
22 to -- to you or the other officers?
23   A. We receive invoices from her, and we, in the
24 corporation main office, put the bill together and send
25 it out.

Page 47

1    Q. So the -- the day-to-day bills going out for A
2  to Z are actually issued by your office --
3    A. That is correct.
4    Q. -- is that correct? And Diane Pefley keeps
5  you informed of the profitability or the losses for A
6  to Z; is that correct?
7    A. I do that.
8    Q. You do that. And how do you determine the
9  losses or profitability?
10   A. Bookkeeper.
11   Q. And who is your bookkeeper?
12   A. Mary Hone.
13   Q. And how long has Mary Hone been your
14 bookkeeper?
15   A. Five to seven years. Maybe longer.
16   Q. Does Diane Pefley discuss with you anything
17 concerning the clients for A to Z?
18   A. Yes.
19   Q. Does she discuss with you clients that A to Z
20 has lost?
21   A. Yes.
22   Q. Does she discuss with you marketing for A to
23 Z?
24   A. No.
25   Q. Has she ever discussed Evergreen Financial

Page 48

1  Services with you?
2    A. No.
3    Q. Has she ever discussed Yakima County Credit
4  Services with you?
5    A. No.
6    Q. Has she ever discussed Pronto Processing
7  Services, Inc., with you?
8    A. Yes.
9    Q. And what was the substance of those
10 discussions?
11   A. Forwarding business.
12   Q. Has she ever discussed Legal Couriers with
13 you?
14   A. Yes.
15   Q. And what was the substance of those
16 discussions?
17   A. Forwarding business.
18   Q. Has she ever discussed Armada Corporation with
19 you?
20   A. Yes.
21   Q. And what was the substance of those
22 discussions?
23   A. Serving legal papers.
24   Q. Has she ever discussed the Liquor Control
25 Board with you?

Page 49

1    A. No.
2    Q. Has she ever discussed the Washington State
3  Ethics Board with you?
4    A. No.
5    Q. Has she ever discussed -- strike that.
6       I'd like to discuss with you now the
7  plaintiffs. You mentioned earlier that you first met
8  Mario Torres at the contract bid for the State
9  contracts. Is that correct?
10   A. Yes.
11   Q. Have you met him on any other occasions?
12   A. No.
13   Q. Have you spoken to him at any other times?
14   A. No.
15   Q. Have you ever spoken with anyone associated
16 with Casey Investigations before, other than Mario
17 Torres?
18   A. No.
19   Q. Has Diane Pefley ever discussed Mario Torres
20 or Casey Investigations with you?
21   A. Yes.
22      MR. WINSKILL: Are you talking about outside
23 the context of this lawsuit, by the way? You might
24 want to --
25      MR. MYHRE: Yes, outside the context of this

**Page 50**

1 lawsuit.
2     THE WITNESS: Give me the question again.
3     Q. Has Diane Pefley ever discussed Mario Torres
4 or Casey Investigations with you?
5     A. No.
6     Q. Are you aware of any complaints against Mario
7 Torres?
8     A. Yes.
9     Q. Okay. What complaints are you aware of?
10     A. The complaint that was delivered and received
11 by MaryLee Rustand.
12     MR. WINSKILL: Talking to -- you're not
13 talking about the complaint in this lawsuit.
14     He's talking about whether you have heard of
15 any complaints against Mr. Torres.
16     THE WITNESS: Yes.
17     Q. All right. What's -- what complaint is that
18 or complaints are those?
19     A. Mr. Owens contacted me.
20     Q. Okay. What did Mr. Owens say?
21     A. Basically he was unhappy of the plaintiff's
22 actions in regards to competitive bidding with clients
23 in the state.
24     Q. How unhappy was he?
25     A. You'd have to ask him that.

**Page 51**

1     Q. When you say "unhappy," what do you mean by
2 "unhappy"?
3     A. He felt that he was getting lowballed.
4     Q. What else did he say to you?
5     A. I don't recall much of the conversation beyond
6 that point.
7     Q. And when you say "lowballed," you mean what
8 exactly?
9     A. Underbidding.
10     Q. Does that mean that Mario was underbidding
11 Mark Owens?
12     A. Apparently.
13     Q. Did Mr. Owens indicate what he wanted to do
14 about that?
15     A. Possibly he was going to file a complaint.
16     Q. Does he -- did he say who that complaint was
17 to be filed with?
18     A. No.
19     Q. Did he tell you anything about the nature of
20 his assertions for that complaint?
21     A. No.
22     Q. Did he give you any details about what he
23 might say relating to that complaint?
24     A. No.
25     Q. Is that no, period, or no, you don't remember

**Page 52**

1 at this time?
2     A. I don't remember at this time.
3     Q. Are you aware that Diane Pefley's office at A
4 to Z received a request to get affidavits --
5     A. I am aware of what.
6     Q. -- relating to -- to Mario and to Casey
7 Investigations?
8     A. Yes.
9     Q. All right. How did you become aware of that?
10     A. Diane contacted me.
11     Q. And what did Diane say?
12     A. Stated that she was requested by Mark that he
13 would like to see if we could get affidavits at the
14 local court in regards to Mr. Torres serving legal
15 documents.
16     Q. And what did you tell Ms. Pefley?
17     A. I gave her the okay to do that, but other than
18 that, do nothing else.
19     Q. Did you or your business charge Mr. Owens for
20 that service?
21     A. No.
22     Q. Did you provide that service free of charge?
23     A. Yes.
24     Q. Why did you provide it free of charge?
25     A. We don't necessarily charge everyone.

**Page 53**

1     Q. Why didn't you charge him this instance?
2     A. He's a member.
3     Q. Has Mr. Owens ever performed a service for you
4 for which you were not charged?
5     A. You'd have to ask Diane that.
6     Q. Were you ever contacted concerning Mario
7 Torres by the State of Washington or any of its
8 representatives?
9     A. No.
10     Q. Were you aware of any investigation concerning
11 Mario Torres by the State?
12     A. After Diane contacted me.
13     Q. And what did Diane tell you?
14     A. That he was being investigated by the State.
15     Q. Did Mr. Owens ever discuss with you any
16 letters he received from Mario Torres?
17     A. Not that I remember.
18     Q. Are you aware of any rumors involving Mario
19 Torres or Casey Investigations -- so-called
20 word-of-mouth things?
21     A. I have heard rumor.
22     Q. And what rumor did you hear?
23     A. I don't recall.
24     Q. Did you give it any credence when you heard
25 it?

Page 54

1   A. No.
2   Q. And why didn't you give it any credence?
3   A. There is no factual basis.
4   Q. Other than instructing Ms. Pefley to -- to
5   have A to Z retrieve the affidavits, did you instruct
6   her to take any other actions regarding or relating to
7   Mario Torres or Casey Investigations?
8   A. No.
9   Q. Are you aware of any clients for which A to Z
10  and the plaintiffs are in competition?
11  A. Yes.
12  Q. All right. And what clients are those?
13  A. At one time, Olympic Credit.
14  Q. And when was that?
15  A. Approximately a couple of years ago.
16  Q. And what happened in relation to Olympic
17  Credit a couple of years ago?
18  A. I believe the plaintiff made contact with
19  Olympic Credit, possibly made a deal with them, so they
20  started using the plaintiff.
21  Q. Were there any other clients?
22  A. Not that I'm aware of.
23  Q. Okay. Are you aware of any potential clients
24  that A to Z and the plaintiffs might be in competition
25  for?

Page 55

1   A. No.
2   Q. Are you aware of a man named Dennis Copeland?
3   A. Yes.
4   Q. Who is Dennis Copeland?
5   A. He's a member.
6   Q. Member of WSPSA?
7   A. Yes.
8   Q. Is he a member of NAPPS?
9   A. I believe so.
10  Q. How long has he been a member of WSPSA?
11  A. At least ten years, if not longer.
12  Q. How long has he been a member of NAPPS?
13  A. Unknown.
14  Q. What is your relationship with Mr. Copeland?
15  A. Business associate and friend.
16  Q. How often do you talk with Mr. Copeland?
17  A. Maybe once every other month.
18  Q. Have you ever discussed Mario Torres or Casey
19  Investigations with Mr. Copeland?
20  A. Yes.
21  Q. And when was that?
22  A. I don't recall.
23  Q. Was it prior to the institution of this
24  lawsuit?
25  A. I believe it was. Right after the bid or the

Page 56

1   bids that came out from Washington Child Support.
2   Q. And that was the contract meeting that you
3   testified to earlier?
4   A. Yes.
5   Q. What was the substance of that conversation
6   with Mr. Copeland?
7   A. I believe it was in the contents of the State
8   contract in regards to the low bid.
9   Q. My understanding is that Casey Investigations
10  got the contract that had been previously held by A to
11  Z with the State. Is that correct?
12  A. That is not correct.
13  Q. That is not correct. Why is it not correct?
14  A. Because we were a subcontractor. The person
15  who had the contract for that area was Dennis Copeland
16  and his company. He would subcontract the legal papers
17  to be served out to us. So we never had the State
18  contract in the first place.
19  Q. When Copeland lost the contract, is it correct
20  that you lost your subcontract?
21  A. Yes.
22  Q. What was the volume of business that you were
23  doing on that subcontract?
24  A. I don't recall.
25  Q. Do you recall how much money you made on that

Page 57

1   subcontract on a yearly basis, on average?
2   A. Approximately $15,000.
3   Q. I'd like to ask you some questions about the
4   affirmative defenses in this case.
5   MR. WINSKILL: Sure.
6   Q. Which I assume may have similar results as
7   previously. Mr. Rustand, are you aware of any facts
8   supporting the assertion that -- that you were not
9   served with the summons and complaint in this case?
10  A. I was not served.
11  Q. Was your wife served?
12  A. Yes.
13  Q. Was A to Z served?
14  A. I believe so. Greg Rustand, Inc., was served,
15  I believe. But there is no A to Z, Inc.
16  Q. It's -- that's Greg Rustand doing business as
17  A to Z, Inc.?
18  A. That is correct, sir.
19  Q. What is your understanding of the facts
20  underlying the assertion the plaintiffs have failed to
21  state a claim?
22  A. Refer to counsel.
23  Q. All right. Do you have any understanding at
24  this time?
25  A. Please refer to counsel.

Page 62

1  Linda.
2      Q. Who is Linda?
3      A. Dennis's wife.
4      Q. Have you ever spoken with anyone from Armada
5  Corporation?
6      A. No.
7      Q. Has anyone in your employ ever spoken with
8  someone from Armada Corporation, within the last five
9  years?
10     A. Yes.
11     Q. And who was that?
12     A. Diane Pefley.
13     Q. And what was the substance of those
14 conversations?
15     A. Unknown.
16     Q. How do you know that she has spoken with them?
17     A. We serve their papers.
18     Q. Other than Diane Pefley, have you or anyone in
19 your employ or the employ of your businesses contacted
20 the Liquor Control Board?
21     A. Not that I'm aware of.
22     Q. Same question regarding Washington State
23 Ethics Board.
24     A. Same answer.
25        MR. MYHRE: All right. Let's take a break.

Page 63

1         MR. WINSKILL: Fine.
2         MR. MYHRE: We're getting close to the end of
3  the deposition.
4         THE WITNESS: Good.
5         (Brief recess.)
6         MR. MYHRE: Back on the record.
7      Q. Mr. Rustand, I appreciate your time today. In
8  the interest of keeping this short, I think that we are
9  approaching the end. I'd like to just ask you, have
10 you had -- other than from the time that this lawsuit
11 was filed, have you had any conversations with any
12 other person or business entity concerning Mario
13 Torres, other than what we've discussed already today.
14     A. No.
15     Q. After the filing of this lawsuit, other than
16 your attorney and the other parties to this matter,
17 have you discussed Mario Torres or Casey
18 Investigations?
19     A. No.
20     Q. All right. I would like to show you
21 Exhibit-No.-2.
22        MR. MYHRE: Do you have those?
23     Q. This exhibit has been used in previous
24 depositions. My question for you here is, have you
25 ever seen this letter before. And this is a letter

Page 64

1  from Robert Lack to Rex Prout with the Liquor Control
2  Board.
3      A. I have not.
4      Q. Okay. Has anyone ever discussed this letter
5  with you?
6      A. No.
7      Q. Okay. To the best of your knowledge, have you
8  or any of your employees participated in any
9  investigation by the Liquor Control Board of Mario
10 Torres, other than Diane Pefley?
11     A. No.
12     Q. Okay. Is it your understanding that Ms.
13 Pefley participated in that investigation?
14     A. Yes.
15     Q. And what is your understanding of the extent
16 to which she participated in that investigation?
17     A. She was requested to look up affidavits in the
18 courthouse concerning the plaintiff.
19     Q. And is that the extent -- the entire extent of
20 her participation?
21     A. That's it.
22     Q. And I believe it was your testimony today,
23 that that was Mark Owens who made that request. Is
24 that correct?
25     A. I believe so, yes.

Page 65

1      Q. Mr. Rustand, when you're recruiting new
2  members for the WSPSA or for NAPPS, have you ever said,
3  "If you want to do business in Washington, you have to
4  join us"?
5      A. No.
6      Q. Okay. Are you aware of any other members of
7  WSPSA or NAPPS saying that sentence or something
8  similar to it?
9      A. I'm not of -- aware of that.
10     Q. I'd like to show you Exhibits-4 and 6, which
11 have been discussed in previous depositions. These are
12 letters from Mario -- excuse me, not 4 and 6. I meant
13 13 and 14. Exhibits-13 and 14. These are letters from
14 Mario Torres to Mark Owens. Have you ever seen these
15 letters before?
16     A. No, I have not.
17     Q. Okay. Has Mark Owens ever discussed these
18 letters with you?
19     A. Not that I'm aware of.
20     Q. Do you know if Mr. Owens has ever discussed
21 these letters with any of your employees?
22     A. That's unknown.
23     Q. Do you know whether Mr. Owens has discussed
24 any of these letters with any other parties -- any
25 third persons?

Page 66

1    A. That's unknown.
2    Q. Mr. Rustand, is it fair to say that the -- any
3 of the allegations made in the complaint by Mr. Lack --
4 that you have no personal knowledge of any of those
5 allegations? Is that correct?
6    A. That is correct.
7    Q. Do you know if -- if any of your employees has
8 any personal knowledge of any underlying facts related
9 to those assertions?
10    A. Not that I'm aware of.
11    Q. Are you aware of any members of WSPSA that may
12 have any knowledge regarding the factual assertions in
13 that complaint by Mr. Lack?
14    A. Not that I'm aware of.
15    Q. And same question regarding NAPPS.
16    A. Same answer.
17    MR. MYHRE: All right. Mr. Rustand, I have no
18 further questions for you today.
19    MR. WINSKILL: I have none.
20    MR. ZISSLER: I have none.
21    MR. SCHULTZ: None.
22    MR. WINSKILL: We reserve signature.
23    (Discussion off the record.)
24    MR. MYHRE: And this is the same kind of
25 go-round. If there is further information that comes

Page 67

1 to light, we'd like to reserve the right to continue
2 the deposition, be it through other deposition
3 testimony or discovery which has not yet been received.
4    MR. WINSKILL: I don't agree with that, but
5 we'll cross that bridge when we come to it.
6    (Deposition adjourned at 3:12 p.m.)
7    (Signature reserved.)

Page 68

1    S I G N A T U R E

5    I declare under penalty of perjury under the
6 laws of the State of Washington that I have read my
7 within deposition, and the same is true and accurate,
8 save and except for changes and/or corrections, if any,
9 as indicated by me on the CHANGE SHEET flyleaf page
10 hereof. Signed in...............WA on the......day
11 of................., 2005.

15    ........................
16    GREGORY W. RUSTAND
17    Taken: February 17, 2005

25 Mindi L. Pettit, RPR, CCR

Page 69

1    C E R T I F I C A T E
2 STATE OF WASHINGTON )
3    ) ss.
4 COUNTY OF KING )
5    I, the undersigned Registered Professional
6 Reporter and an officer of the Court under my
7 commission as a Notary Public for the State of
8 Washington, hereby certify that the foregoing
9 deposition upon oral examination of GREGORY W. RUSTAND
10 was taken before me on February 17, 2005, and
11 transcribed under my direction;
12    That the witness was duly sworn by me to
13 testify truthfully; that the transcript of the
14 deposition is a full, true, and correct transcript to
15 the best of my ability; that I am neither attorney for,
16 nor a relative or employee of, any of the parties to
17 the action or any attorney or counsel employed by the
18 parties hereto, nor financially interested in its
19 outcome.
20    IN WITNESS WHEREOF, I have hereunto set my
21 hand and seal this date: February 24, 2005.
22    /S/MINDI L. PETTIT
23 NOTARY PUBLIC in and for the State of Washington,
24 residing at Snohomish. Commission expires
25 June 27, 2006.