# EXHIBIT 5

```
 1                    UNITED STATES DISTRICT COURT
 2               FOR THE WESTERN DISTRICT OF WASHINGTON
 3                              AT SEATTLE
 4    CASEY INVESTIGATORS LLC, a      )
      Washington Limited Liability    )
 5    Company, and MARIO A. TORRES,   )
      an individual,                  )
 6                                    )
               Plaintiffs,            )
 7                                    )
            vs.                       )     No. CV04-1453 C
 8                                    )
      PRONTO PROCESS SERVICE, INC.,   )
 9    a Washington corporation;       )
      NORTHWEST RAIL ENTERPRISES,     )
10    INC., a Washington corporation;)
      MARK OWENS, an individual;      )
11    GREGORY and MARY LEE RUSTAND,   )
      individually and as a married   )
12    couple; DIANE PEFLEY, an        )
      individual; A to Z LEGAL        )
13    SUPPORT SERVICES, a Washington  )
      business entity; ROBERT G.      )
14    LACK, an individual; WASHINGTON)
      STATE PROCESS SERVERS           )
15    ASSOCIATION, a Washington       )
      business association; and       )
16    NATIONAL ASSOCIATION OF         )
      PROFESSIONAL PROCESS SERVERS,   )
17    a national business association)
                                      )
18             Defendants.            )
19    _____
20
                 DEPOSITION UPON ORAL EXAMINATION OF:
21                           MARK OWENS
22    _____
23
24
25
```

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARK OWENS

**Page 18**

1  Q.  Is Mr. Lack a member of the Imperial Court?
2  A.  I'm not sure. You'd have to ask him. I'm not sure if
3      he is. He'd probably know. We went to a couple of
4      those fund-raisers together.
5  Q.  Do you own any property or other assets with Mr. Lack?
6  A.  No.
7  Q.  Do you pay any bills together?
8  A.  No. I pay his, you know -- the utilities there at the
9      house.
10 Q.  Do you have your own room in that house?
11 A.  Yes, I do.
12 Q.  Do you sleep in that room?
13 A.  Yes, I do.
14 Q.  We're now getting into a sensitive area from earlier,
15     which is, are you now or have you ever been in a
16     romantic relationship with Robert Lack?
17 A.  No. We're friends, very good friends.
18     MR. MYHRE:   Counsel, we'll have to probably
19 enter the same series of objections that we did last
20 time.
21 Q.  Mr. Owens, what is your sexual orientation?
22     MR. FEARING:   I will raise the same objection
23 and instruct Mr. Owens not to answer.
24     MR. MYHRE:   Okay, and we'll reserve our
25 right to move to compel that answer.

**Page 19**

1  Q.  Will you answer the question?
2  A.  No, I won't.
3  Q.  And the same question regarding Mr. Lack's sexual
4      orientation. Do you know what his orientation is?
5  A.  You'd have to ask --
6      MR. FEARING:   Same objection.
7      MR. MYHRE:   Same response to the objection,
8  reserve the right to move to compel.
9  Q.  All right, I'm sorry for that awkward bit. All right.
10     Now that we're through those objections, I'd like to
11     discuss your relationship with Robert Lack a little
12     bit. You said that you had become friends five to six
13     years ago?
14 A.  Yeah, I'm pretty sure that's when it was. I met him
15     five or six years ago.
16 Q.  When did you become friends?
17 A.  Probably -- On a regular basis, probably a year or so
18     after that.
19 Q.  Was it about the time that your father retired?
20 A.  I think I knew him before then. I think I knew him a
21     couple years before then.
22 Q.  Does Mr. Lack ever use any of your vehicles?
23 A.  Yeah, he does, when his truck's broke down.
24 Q.  Which vehicles does he use?
25 A.  I have a 2000 Taurus, Ford Taurus, that I let him use

**Page 20**

1      to drive to work and back.
2  Q.  Do you ever let him use any of your other vehicles?
3  A.  No. I had a Lincoln that he drove once in a while to
4      work, but I sold it.
5  Q.  So, is it fair to say, when he used your vehicles, he
6      was using it to simply commute to and from work?
7  A.  Yeah.
8  Q.  Did he use it for any other reason, to the best of your
9      memory?
10 A.  I let him -- I think I let him take it once to
11     Seattle, I think. He's taken it to Seattle, I think,
12     once or twice.
13 Q.  Is that a personal trip?
14 A.  Yeah.
15 Q.  Both times?
16 A.  I'm pretty sure it was. There was one time, yeah, I
17     think it was personal.
18 Q.  Does anyone else reside with you in the house?
19 A.  No.
20 Q.  Has Mark ever rented -- Excuse me. Has Robert Lack
21     ever rented out a room in that house previous to your
22     moving in?
23 A.  Not to my knowledge, huh-uh.
24 Q.  Have you ever performed any work from home?
25 A.  From what?

**Page 21**

1  Q.  From home. Have you ever performed any work from home?
2  A.  Phone calls maybe, but no.
3  Q.  When you say "phone calls," what would that entail?
4  A.  Calling my office.
5  Q.  Do you ever call clients from the home phone?
6  A.  No, not that I recall.
7  Q.  I'd like to discuss the plaintiffs now and sort of
8      explore your relationship to the plaintiffs. When did
9      you first become aware of Mario Torres?
10 A.  Let's see. Yearwise, I couldn't tell you. I don't
11     know. It's been -- Let's see. Probably -- It's a
12     guess. Probably 2000, maybe 2001.
13 Q.  And how did you become aware of him?
14 A.  We went and bid on the same state contract for child
15     support.
16 Q.  Do you recall who was in attendance at that meeting?
17 A.  Let's see. There was probably 12 or so of us. I know
18     there was a guy from Legal Couriers in Yakima named
19     Dennis Copeland. I'm not sure if Greg Rustand was
20     there or not. I think he bid on that year. There
21     was -- I don't recall how many. I know they kept a
22     list. We signed in. That's how I seen his name on
23     there. That was the first time I was aware.
24 Q.  So, did you meet Mr. Torres at that --
25 A.  No, I didn't. He never made an effort and I didn't

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARK OWENS

Page 22

1   either, so --
2   Q. Have you ever met Mr. Torres?
3   A. I met him there. That's the only time. But I didn't
4      even meet him. I mean, hello, how are you, I'm so and
5      so, we didn't do that.
6   Q. You just became aware of who he was?
7   A. Yes.
8   Q. Have you ever had a conversation with Mr. Torres?
9   A. Yeah, I have. I've had a conversation with him, once.
10  Q. When was that conversation?
11  A. Oh, about -- I think it was like the first year he was
12     in business.
13  Q. Do you recall what year that was?
14  A. No, I don't. It was like, I think, the first year that
15     he was there, and that's -- I don't recall what year
16     it was.
17  Q. What was the substance of the conversation?
18  A. He accused me of bad-mouthing him, telling me, you
19     know, that I was bad-mouthing his clients. That's
20     pretty much what it was. The conversation ended. I
21     told him I didn't need to do that, didn't do that, and
22     the conversation ended.
23        He goes, "Well, it must be that other girl over in
24     Pasco," and I took it to believe that he was talking
25     about Dina at Intercity. That's the only other girl

Page 23

1   that's in business. And he apologized to me at that
2   time.
3   Q. Do you know what Dina's last name is?
4   A. It's Navejar. I don't -- I think it's N-a-v-e-r-r-a,
5      something like that.
6   Q. When did this conversation take place?
7   A. It was that first year that he was in business. I
8      don't know.
9   Q. Was it telephonically or face to face?
10  A. It was telephonically. I've never --
11  Q. Did you become aware of Casey Investigations the same
12     time you became aware of Mario Torres?
13  A. Yeah.
14  Q. What is your understanding of what Casey Investigations
15     does, or is in the business of doing?
16  A. He's told me he was primarily an investigator, but he
17     did do process work and he said he had a messenger
18     service, also.
19  Q. What is the nature of Pronto's business?
20  A. It's an attorney service. We have a messenger
21     service. We serve papers, as he does.
22  Q. Are you in direct competition with Casey
23     Investigations?
24  A. Yeah, I would say, along with everybody else here in
25     town.

Page 24

1   Q. Do you know Diane Pefley?
2   A. Yes, I do.
3   Q. How do you know Diane Pefley?
4   A. I know that she used to own A to Z up in Moses Lake,
5      and I've known her when she used to work for the people
6      that died that owned it before that.
7   Q. Do you recall their names?
8   A. It was Len and Ellie Gardner, both deceased.
9   Q. So, how long have you known Miss Pefley?
10  A. God, I have no idea. I don't recall. We started doing
11     business together -- I mean, I'd get a paper from her,
12     I'd send one to her, you know, but I don't recall how
13     long ago it was.
14  Q. Have you known her since the 1980s?
15  A. No.
16  Q. Since the 1990s?
17  A. Yeah, that sounds more right.
18  Q. How well do you know Miss Pefley?
19  A. Business associate.
20  Q. When you say "business associate," what does that
21     entail?
22  A. Sending her work to do for me and vice versa.
23  Q. Other than exchange of work, are you friends?
24  A. Not -- Well, I mean friendly on the phone.
25  Q. Have you ever met face to face?

Page 25

1   A. Yes, we have.
2   Q. When?
3   A. Probably once a year at our convention, for two or
4      three years.
5   Q. And when you say "at our convention," what do you mean
6      by that?
7   A. The Washington State Process Servers Association.
8   Q. Is she a member of that group?
9   A. Yes, to my knowledge, she is, yeah, or their company
10     is.
11  Q. When you say "their company," what company do you mean?
12  A. Well, it's my understanding that she and another
13     business associate of hers sold the company to SSP --
14     that would be the Rustands -- four or five years ago,
15     maybe. It might have been longer. But she also works
16     there.
17  Q. And the company she sold was A to Z Legal?
18  A. Yeah. I think they still call it -- I'm pretty sure
19     they -- But SSP/A to Z Legal Support. I think they
20     kept the name in there.
21  Q. Have you ever met the Rustands before?
22  A. Yes.
23  Q. And when did you meet them?
24  A. At our conventions.
25  Q. That's Gregory and Mary Rustand; is that correct?

BY MR. MYHRE

Page 26

1  A.  Yeah.
2  Q.  Did you have a good business relationship with them?
3  A.  Yeah. As far as I know, yeah.
4  Q.  Do you have a personal relationship with them?
5  A.  Not really, no.
6  Q.  Do you have a personal relationship with Miss Pefley at
7      all?
8  A.  Not really. Just on the phone at work, is -- The only
9      time I talk to her is regarding work.
10 Q.  Do you only discuss work with the Rustands?
11 A.  I don't even talk to the Rustands, usually, because
12     they're not up there. To my knowledge, they're not up
13     there all the time, so --
14 Q.  So, you only speak to the Rustands at the conventions;
15     is that correct?
16 A.  Yeah. You know, I've sent stuff to Bellingham, too,
17     but --
18 Q.  By "stuff to Bellingham," what do you mean?
19 A.  Papers to serve.
20 Q.  What is your relationship to the Washington State
21     Process Servers Association?
22 A.  I'm a member.
23 Q.  And when did you become a member?
24 A.  I think I became a member, like, in 1990 probably,
25     although my company's been -- my father was a founding

Page 27

1      member.
2  Q.  Do you know when that was?
3  A.  It was probably '81. Might have been before that.
4  Q.  Is the WSPSA associated with any other associations?
5  A.  Do you mean do they belong to anybody?
6  Q.  Yes.
7  A.  Not that I know of, no.
8  Q.  Do they work in conjunction with any other
9      associations?
10 A.  I don't think so. Just maybe other state
11     organizations, national association. I mean, I don't
12     think they work in conjunction with them. Members
13     might use --
14 Q.  Are you a member of the national association?
15 A.  Yes, I am.
16 Q.  What is the full name of that national association?
17 A.  It's the National Association of Professional Process
18     Servers.
19 Q.  Is that abbreviated NAPPS?
20 A.  Yes.
21 Q.  N-A-P-S?
22 A.  N-A-P-P-S.
23 Q.  When did you join NAPPS?
24 A.  Probably about the same time -- I just switched it
25     over because I couldn't see me and my father both being

Page 28

1      members and paying the dues, so probably about the same
2      time, 1990 or so.
3  Q.  How much are your dues?
4  A.  I think they went up. I think they're like $150 a
5      year.
6  Q.  For NAPPS?
7  A.  Yeah. They might have went up. I haven't got my bill
8      yet.
9  Q.  Do you pay dues for the Washington State Association?
10 A.  Yes, I do.
11 Q.  And how much are those dues?
12 A.  I'm pretty sure they're $150. I'm pretty sure.
13 Q.  Do you have conferences or conventions for these
14     associations?
15 A.  I have -- For the Washington State ones, we do. And I
16     know NAPPS has them, but I've never been to one.
17 Q.  How often are the conferences, or conventions?
18 A.  Just once a year.
19 Q.  Where do they take place?
20 A.  It depends what the board decides on. They try to
21     spread them out.
22 Q.  How many members are on the Washington State
23     Association board?
24 A.  I don't know. President, vice-president, treasurer,
25     secretary. I think there's a governor at large.

Page 29

1  Q.  Have you ever served on the board?
2  A.  Yes, I have.
3  Q.  When did you serve on the board?
4  A.  I don't recall the dates. I haven't been going to the
5      conventions lately in the last few years. I know I --
6      Probably last time I served on the board was probably
7      five, six years ago, probably.
8  Q.  What sort of decisions would the board make?
9  A.  It would be just whatever came up. I mean, if there
10     was a conflict with somebody, you know, they'd address
11     that issue, and decide how much the dues were going to
12     be that year, you know, complaints, if they got any
13     complaints about anybody. Pretty much, that's all I
14     came across. We have legislature that would affect our
15     business, you know, our businesses. That's about it.
16 Q.  Did you work with a lobby group at all?
17 A.  Yeah, we do have lobbyists to watch the bills and stuff
18     that come through that would affect our businesses.
19 Q.  Do you make contributions to political campaigns?
20 A.  I know we pay a lobbyist, but that's about all I would
21     know about that.
22 Q.  I'd like to talk a little bit about the Washington
23     State Process Servers Association in terms of kind of
24     how it's set up for the businesses in the state.
25 A.  Sure.

Page 30

1  Q. I would like you to sort of structurally explain it to
2     me. So, does it divide the state into areas, distinct
3     areas?
4  A. No, it's just whoever wants to join. It's to get
5     business, is what it's for. You join to get, you know,
6     contacts to wherever your clients might need a paper
7     served. You can grab the book and see if there's
8     somebody close and you call them.
9  Q. So, it's for contacts and referrals?
10 A. Yeah. Pretty much, yeah.
11 Q. And so it's your understanding that it's not by region
12    in the state?
13 A. No. I mean, I think they have it regional, but it's
14    not separated that way, no.
15 Q. Do you serve papers in King County?
16 A. I send papers over to King County.
17 Q. And who do you send them over to?
18 A. It depends. There's a company called I-5 over there
19    that I send papers to. I send some to ABC Legal
20    Messengers. Whoever is closest to the address that I
21    have because it's cheaper.
22 Q. Are they members of the association?
23 A. To my knowledge, both of them are, yes.
24 Q. How is the pricing determined for their services?
25 A. That's up to the individual company.

Page 31

1  Q. So, if somebody from King County were to contact you to
2     serve a paper here, how would a price be determined?
3  A. I give them my same rate that I always give everybody.
4  Q. What is that rate?
5  A. It's 30, 35 dollars, as long as it's right here in
6     town.
7  Q. So, for the Tri-Cities area?
8  A. Yeah, as long as it's not way out in the boonies or
9     something. Then I'll charge extra for mileage.
10 Q. Do we want to take a break?
11 A. I don't need to.
12    MR. ZISSLER:    Yeah, I'd like to.
13    MR. WINSKILL:   Yeah, let's take a break.
14              (Recess)
15 Q. Have you ever spoken to the Rustands about Mario Torres
16    or Casey Investigations?
17 A. Not to my knowledge, not until after I was served. I
18    think I called Greg and asked him probably if he was
19    served, and that was pretty much it. I think it was
20    just, you know, he said he had or hadn't. I can't
21    remember if he had at that point.
22 Q. So, your memory is that you haven't spoken about Mario
23    or Casey Investigations prior to being served?
24 A. No, yeah.
25 Q. Have you discussed Mario or Casey Investigations with

Page 32

1     Diane Pefley?
2  A. Yeah, I did talk to her.
3  Q. And when was that?
4  A. Right after he won the state contract.
5  Q. And what did you say?
6  A. I just talked to her. She, you know, was curious and
7     wondering how he was going to swing doing all that from
8     here, driving all that way and undercutting them.
9  Q. Did you have an answer for her?
10 A. No, I didn't know how he was going to do it. He didn't
11    list any subcontractors on his contract bid, so that's
12    kind of what raised eyebrows.
13 Q. Now, why would that raise eyebrows?
14 A. That's a lot of miles to travel with not having any
15    subcontractors, using any subcontractors or anything.
16    You try to save your clients money by, you know,
17    farming them out to people, than, you know, charge
18    them, you know, mileage.
19 Q. So, my understanding is that you charge your clients
20    mileage; is that correct?
21 A. No, I don't. I charge a basic flat fee for mileage,
22    but it doesn't matter how many attempts we make. We
23    might have to go out 15, 16 times, you know. We might
24    get one on the first attempt, but it's just, you know,
25    part of the $30.

Page 33

1  Q. Do you get paid if service is not accomplished?
2  A. Yeah.
3  Q. So, my understanding is that you get paid regardless of
4     whether service is successful or not successful?
5  A. I make a due diligence affidavit up and give it to
6     them, you know. We charge like $25, you know, for our
7     attempts and for our time. We don't do something for
8     nothing.
9  Q. Did you have any other conversations with Diane Pefley
10    concerning Mario Torres or Casey Investigations?
11 A. I don't recall if I had any about him after that, I
12    really don't. You don't really make a habit of
13    bringing up your competition to, you know, some of your
14    other affiliates. It's just not the way it works.
15 Q. When you spoke with Diane Pefley, was it in her
16    capacity as an employee or owner of A to Z, or was it
17    in her personal capacity? Were you talking to her as a
18    friend or talking to her as a business?
19 A. I think I was just talking to her, you know -- I know
20    she was, you know, she was kind of worried about the
21    business, but it was more friendly than anything.
22 Q. So, were you talking to her because she was another
23    member of Washington State Process Servers Association?
24 A. Not really, no. I used them before they were members.
25    Len and Ellie never were members.

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARK OWENS

Page 34

1 Q. So, if I understand your testimony correctly, your
2    conversation was kind of a blend between a business and
3    a personal conversation?
4 A. Business was brought up, but, yeah, she was -- It was
5    a curious kind of a deal, yeah.
6 Q. Did you talk with any other Washington State Process
7    Server Association members about Mario Torres or Casey
8    Investigations?
9 A. Not that I recall. I mean, like I said, you don't go
10   telling, you know, the people you use about your
11   competition. I mean, why would I bring his name up?
12   So they can start using him? I mean, it doesn't make
13   sense.
14 Q. Have you had any conversations with any other parties
15    concerning Mario Torres or Casey Investigations?
16 A. In what capacity? I don't understand.
17 Q. Well, have you spoken with anybody else about Mario
18    Torres or Casey Investigations?
19 A. I talked to Rob. I mean Rob would hear, you know --
20    Yeah, I talked to him about it, but it was nothing, you
21    know, just, you know --
22 Q. When did you first start -- And by "Rob" you mean
23    Robert Lack?
24 A. Yeah.
25 Q. When did you start to talk to Rob about it?

Page 35

1 A. I think I might have mentioned it after I got one of
2    his letters.
3 Q. Do you recall when that was?
4 A. No, I don't.
5 Q. Is it after you received the first letter or the second
6    letter?
7 A. I don't remember getting a second letter. I remember
8    getting a first one and reading it and throwing it in
9    the garbage can because it was the same thing he told
10   me on the phone. And I did try to call him back to
11   discuss it, but he wouldn't take my call, or return it.
12 Q. Earlier you did testify that you had a conversation
13    with him about --
14 A. Yeah.
15 Q. -- allegations.
16 A. He called me once, and I told him I wasn't doing that,
17    that I didn't need to do that, that we'd been here --
18 Q. And how often did you talk to Rob about it after that
19    first conversation?
20 A. I don't recall. Just -- I don't remember.
21 Q. That first letter, what year was that?
22 A. I don't recall.
23 Q. Did you speak with anyone else?
24 A. Just regarding him?
25 Q. Regarding Mario or Casey Investigations.

Page 36

1 A. Not that I recall, no. Like I said, you don't make a
2    habit of it.
3 Q. Your testimony today is that you don't recall having
4    any conversations with anyone other than Robert Lack
5    about Mario Torres and Casey Investigations?
6 A. Well, the people in my office, my secretary, you know,
7    they were all -- they were aware.
8 Q. And who is your secretary?
9 A. Vicki Montgomery.
10 Q. How do you spell Vicki?
11 A. V-i-c-k-i.
12 Q. When you say other people in your office, who do you
13    mean?
14 A. Mark Puryer is like my right-hand man over there.
15 Q. How do you spell Mark's last name?
16 A. P-u-r-y-e-r.
17 Q. What did you say to them?
18 A. I just told them we had new competition.
19 Q. Have you talked to them more than once about Mario
20    Torres or Casey Investigations?
21 A. His name might have came up, but not -- Just kind of
22    in general.
23 Q. Have you ever talked to any of your clients about Mario
24    Torres or Casey Investigations?
25 A. Yeah, I have.

Page 37

1 Q. And what clients are those?
2 A. I don't recall the ones I talked to. A couple of them
3    called me. I think it was like Hanford Collectors and
4    Armada, I think.
5 Q. When did Hanford call you?
6 A. I have no idea. I think they hired him for a time. I
7    think they used him.
8 Q. Had you previously been working with Hanford?
9 A. Uh-huh.
10 Q. Is that a yes?
11 A. Yes.
12 Q. And when did you speak with Armada?
13 A. I don't recall the date.
14 Q. Do you recall with whom you spoke?
15 A. I think Dina was the manager down there at the time.
16 Q. Do you know Dina's last name? Dina England?
17 A. It might be. I just knew her as "Dina."
18 Q. And Armada was a client of yours at the time?
19 A. Yeah, they were. Always have been.
20 Q. Do you recall the name of the person at Hanford you
21    spoke with?
22 A. My contact over there is Mary Kay, but I've always
23    talked to the owner herself, Carol Krueger.
24 Q. And what was the substance of your conversation with
25    Carol Krueger?

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARK OWENS

Page 42

1 have any understanding as to how Mr. Lack was made
2 aware of this alleged problem?
3 A. I don't. I don't know how he was made aware. I know
4 that I -- I don't know.
5 Q. Do you believe that you were the person who made him
6 aware of the problem with Mario Torres?
7 A. I know that I mentioned his name to him, but I didn't
8 go into -- No, I didn't go into -- I didn't know some
9 of that stuff, yeah.
10 Q. So, when you say you didn't know some of this stuff
11 here, you mean later on, the content of the letter, you
12 didn't know some of that content?
13 A. As I said, I didn't see any complaint letter to Liquor
14 Control Board until after I was served papers. I never
15 knew it existed. I never knew -- I mean, he did it
16 without my knowledge of doing it.
17 Q. In the second sentence it discusses the plaintiff's
18 driving to Moses Lake and many other locations while on
19 the clock and in a state vehicle. Do you know anything
20 about that factual allegation?
21 A. No, not at all. I don't know it to be a fact or -- It
22 says "concerns" here. It doesn't say he was doing it.
23 It says he has concerns that he might be doing it.
24 Q. Well, the characterization aside, there are facts that
25 are asserted, so do you have any knowledge of those

Page 43

1 facts?
2 A. Which facts?
3 Q. To wit, the plaintiff's, or Mario, driving to Moses
4 Lake and other locations while on the clock with the
5 state and in a state vehicle?
6 A. No, I have no facts of that at all.
7 Q. So, you have no personal knowledge of that?
8 A. No.
9 Q. Do you have any personal knowledge of whether Mr.
10 Torres has a business that he owns with his wife?
11 A. Well, it's after her name. It's Casey Investigations.
12 Her name's Cassie. So, yeah, I would think. I know in
13 the state contract he listed him as president and an
14 employee of Casey Investigations.
15 Q. So, on the basis of the state contract you have an
16 understanding, then, of who own Casey Investigations;
17 is that correct?
18 A. Yeah. They give everybody a copy of it after the bids
19 are taken.
20 Q. Do you have any knowledge of Mario or Casey
21 Investigations using state resources to, as it says
22 here in this letter, subsidize and undercut others in
23 the same field?
24 A. No, I don't know that he did that for a fact.
25 Q. Did you ever discuss with Mr. Lack that you thought

Page 44

1 that was the case?
2 A. There was discussion that maybe that's how he was doing
3 it, but there was no facts.
4 Q. Did you express to Mr. Lack that these were not facts,
5 these were just speculation?
6 A. Yeah.
7 Q. Were you present or were you aware of Mr. Lack's
8 contacting the State Executive Ethics Board or the
9 Liquor Control Board?
10 A. After he did it, he told me that he did it.
11 Q. How long after he had those contacts?
12 A. Probably two weeks to a month, probably.
13 Q. So, still in the month of June, or in the month of
14 July?
15 A. Well, this is June 30th, so, you know, two weeks to a
16 month would be July, August.
17 Q. In the third paragraph of this letter Mr. Lack says he
18 "discussed this issue at length with another person
19 who began to assist me with obtaining information on
20 the issue." Do you know who that other person is?
21 A. I don't think he told me that that soon because that
22 would be June, and this letter is dated June 30th. Oh,
23 this is when he sent it to them.
24 Q. Right. So, he's actually talking about over the
25 weekend of June 14th he discussed these issues at

Page 45

1 length with another person. Do you who that --
2 A. Yeah. About obtaining information, yeah, he talked to
3 me about that and who he would contact and how he could
4 go about it.
5 Q. And what did you tell him?
6 A. I told him that he could contact anybody in Grant
7 County and that I could help -- I could get the
8 affidavits from Benton and Franklin Counties.
9 Q. Did you get the affidavits for Benton and Franklin
10 Counties?
11 A. Yeah, I did.
12 Q. Who got the affidavits for the other counties?
13 A. I'm not sure who he called, but -- I'm not sure. I
14 probably would think it would be Diane or one of her
15 employees, maybe. I'm not sure, though.
16 Q. And "Diane" is Diane Pefley?
17 A. Yeah, or someone else that worked there. I don't know
18 who he talked to.
19 Q. So, Diane Pefley or a different employee at A to Z?
20 A. Yeah.
21 Q. You provided him with the phone number; is that
22 correct?
23 A. Yeah. I probably did, yes.
24 Q. I'd like to proceed down that paragraph a little ways.
25 It's discussing the contract bid with OSE and it says

12 (Pages 42 to 45)

BY MR. MYHRE

RICHMAN & KENT COURT REPORTERS (509) 627-0869
MARK OWENS

Page 46

```
 1     that Mr. Torres later sent the contract bid in under
 2     his spouse's name, Cassandra, Torres.
 3  A. Yeah, I told him that.
 4  Q. You told him that. And what is the basis for your
 5     saying that?
 6  A. Because that's what it said on the contract. If you
 7     get a copy of it, you can see it. He signed up, was
 8     president, as I said earlier, on the sign-in letter.
 9  Q. The letter then says that Mr. Lack believes he did this
10     in order to avoid having to disclose his involvement
11     with this state job to OSE or vice versa. Did you
12     discuss that with Mr. Lack?
13  A. I don't recall if I discussed that. I know there's a
14     clause in any state deal that you have to disclose if
15     you're a state employee or not.
16  Q. And what is the basis for that knowledge?
17  A. Because you had to fill out like five pages of stuff if
18     you were, and the state contract did not have any of
19     his stuff attached to it.
20  Q. The next sentence says that, quote, my friend was able
21     to locate a way of obtaining affidavits of service that
22     would be available the following week.
23        Are you that friend?
24  A. Yes.
25  Q. And what is your way of obtaining the affidavits of
```

Page 47

```
 1     service?
 2  A. It's public knowledge. I went to the courthouse and
 3     got them. I pulled them myself, along with another
 4     gal.
 5  Q. Who was that other gal?
 6  A. Rachelle Montgomery works in my office, Vicki's
 7     daughter.
 8  Q. Whose idea was it to get the affidavits?
 9  A. Rex Prout called me, or I called him. Vicki says that
10     he called me and I returned his call. He asked me if I
11     could do it, get them for him, because they were
12     investigating Mr. Torres and they needed that
13     information to cross-reference to see if, in fact, this
14     was happening.
15  Q. So, you spoke directly with Rex Prout?
16  A. Yes, I did.
17  Q. What day did that conversation take place?
18  A. I have no idea what day it was.
19  Q. What did you say during that conversation?
20  A. I told him I could get them for him, and my only
21     concern was if he was, in fact, doing that, it was a
22     disadvantage to me. That's all. That was my whole
23     deal with him. It was an unfair advantage to me if
24     that's what was what going on. It was all
25     speculative. I didn't accuse him of anything.
```

Page 48

```
 1  Q. You were very clear with Mr. Lack that this was all
 2     speculative; is that correct?
 3  A. Yes, I was. I mean, you can't --
 4  Q. On the second page is a list of affidavits. Are any of
 5     those the affidavits that you --
 6  A. No.
 7  Q. -- obtained?
 8  A. No. I wasn't going to drive up there.
 9  Q. These are the affidavits that Diane Pefley, or A to Z,
10     obtained; is that correct?
11  A. I'm not sure who got them for him. I would think
12     that's who got them.
13  Q. At the bottom of that page is a list of four entities
14     that it states Mr. Torres is currently serving papers
15     for.
16  A. Uh-huh.
17  Q. Did you provide this information to Mr. Lack?
18  A. I don't know how I would know about Olympic Credit.
19     Office of Support Enforcement, he knew that. He got
20     that contract, so, yeah.
21  Q. He knew that through you; is that correct?
22  A. Yeah, I'm sure that I told him that he won that
23     contract up there, as I did tell him who won it for
24     Yakima County and King County and every other county.
25  Q. What about regarding Yakima Credit Collection Services?
```

Page 49

```
 1  A. Yakima Credit Collection Services, I knew that he was
 2     serving papers for them because one of my servers
 3     had -- Well, they had quit me. It didn't have
 4     anything to do with him taking them away from me.
 5        And the same with Evergreen, the same server, he
 6     got their business, so I knew that they were using
 7     him. Evergreen called and told me that they were using
 8     him.
 9  Q. So, is it your testimony that it didn't take these
10     clients from you; they quit you and he took over; is
11     that --
12  A. No. Yakima Credit quit because one of my servers
13     served -- it was, you know, it was a bad serve and they
14     said they wanted to try somebody else. So, it was
15     nothing like that.
16  Q. When you say "bad serve," what do you mean?
17  A. He went to a wrong apartment and asked for a Peter
18     so-and-so. He probably just asked for the first name,
19     because the guy did live there, but he was in the wrong
20     building. Supposed to be Building B and it was
21     Building A. But there was Peters in both, you know,
22     apartments, and he served the wrong Peter.
23  Q. I'm on the third page, on the next page, if you'd
24     turn. Mr. Lack suggests that Mr. Prout contact other
25     agencies, A to Z Legal Support Services or Pronto
```

13 (Pages 46 to 49)