# EXHIBIT 7

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              WESTERN DISTRICT OF WASHINGTON
 3                       AT SEATTLE
 4  ----------------------------------------------------
 5  CASEY INVESTIGATIONS, LLC, a        )
    Washington Limited Liability       )
 6  Company and MARIO A. TORRES,        )
    an individual,                      )
 7                                      )
              Plaintiffs,               )
 8                                      )
       vs.                              )   No. CV04-1453C
 9                                      )
                                        )
10  PRONTO PROCESS SERVICE, INC.,       )
    a Washington corporation;          )
11  NORTHWEST RAIL ENTERPRISES,         )
    INC., a Washington corporation; )
12  MARK OWENS, an individual;          )
    GREGORY and MARY LEE RUSTAND,       )
13  individually and as a married       )
    couple; DIANE PEFLEY, an           )
14  individual; A to Z LEGAL            )
    SUPPORT SERVICES, a Washington     )
15  business entity; ROBERT G.          )
    LACK, an individual; WASHINGTON )
16  STATE PROCESS SERVERS               )
    ASSOCIATION, a Washington          )
17  business association,               )
                                        )
18            Defendants.               )
19  ----------------------------------------------------
20         Deposition Upon Oral Examination Of
                    MARYLEE RUSTAND
21
22  ----------------------------------------------------
23  701 Fifth Avenue, #6500, Seattle, Washington
24  DATE:  February 17, 2005
25  REPORTED BY: Mindi L. Pettit, RPR, CCR #2519
```

Page 22

1   A. There are various committees, yes.
2   Q. What are the various committees?
3   A. You have the handbook committee, the
4   membership committee, the conference -- convention
5   committee. There is an ad hoc committee regarding the
6   history -- what is that? They -- they -- I can't even
7   remember what that was about. I can't remember. It
8   was an old committee. It got disbanded. I don't
9   remember.
10  Q. So there are three standing committees; is
11  that correct?
12  A. Membership, directory, handbook, and
13  conference, four.
14  Q. All right.
15  A. Oh, continuing education. I forgot that one.
16  Q. All right. And after vice president, you
17  served as president. What were your duties as
18  president?
19  A. To oversee the business of the association,
20  work closely with the administrator, make sure the
21  committee chairs were doing their jobs and oversee the
22  meetings -- run the meetings.
23  Q. What is the "business of the association"?
24  What do you mean by that?
25  A. Well, the administrator -- and you would have

Page 23

1   to speak with Mr. Vennes or Mr. Zornes as to the duties
2   of the administrator, but basically they're collecting
3   the dues and paying the bills and responding to the
4   calls that come into the association office. I don't
5   know all their duties. I don't work in there.
6   Q. Do you know how to spell Mr. Vennes's name?
7   A. Eric Vennes is V-e-n-n-e-s.
8   Q. And Mr. Zornes?
9   A. Robert Zornes, Z-o-r-e -- Z-o-r-n-e-s.
10  Q. Were there any other duties that you performed
11  as president of the association?
12  A. Not that I can think of.
13  Q. Ms. Rustand, since you were a founding member
14  of the organization, what was the model that you used
15  to organize -- or for the organization of the
16  association?
17  A. The model?
18  Q. Yeah. Did you base the organization of the
19  association on -- on any other group?
20  A. As I recall, the gentleman that called us
21  together to form the association, Robert Hoyden, had
22  talked about what was required for a nonprofit
23  organization to be brought together, such as filing
24  with the secretary of state, and he had -- he had
25  already formulated a plan as to how to form the

Page 24

1   association. And that was presented to us in that
2   first meeting. I don't recall an actual model
3   discussion.
4   Q. Are -- are you also a member of NAPPS?
5   A. Yes, sir.
6   Q. And that's the National Association of
7   Professional Process Servers; is that correct?
8   A. Yes, sir.
9   Q. How long have you been a member of NAPPS?
10  A. Since 1992.
11  Q. What made you join NAPPS? What was your
12  reason for joining NAPPS?
13  A. I believed in getting involved with the
14  national level would help me to understand how process
15  worked in other states so that I could better serve my
16  clients should someone forward me work from that area.
17        I also felt that it would prove as an asset to
18  WSPSA to understand more about the legal process
19  industry and how we can protect our industry through
20  legislation and felt that it would, therefore, benefit
21  me as a person in my business likewise.
22  Q. How would it benefit you in your business
23  capacity?
24  A. If I become more aware of the laws of process
25  and how I can better serve my clients, it not only

Page 25

1   enriches my life by education, it also -- I can then
2   bring it to the table of the business so that we can
3   grow and expand and provide a better service to our
4   clients.
5   Q. Does it help provide you with a competitive
6   edge?
7   A. I don't know that it would be a competitive
8   edge. I think most of my competitors have turned out
9   to be my friends and my mentors through the
10  associations. In fact, there were people that I would
11  have considered a competitor in the past who became
12  mentors and friends because we learn to support the
13  industry together as a whole.
14  Q. Let's go back for a minute and talk about your
15  work history. Do you currently work for -- for A to Z
16  Legal or for Gregory Rustand, Inc., or for Rustand,
17  Inc.?
18  A. I'm a -- I work for both Greg Rustand, Inc.,
19  and Rustand, Inc. And that involves all aspects of the
20  corporate business.
21  Q. And what is your job title in those positions?
22  A. Greg Rustand, Incorporated, I'm the vice
23  president -- actually the first VP, administration.
24  And that's my title.
25  Q. Okay. And for Rustand, Inc.?

Page 26

1  A. I'm the president of Rustand, Inc.,
2  administration.
3  Q. And as first vice president and administrator
4  of Gregory Rustand, Inc., what are your job duties?
5  A. I oversee the computer systems that come in in
6  the office. Work with staff, HR, making sure that
7  schedules are -- are out and met. And if someone has a
8  problem, they're welcome to come to me, talk with me.
9     I don't have a lot of direct contact with
10 clients. Most of my work is at the computer. I work
11 on policies and procedures. I'll work on whatever they
12 throw my way. I've cut myself back. I'm not full
13 eight hours a day, because I'm doing other things as
14 well now, so . . .
15 Q. How much time do you spend a day doing work
16 for Gregory, Inc. -- or Gregory Rustand, Inc.?
17 A. I would say that out of -- he's sitting right
18 there.
19     MR. RUSTAND: You're under oath.
20 A. Approximately four hours a day, on an average,
21 for Greg Rustand, Inc., and approximately two hours a
22 day for Rustand, Inc.
23 Q. What are your job duties in your role of
24 president -- role as president of Rustand, Inc.?
25 A. Again, it's mostly administrative, working

Page 27

1  with staff, policies, employees. I touch base with the
2  supervisors to see how things are going.
3  Q. What is your understanding of where A to Z
4  Legal Services falls in this --
5  A. It's a branch office in Moses Lake.
6  Q. Okay. It's a branch office of both of these
7  businesses or just one of them?
8  A. Just of Greg Rustand, Incorporated.
9  Q. In your capacity as vice president of Gregory
10 Rustand, Inc., how much contact do you have with the A
11 to Z branch office?
12 A. Not a lot. I used to have more contact. I go
13 over when they have computer program problems. If
14 someone's on vacation and they need an extra person on
15 staff, I'll come in and help out. I communicate with
16 Diane occasionally, but not on a real regular basis.
17 Q. Is Diane Pefley the highest manager of the
18 agency office?
19 A. In Moses Lake, yes.
20 Q. In Moses Lake, yes. Let's see, prior to
21 working for either one of these corporations, what was
22 your previous employment?
23 A. I was a mom. I -- I did tailoring. I did
24 housecleaning. I've worked in restaurants. That was
25 all after I moved to Washington state. Worked in a day

Page 28

1  care. Before I moved to the state, I was a model. And
2  worked in a restaurant. And I was a mom.
3  Q. That is a noble and time-honored profession.
4  When did you move to Washington state?
5  A. 1972.
6  Q. Have you lived in Bellingham all that time?
7  A. Yes, sir, Bellingham and Blaine, yes, sir.
8  Whatcom County.
9  Q. Are you a part owner of Gregory Rustand, Inc.,
10 or Rustand, Inc.?
11 A. Yes, sir.
12 Q. Are you a co-owner of both of those
13 corporations?
14 A. Yes, sir.
15 Q. Regarding Washington State Process Servers
16 Association, who controls that association?
17 A. The members.
18 Q. The members. All of the members collectively,
19 or does the board control?
20 A. I don't -- I don't understand exactly what
21 you're looking for in the answer here. Rephrase.
22 Q. I'll rephrase the question and clarify it a
23 bit. Who runs the day-to-day operations of WSPSA?
24 A. The -- the administrator, EO, director. In
25 this case, it would be Eric Vennes. I'm not sure of

Page 29

1  his exact title. I think it's executive director
2  or . . .
3  Q. Ms. Rustand, do you -- have you ever been
4  arrested or charged with a crime?
5  A. No, sir.
6  Q. Do you have -- have you ever served for the
7  United States military?
8  A. I have to say no, but my heart says yes. I
9  was an Air Force brat for 18 years.
10 Q. I -- that is a service.
11 A. Okay. Thank you.
12 Q. That is a service. But you never formally
13 served with the United States military?
14 A. That is correct.
15 Q. Ms. Rustand, do you know Diane Pefley?
16 A. Yes.
17 Q. Okay. What is the -- what is your -- or the
18 extent of your relationship with Ms. Pefley?
19 A. Business and friendship.
20 Q. For how long have you been friends with Ms.
21 Pefley?
22 A. I don't remember the year. I'd say we've been
23 friends seven or eight years.
24 Q. And how long have you conducted business with
25 Diane Pefley?

Page 30

1   A. Between six and seven years. I'd have to look
2   at the date. I don't remember the date.
3   Q. How did you meet Ms. Pefley?
4   A. At a WSPSA meeting, annual conference.
5   Q. Do you remember where or when?
6   A. I don't remember where we were or the year. I
7   just remember the meeting.
8   Q. Okay. My understanding is that your business
9   purchased A to Z from Diane Pefley. Is that correct?
10  A. Purchased?
11  Q. Well, how did you come to -- to have A to Z as
12  a --
13  A. We did a --
14  Q. -- Moses Lake branch?
15  A. We did a two-year merge with an option to then
16  become a primary.
17  Q. And what -- what year was that initiated?
18  A. That's the year I can't remember. I want to
19  say that was six or seven years ago. I'd have to pull
20  the paperwork on it, I'm sorry.
21  Q. And did you -- did you initiate that proposal?
22  A. My husband and I together.
23  Q. How knowledgeable are you about the Moses Lake
24  office for A to Z? Are you familiar with its
25  day-to-day operations?

Page 31

1   A. The general day-to-day operations, yes.
2   Q. Are you familiar with its client list?
3   A. Some of its clients, from when I've worked in
4   the office.
5   Q. Which clients are you familiar with?
6   A. The -- I've answered the phone and spoken to
7   some of the local attorneys in town. Clients in the
8   area. I have to scratch my head for names.
9   Q. Can you recall any names at this time?
10  A. Of some clients?
11  Q. Right.
12  A. ABC, Legal Couriers, Pronto, Armada, Black,
13  Northwest Legal, Polanski. I always have a hard time
14  with that name. I don't know. I don't know all their
15  clients' names.
16  Q. Okay. Who is Black?
17  A. An attorney. I can't -- I think her name is
18  Barbara Black, an attorney. Just people we do business
19  with.
20  Q. Is Polanski also an attorney?
21  A. Yes. And she's probably going to tell me I
22  said those names wrong. I don't know them personally.
23  I just -- from answering the phone.
24  Q. How often do you and Diane Pefley speak or
25  otherwise communicate?

Page 32

1   A. Lately -- the last couple years, it's maybe
2   been two or three times a month.
3   Q. And what is the substance of those
4   communications?
5   A. Somewhat work related, somewhat personal, "How
6   are you doing?"
7   Q. Are you familiar with a man named Mark Owens?
8   A. Yes.
9   Q. Okay. What is your -- what is your
10  relationship with Mark Owens?
11  A. I know that I've met him at WSPSA meetings.
12  I've spoken to him on the phone regarding papers to and
13  from the office. I was a friend of his father's. I
14  know his mother and his father. So -- I don't think of
15  him as a close friend, but an acquaintance.
16  Q. Were you close friends with his mother and
17  father -- or father?
18  A. No, just through WSPSA. Just through the
19  meetings when we were first starting the association.
20  Q. Have you ever visited Mr. Owens?
21  A. I believe he had a WSPSA meeting one time in
22  his town. We went to his office to meet and then went
23  to a close restaurant to hold the meeting. They had a
24  board room or luncheon room, so we could have our lunch
25  together and meet.

Page 33

1   Q. Do you recall what year that was?
2   A. No.
3   Q. How often have you spoken with Mark Owens in
4   the past five years? Or how many times have you spoken
5   with Mr. Owens in the past five years?
6   A. If I speak to him three or four times a year,
7   that's a lot. That's probably about my average.
8   Q. In these conversations, do they concern your
9   sending business to him?
10  A. They have regarded process, yes.
11  Q. Do they concern his sending business to you?
12  A. Yes, service of process, either direction.
13  Q. Ms. Rustand, are you aware of competitors for
14  A to Z in the -- in the Moses Lake area?
15  A. I know of AMPM, Darwin Hines.
16  Q. Other than the -- the Hineses, are you
17  familiar with any other competitors?
18  A. Not that I can recall.
19  Q. Ms. Rustand, are you familiar with a person
20  named Robert Lack?
21  A. No.
22  Q. Have you ever heard the name Robert Lack prior
23  to the -- this lawsuit?
24  A. No.
25  Q. Have you ever met Mario Torres?

Page 34

1  A. No.
2  Q. Have you ever spoken with Mario Torres?
3  A. No.
4  Q. Has anyone ever spoken about Mario Torres to
5  you prior to this lawsuit?
6  A. No.
7  Q. Has anyone ever spoken to you concerning Casey
8  Investigations prior to this lawsuit?
9  A. No.
10 Q. Are you aware of Casey Investigations?
11 A. Now.
12 Q. Were you aware of Casey Investigations prior
13 to the lawsuit?
14 A. No.
15 Q. Has Diane Pefley ever discussed Mario Torres
16 or Casey Investigations with you prior to the -- this
17 lawsuit?
18 A. No.
19 Q. Were you aware of any participation by Ms.
20 Pefley in an investigation into Mario Torres or Casey
21 Investigations?
22 A. No.
23 Q. Ms. Rustand, I'd like to ask you some
24 questions about your relationship with Gregory Rustand.
25 He is your husband; is that correct?

Page 35

1  A. Yes.
2  Q. And how long have you been married?
3  A. 19 years.
4      MR. RUSTAND: Then I got it right.
5      MR. MYHRE: Good for you.
6      MR. RUSTAND: Seems longer.
7      THE WITNESS: We've been together longer.
8  Q. Ms. Rustand, how closely do you work with your
9  husband in your businesses?
10 A. Normally, it was very close. The last two
11 years, it has not been close -- in business.
12 Q. And when you say worked "very close," what do
13 you mean?
14 A. Prior to two years ago, I was there quite a
15 bit. Actually two -- it would be . . . Up until about
16 July -- June, July of 2002, I was there full-time and
17 working very close and very active with the business.
18 And after that time, I had to pull away and cut my
19 hours back.
20 Q. Why did you pull away and cut your hours back?
21 A. Because my father was dying of Alzheimer's and
22 I took care of him until the end of his life. I was
23 his guardian, and I took care of him.
24 Q. Have you -- have you since returned to working
25 closely with your husband?

Page 36

1  A. I'm getting back into the working field.
2  We -- I still help care for his grandmother now who
3  lives with us who has dementia. So I do go in as much
4  as possible.
5  Q. How closely have you worked with Diane Pefley
6  regarding A to Z?
7  A. In the beginning, quite closely, when we were
8  setting up computers and setting up programs and
9  procedures and what have you. Over the last two and a
10 half years, not as closely. Only as a -- on a on-need
11 basis. When someone is on vacation or there is a
12 problem with some equipment, then I'll go over and
13 assist in any way I can.
14 Q. So it's fair to say because of your family
15 concerns, you've withdrawn from a great deal of your
16 business activities. Is that correct?
17 A. It's consumed a lot of my time lately.
18 Q. Ms. Rustand, prior to the institution of this
19 lawsuit, were you aware of any complaints -- and by
20 "complaint," I don't mean complaint as in something
21 that starts a lawsuit. I mean, complaint as in
22 something that starts an investigation -- of any
23 complaints regarding Mario Torres to the Liquor Control
24 Board?
25 A. No.

Page 37

1  Q. Has anyone ever discussed or are you aware of
2  any rumors concerning Mario Torres?
3  A. Prior to this lawsuit?
4  Q. Prior to this lawsuit.
5  A. No.
6  Q. Ms. Rustand, do you own a cell phone?
7  A. Yes, sir.
8  Q. What is the number of your cell phone?
9  A. (360) 739-0721.
10 Q. And who is the service provider for the cell
11 phone?
12 A. Verizon.
13 Q. And how long have you had that number and the
14 service provider?
15 A. For as long as I've had a cell phone.
16 Q. How long is that?
17 A. '90, 1990 area, early '90s.
18 Q. Do you know -- do you have any other phones?
19 A. Business phones.
20 Q. Is your business phone the same as your
21 husband's?
22 A. Yes, sir.
23 Q. Okay. And who is the service provider for
24 that phone?
25 A. We work with a company called UCI, which is

Page 38

1  United Communications, Incorporated, as well as Quest
2  and ATG handles two lines and Internet. And I believe
3  Sprint does part of the long distance.
4      Q. Well, that's certainly a lot of providers. Do
5  you have the phone records from the business, or
6  does --
7      A. They're maintained in the corporate office by
8  our bookkeeper.
9      Q. How far back do those phone records go?
10     A. I honestly couldn't tell you, but I do believe
11 we hold records up to five years. But I'm not sure
12 about the phone records.
13     Q. And what about your cell phone? Are there --
14 do you have records regarding your cell phone for the
15 past five years?
16     A. Well, my bookkeeper would have them, but I
17 don't know how long she keeps them.
18     Q. Who is the service provider for your home
19 phone?
20     A. Verizon.
21     Q. And for how long have they been the service
22 provider for your home phone?
23     A. I'd say, ten or 11 years, unless it was Quest
24 before that. I don't know. I don't remember.
25     Q. Ms. Rustand, have you ever attempted to

Page 39

1  recruit anyone for the Washington State Process Servers
2  Association for membership?
3      A. Yes.
4      Q. And could you please describe that
5  recruitment.
6      A. When I attend like a national meeting or
7  another state association meeting, I would bring our
8  directory and our handbook and show it to people. And
9  on the last page, I believe, of the directory is an
10 application form inviting people to join, which also is
11 available on the Web site.
12     Q. Do you ever independently provide an
13 application to a prospective member?
14         MR. WINSKILL: Independently of what?
15         MR. MYHRE: Independent of the handbook.
16     A. You mean, the directory?
17     Q. Or of the directory.
18     A. I believe at the annual conference, WSPSA
19 prints out several of them and they're available on a
20 display table where the vendors go during a conference.
21 I haven't personally, no.
22     Q. Are you aware of Mr. Zorne ever having -- or
23 Zornes --
24     A. Robert Zornes.
25     Q. -- ever having recruited members to the

Page 40

1  association?
2      A. I'm assure -- I'm sure as EO, he did, yes.
3      Q. All right. Are you familiar with his methods
4  of recruiting?
5      A. I remember attending a state association --
6  this is through NAPPS -- state-chartered association
7  summit in Memphis -- I don't remember the year -- and
8  he invited people to join as affiliates. And he said,
9  you know, "We would welcome you as members. And anyone
10 who is interested, please contact me, and I'll provide
11 you an application." It was just a simple little --
12 during the introduction and greeting, which all the
13 people who were representing different state
14 associations did.
15     Q. And that was to solicit cross membership in
16 the organization; is that correct?
17     A. Yeah. If you want to be a member -- want to,
18 you know, join our group, feel free.
19     Q. Are you aware of his recruiting any members
20 inside Washington state for the association?
21     A. I would only be able to assume that he did. I
22 don't -- didn't witness any.
23     Q. Are you familiar with a man named Dennis
24 Copeland?
25     A. Yes.

Page 41

1      Q. How long have you known Dennis Copeland?
2      A. I believe I met him shortly after WSPSA was
3  formed, probably within the first year or so after
4  WSPSA was formed. So we're talking 19 years, maybe.
5      Q. Did you meet him through the association?
6      A. Yes, I did.
7      Q. Was he a member of the association at that
8  time?
9      A. I believe he joined shortly after we formed,
10 if he wasn't there at the beginning. I don't remember.
11     Q. Do you know if he's currently a member of the
12 association?
13     A. Yes, he is.
14     Q. Are you familiar with someone named Rachel
15 Montgomery?
16     A. No.
17     Q. Ms. Rustand, I'd like to ask you some
18 questions about your affirmative defenses in this case.
19 As you --
20         MR. WINSKILL: That means we're getting near
21 the end.
22         MR. MYHRE: It may, at that.
23     Q. Ms. Rustand, were you served with a summons
24 and complaint in this matter?
25     A. Yes.

11 (Pages 38 to 41)

Page 46

1    MR. MYHRE: Other than what she's already
2 said.
3    A. No.
4    Q. Ms. Rustand, have you ever spoken with anyone
5 from Evergreen Financial Services regarding Mario
6 Torres or Casey Investigations?
7    A. No.
8    Q. Have you ever spoken with anyone from Yakima
9 County Credit Services regarding Mario Torres or Casey
10 Investigations?
11   A. No.
12   Q. Have you ever had any communications with
13 anyone from Pronto Process Service, Inc., regarding
14 Mario Torres or Casey Investigations?
15   A. No.
16   (Ms. Pefley entered.)
17   Q. Have you ever had any conversation or other
18 communications with anyone from A to Z regarding Mario
19 Torres or Casey Investigations?
20   A. Not since this action began, no.
21   Q. And since this action began?
22   MR. WINSKILL: You mean, since it began or not
23 before it began?
24   THE WITNESS: I mean, since I got legally
25 served and I had to call and ask what I was getting

Page 47

1 served with. I didn't know anything about it.
2    MR. WINSKILL: Oh, okay. Whatever. Ask
3 another question.
4    Q. So, prior to your being served in this
5 lawsuit, had you communicated with anyone at A to Z
6 concerning Mario Torres or Casey Investigations?
7    A. No.
8    Q. All right. Have you had any communications
9 with anyone at Armada regarding Mario Torres or Casey
10 Investigations?
11   A. No.
12   Q. Have you had any communications with the
13 Liquor Control Board regarding Mario Torres or Casey
14 Investigations?
15   A. No.
16   Q. And when I'm asking you "ever," that's -- I'm
17 not -- that's not limited to prior to the service of --
18   A. Ever.
19   Q. Ever, okay. Have you had any communications
20 with the Washington State Ethics Board concerning Mario
21 Torres or Casey Investigations?
22   A. No.
23   Q. Have you had any communications with any of
24 your clients or potential clients concerning Mario
25 Torres or Casey Investigations?

Page 48

1    A. No.
2    Q. Are you aware of anyone in your employ having
3 any communications with any of your clients or
4 potential clients concerning Mario Torres or Casey
5 Investigations?
6    A. Prior or -- before or -- during? I don't
7 understand the question.
8    Q. At all.
9    A. At all. Ever at any time?
10   Q. Yeah.
11   A. Clients. Just what I heard here today.
12   Q. And what do you recall hearing today regarding
13 those communications?
14   A. That Diane testified that she had talked to
15 somebody. I don't remember the name.
16   Q. Other than this -- that testimony, do you have
17 any other awareness of communications from anyone in
18 your employ to clients or potential clients regarding
19 Mario Torres or Casey Investigations?
20   A. No.
21   Q. Have you retained any experts in this matter?
22   A. No.
23   Q. Ms. Rustand, approximately what volume of
24 business do you refer to other WSPSA members on a
25 yearly basis?

Page 49

1    A. I don't work in that division in the office,
2 so I couldn't answer that. I'd have to have someone
3 pull the numbers for me, because I don't -- I don't
4 work in that.
5    Q. Who -- who would pull those numbers for you?
6    A. From Moses Lake, it would be Diane, and from
7 Bellingham, it would be Monica, or the easiest would be
8 the bookkeeper.
9    Q. When you say "Monica," who is Monica?
10   A. Unser.
11   Q. Could you spell that last name.
12   A. U-n-s-e-r. Or the bookkeeper, Mary Hone.
13 Other than that, I don't know who would be the better
14 person to do it.
15   Q. I'd like to show you some of the exhibits that
16 we've looked at earlier today to see if you have ever
17 seen these documents before.
18   MR. MYHRE: Could we please show her
19 Exhibit-No.-14.
20   Q. Ms. Rustand, have you ever seen Exhibit-No.-14
21 before?
22   A. Not before today.
23   MR. MYHRE: Okay. Would you please show the
24 witness Exhibit-No. -- I believe it's 15 or 13 --
25 Exhibit-No.-13.